**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| DEVIN B. WEISLEDER,<br><br>*Plaintiff*,<br><br>v.<br><br>KINDERHOOK INDUSTRIES, LLC,<br>**Serve:** Corporation Service Company, Registered Agent<br>251 Little Falls Drive<br>Wilmington, Delaware 19808<br><br>and<br><br>PDPP HOLDINGS, LLC,<br>**Serve:** Corporation Service Company, Registered Agent<br>251 Little Falls Drive<br>Wilmington, Delaware 19808<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. ___________ |

## COMPLAINT

Plaintiff, Devin B. Weisleder ("**Plaintiff**" or "**Weisleder**"), by counsel, states as follows for his Complaint against Defendants, Kinderhook Industries, LLC ("**Kinderhook**)" and PDPP Holdings, LLC ("**PDPP**" or "**the Company**" and, together with Kinderhook, the "**Defendants**").

## INTRODUCTION

1. This action arises from Defendants' material misrepresentations and omissions made at the time of closing concerning PDPP's liquidity, capital structure, and ability to fund operations through a represented period of time. Those statements were made to induce Weisleder to accept $6,000,000.00 in PDPP equity as part of the consideration for the sale of his company, EcoKind, LLC ("**EcoKind**"). In truth, PDPP was materially undercapitalized at closing, and the equity issued to Weisleder was impaired from inception.

2. Weisleder founded EcoKind in 2017 and established it as a leader in the production and distribution of premium, all-natural dog chews, achieving approximately $14 million in sales prior to its sale to PDPP.

3. Kinderhook is a private equity company that, in March 2020, began assembling a portfolio of companies in the pet food and pet treat market. PDPP was one of those acquisitions and, when Weisleder sold EcoKind, PDPP served as the holding company for the various entities acquired by Kinderhook.

4. Attracted to EcoKind's success, Defendants aimed to integrate EcoKind into their portfolio, and they initiated negotiations with Weisleder for the acquisition of EcoKind.

5. Throughout these negotiations, Defendants made material misrepresentations and omissions concerning the financial condition, capital structure, and operational viability of PDPP. Those misrepresentations and omissions centered on false assertions that PDPP had adequate liquidity.

6. Weisleder relied on these misrepresentations and omissions in agreeing to proceed with the transaction on revised valuation terms, including a $300,000.00 EBITDA reduction imposed in late January 2022, and in accepting $6,000,000.00 in PDPP equity as part of the consideration.

7. In connection with that reduction in EBITDA, on or about January 27, 2022, Kinderhook's Chairman, Tom Tuttle ("**Tuttle**"), represented that Weisleder would receive $500,000.00 per year for two years in consulting compensation to "make it right," which Weisleder understood as bona fide compensation and additional economic consideration supporting the transaction.

8. In reality, the equity he received was materially impaired at inception due to undisclosed liquidity and capital structure fragility.

9. Over the following two years, Defendants repeatedly assured Weisleder of the Company's stability, while simultaneously denying him access to critical information and concealing the discrepancies between their pre-closing promises and the true financial state of the Company.

10. It was not until April 29, 2024, when Weisleder learned for the first time of a previously undisclosed December 2023 preferred equity raise and its dilutive and subordinating terms, that the true capital fragility of the Company at the time of closing became apparent.

11. The structure of that raise, and the necessity of issuing senior preferred units, revealed that PDPP lacked the liquidity and capital stability represented at closing. Subsequent financial disclosures obtained in 2026 confirmed the severity of the liquidity shortfall and capital impairment that had existed from inception.

12. In January 2025, Weisleder learned from a then-employed senior executive that Kinderhook had begun self-financing PDPP in late 2024 and intended to continue doing so because PDPP could not sustain operations from its own revenues. Weisleder further learned that external credit capacity, including borrowing-base availability, had been exhausted.

13. This disclosure confirmed that the Company's liquidity was dependent on sponsor capital and not supported by operating performance. These conditions were inconsistent with Defendants' pre-closing representations that PDPP possessed sufficient liquidity and capital stability to operate through the represented runway period without sponsor rescue financing.

14. As a direct result of Defendants' fraudulent scheme, Weisleder suffered damages including the total loss of his equity investment of $6,000,000.00.

## THE PARTIES

15. Weisleder is a resident of the Commonwealth of Virginia and the former owner of EcoKind. Weisleder later joined Primal to consult on e-commerce.

16. Kinderhook Industries, LLC is a Delaware limited liability company with its principal place of business in New York.

17. PDPP Holdings, LLC is a Delaware limited liability company with its principal place of business in Delaware.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa(a), because this case involves a question of federal law and a violation of the Securities Exchange Act of 1934.

19. This Court has personal jurisdiction over Defendants because Defendants transacted business with Weisleder in the Commonwealth of Virginia, purposefully directing communications into the Commonwealth, including the false statements challenged herein, thereby causing injury within the Commonwealth and this District.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants directed all the communications containing misstatements and omissions into this judicial district.

## FACTUAL BACKGROUND

*Kinderhook and Primal Pet Group*

21. Kinderhook is a private investment firm that has made over 500 investments and follow-on acquisitions since its inception in 2003. Kinderhook focuses on middle market

businesses with defensible niche market positioning. Its portfolio ranges from waste solution companies to primary care physician groups.

22. In 2020, Kinderhook was determined to enter into the lucrative and growing pet products industry. To establish its portfolio of companies involved in the pet products market, Kinderhook acquired several companies, including Holistic Hound, Inc. ("**Holistic Hound**"), Prairie Dog Pet Products, LLC ("**Prairie Dog**"), Himalayan Dog Chew, LLC ("**HDC**"), and Primal Pet Foods, Inc. ("**Primal Pet**").

23. Following Kinderhook's acquisitions of Prairie Dog and HDC, Kinderhook formed PDPP and Himalayan Holdings, Inc. ("**HHI**"), both Delaware entities, to hold the equity of these various entities. PDPP owns all issued and outstanding capital stock of HHI, which in turn owns all issued and outstanding equity interests of HDC.

24. On or about August 17, 2021, Kinderhook acquired Primal Pet, and consolidated Holistic Hound, Prairie Dog, HDC, and Primal Pet under one group: Primal Pet Group ("**Primal**"). PDPP functioned as the parent holding company through which Kinderhook organized and controlled these entities and their respective subsidiaries.

*Acquisition of EcoKind*

25. Weisleder founded EcoKind in 2017 to sell natural dog treats online via EcoKind's website and through Amazon. Approximately 95% of EcoKind's sales originated through Amazon. EcoKind had total annual sales of roughly $14 million before its acquisition by Kinderhook and PDPP.

26. In 2022, Defendants sought to acquire EcoKind. Defendants agreed to purchase EcoKind in exchange for $15,122,500.00 in cash and a $6,000,000.00 in PDPP equity interest.

That equity consisted of 6,000,000 Class A Common Units and 6,000,000 Investment Preferred Units. As part of the transaction, Weisleder was offered, and agreed to join Primal as a consultant.

27. Before or at closing, as set forth in greater detail herein, Defendants made a series of representations concerning PDPP's financial condition, operations, and prospects. During due diligence, PDPP provided Weisleder with Primal's financials, including the group's actual and projected performance. A copy of Primal Pet Group's Financials as provided to Weisleder is attached as **Exhibits A and B**.

28. During the due diligence period prior to closing, Defendants and their representatives had numerous direct oral communications with Weisleder in an effort to ensure that he was comfortable with the financial health and business prospects of PDPP and to induce him to sell EcoKind to Kinderhook to add its revenue and positive earnings to Kinderhook's pet food and pet treat portfolio.

29. On June 7, 2021, Weisleder had a call with Tuttle. During that call, Tuttle made numerous statements regarding the Company's then-present liquidity and capital position. Specifically, Tuttle represented that the Company had lending capacity through Comerica Bank ("**Comerica**") sufficient to support operations through the end of 2022. Tuttle further represented that Kinderhook had invested substantial capital to upgrade the Texas facility obtained through the Prairie Dog acquisition, including the purchase and installation of new freeze-drying equipment from Germany. He represented, based on the then-current financial position of the Company, that the Company's existing plan to sell the facility would generate significant liquidity and strengthen the Company's balance sheet, providing runway toward a sale of the Company within the following 12–18 months.

30. On July 9, 2021, Weisleder had back-to-back calls with Primal's then-CEO Ted Mischaikov ("**Mischaikov**") and Tim Simonds ("**Simonds**"), who at that time served on the Company's board of directors. During those calls, Mischaikov and Simonds reiterated the state of the Company's capital structure and liquidity previously described by Tuttle. They also stated that based on the then-current liquidity and equity position of the Company, its lending relationship with Comerica would provide sufficient operating liquidity through 2022, and that the planned sale of the Texas facility before that time would generate additional liquidity and balance sheet strength necessary to position the Company for a sale within the following 12–18 months. The calls with Mischaikov and Simonds also included broader discussion regarding Primal's growth initiatives, including expansion in the yak cheese treat market.

31. On November 10, 2021, Tuttle, Simonds, the then-president of HDC, and other Kinderhook team members attended an in-person meeting with Weisleder at his EcoKind facility in Ashland, Virginia. During that visit and a dinner later that evening attended by Tuttle, members of the Kinderhook deal team, representatives of Weisleder's investment bank, and Weisleder's accountant, Tuttle again described the same capital and liquidity structure plan previously conveyed to Weisleder, including that the Company's financing relationship with Comerica would support operations through 2022 and that, based on the Company's then-current capital and liquidity structure, the anticipated sale of the Texas facility would provide additional liquidity and balance sheet strength necessary to position the Company for a sale within the following 12–18 months.[1]

32. On January 27, 2022, Weisleder had a call with Tuttle during which Tuttle again described the Company's capital and liquidity position as stable. Tuttle reiterated that, given that

[1] Simonds did not attend the dinner on November 10, 2021.

stability, the Company's financing relationship with Comerica would support operations through 2022 and that the anticipated sale of the Texas facility would generate additional liquidity and balance sheet strength, positioning the Company for a sale within approximately 12–18 months.

33. Defendants represented that the quality-of-earnings analysis of EcoKind was objective, reliable, and appropriately normalized. Nevertheless, shortly before closing, Defendants imposed a $300,000.00 reduction to EcoKind's EBITDA that materially reduced the transaction valuation. Weisleder objected to this reduction as unsupported by accounting analysis or historical performance. In response, on or about January 27, 2022, Tuttle contacted Weisleder and offered $500,000.00 per year for two years under a consulting agreement to "make it right" and induced Weisleder to proceed with the transaction and accept rollover equity. Weisleder understood these payments to be bona fide consulting compensation, separate from purchase consideration, and relied on that representation in agreeing to close.

34. On March 15, 2022, Weisleder participated in a pre-closing integration call with Simonds, along with PDPP's COO and CFO, regarding the integration of EcoKind into PDPP's operations. During that call, Simonds again described the Company's capital and liquidity position as stable, and reiterated the previously described capital strategy, including that the Company's financing relationship with Comerica would support operations through 2022 and that the anticipated sale of the Texas facility would provide additional liquidity and balance sheet strength to support a sale of the Company within approximately 12–18 months.

35. On March 18, 2022, Weisleder had a follow-up call with Simonds regarding strategy and the integration of EcoKind's operations with HDC. During that call, Simonds again described the Company's capital and liquidity position as stable and reiterated that PDPP's financing relationship with Comerica would support operations through the end of 2022, while the

anticipated sale of the Texas facility would provide additional liquidity and balance sheet strength sufficient to position the Company for a sale within approximately 12–18 months.

36. On March 31, 2022, the parties conducted the closing call via Zoom. Tuttle and members of the Kinderhook deal team participated in the call along with Weisleder and his advisors. During that call, Tuttle expressed enthusiasm about completing the transaction and noted that Weisleder's decision to take equity reflected that he would be a "real partner" in the business. At no point during the closing process did Defendants disclose any liquidity constraints, capital shortfall, or other financial issues inconsistent with the liquidity and capital strategy previously described to Weisleder.

37. As set out above, at or prior to closing, Defendants assured Weisleder that PDPP had sufficient liquidity and lender support to operate through 2022 without emergency sponsor financing and that the anticipated sale-leaseback of the Texas facility would provide substantial additional operating runway, enabling a near-term exit.

38. Defendants conveyed that the Texas transaction was expected to generate significant net proceeds that would stabilize the Company's capital structure and fund operations for approximately 12–18 months following the sale.

39. Based on these representations, Weisleder understood that interim equity dilution or sponsor rescue capital would not be necessary before the anticipated exit process.

40. During the same pre-closing discussions described above, including the calls and meetings with Tuttle, Mischaikov, and Simonds, Defendants also represented that PDPP's operations and supply chain were sound, that its inventory quality was strong, and that the Company maintained sufficient inventory levels to support ongoing operations and lender financing. Defendants described the Company's supply chain execution as strong and scalable.

41. During the same pre-closing discussions described above, including the calls and meetings with Tuttle, Mischaikov, and Simonds, Defendants represented that PDPP had sufficient liquidity and financial flexibility to support growth initiatives, which included marketing expenditures, hiring, inventory purchases, and operational expansion, and that the Company was positioned to grow rather than contract. During those discussions, Defendants also represented that PDPP's financial statements fairly reflected the Company's performance and overall financial condition. Additionally, Tuttle, together with Simonds, represented that the transaction presented a compelling investment opportunity and that Weisleder could reasonably expect an exit within 18 to 24 months at a 5–6x return. Tuttle emphasized Kinderhook's broader track record of more than forty portfolio company sales to strategic buyers and portrayed PDPP as a scalable platform led by an elite and stable management team, capable of executing a near-term sale.

42. Defendants further described Primal and HDC as best-in-class businesses within their respective markets. Defendants did not disclose that prior platform acquisitions, including Holistic Hound and Prairie Dog, had already experienced significant operational failures and value destruction. In reliance on Defendants' statements, Weisleder agreed to sell EcoKind pursuant to an Asset Purchase Agreement (the "**Purchase Agreement**"), executed on or about March 31, 2022. A copy of the Purchase Agreement is attached as **Exhibit C.**

43. Concurrently, PDPP, EcoKind, and Weisleder executed a Contribution Agreement (the "**Contribution Agreement**") under which EcoKind transferred its goodwill and going concern value (the "**Contributed Assets**") to PDPP in exchange for 6,000,000 Investment Preferred Units and 6,000,000 Class A Common Units (collectively, the "**Equity Consideration**") issued to Weisleder. A copy of the Contribution Agreement is attached as **Exhibit D**. The Equity Consideration was assigned a combined transaction value of approximately $6,000,000.00. As

alleged herein, that equity was materially overvalued and impaired at issuance due to undisclosed liquidity distress and capital fragility existing at or before closing.

44. Immediately thereafter, PDPP Holdings entered into a Subsidiary Contribution Agreement (the "**Subsidiary Contribution Agreement**") providing that PDPP would transfer the Contributed Assets to HHI, which would then transfer them to HDC.

45. Upon execution of the foregoing agreements, EcoKind became part of Primal and Kinderhook's portfolios, and Weisleder joined Primal as a consultant to assist with their e-commerce strategy as Director of E-Commerce.

46. Weisleder bargained for total consideration of $21,122,500.00 for EcoKind. He received $15,122,500.00 in cash and $6,000,000.00 in equity consideration. As alleged herein, that equity was materially overvalued and impaired at issuance due to undisclosed liquidity distress, capital fragility, and structural subordination risk existing at or before closing.

*Defendants' Post-Closing Liquidity Misrepresentations and Concealment*

47. Following closing, Weisleder served on the Board of Directors of PDPP and, for a short period of time, participated in leadership calls. Soon after, however, Weisleder's access to company-level financial and capital-structure information was materially restricted, including limitations on board-level visibility, internal reporting access, and lender-related disclosures.

48. Although Weisleder received information concerning discrete operational and financial challenges after closing, he reasonably understood those developments as post-closing execution issues and business deterioration, not as evidence that Defendants' pre-closing representations regarding liquidity and capital stability had been false when made. In May 2022, during a leadership conference call, Simonds informed Weisleder and others that the Company was projecting cash exhaustion by late summer 2022.

49. Simonds did not disclose that PDPP had been materially undercapitalized at closing or that prior representations regarding runway and capital stability were false. Instead, the liquidity shortfall was characterized as a temporary operational and working capital issue being actively managed by Kinderhook and PDPP leadership, reinforcing Weisleder's understanding that the problem reflected post-closing execution challenges rather than falsity of pre-closing representations.

50. In August 2022, Kinderhook provided bridge financing to PDPP to support continued operations. The financing was described as temporary and customary sponsor support, and Weisleder understood it to reflect short-term working capital management rather than structural insolvency.

51. In late 2022, after turnover in the C-suite, Weisleder was removed from the Board without explanation and without continued access to board-level financial and capital planning discussions and information.

52. In early 2023, Weisleder learned that Comerica had classified PDPP's debt as non-accrual and had demanded repayment from the anticipated proceeds of the Texas facility sale. Management and Kinderhook characterized this development as part of the existing plan to use sale proceeds to pay down outstanding credit.

53. They did not disclose that the lender classification reflected deeper liquidity impairment existing at or before closing. Weisleder reasonably understood this as an issue to be resolved through the Texas transaction rather than evidence that prior liquidity representations had been false when made.

54. In January 2023, Weisleder received updated financial statements for PDPP. Although certain revenue presentations and line items differed from the pre-closing diligence

materials, overall performance metrics—including EBITDA—were broadly consistent with prior figures and did not suggest that PDPP had been materially undercapitalized at closing. While the reporting raised some questions regarding presentation and internal consistency, nothing in those materials indicated that Defendants' pre-closing liquidity or runway representations were false when made. Weisleder continued performing his operational responsibilities and focused on improving execution.

55. At that time, Weisleder did not have access to lender communications, capital planning materials, or full cash-flow reporting necessary to evaluate PDPP's underlying liquidity position. A copy of the January 2023 financial statements is attached as **Exhibit E**.

56. As 2022 progressed into 2023, Weisleder observed that PDPP was underperforming operationally relative to expectations. He understood these issues as execution challenges and management shortcomings rather than evidence that pre-closing liquidity representations were false.

57. As previously stated, in January 2023, Weisleder received a high-level operating P&L summary. He was not, however, provided with the full shareholder-level financial reporting required under the Amended and Restated Agreement, including complete balance sheets, cash flow statements, and comparative period analyses.

58. Unlike other equity holders who received financial reporting automatically from the Company's CFO, Weisleder was required to affirmatively request financial information. In February 2024 while still employed and a significant equity holder, he requested 2023 shareholder financials from PDPP's third CEO Jon Balousek ("**Balousek**"). Balousek declined to provide them and directed him to Tuttle. Only after citing the governing agreement did Weisleder receive limited quarterly figures, rather than the monthly shareholder reporting maintained in the ordinary course.

He was not provided with lender communications, capital planning materials, borrowing-base data, full balance sheets, cash flow statements, or cash-flow projections necessary to evaluate PDPP's liquidity position.

59. This restricted access to financial information prevented Weisleder from assessing whether PDPP's capital structure and liquidity condition at closing had been materially misrepresented.

60. On or about April 29, 2024, Weisleder learned for the first time that PDPP had completed a preferred equity financing in December 2023. That financing had not been disclosed to him at the time it was undertaken. The preferred raise was structured on terms senior to the existing common equity and was offered only to select insiders affiliated with Kinderhook and Company leadership.

61. The existence and structure of this financing revealed, for the first time, that PDPP's capital structure had been materially impaired and that substantial additional capital had been required to sustain operations. The preferred raise directly contradicted Defendants' pre-closing representations that PDPP possessed sufficient liquidity and runway to operate without sponsor rescue capital and to pursue a near-term exit. It was at this point that the prior liquidity shortfalls and operational deterioration cohered into evidence that PDPP had been undercapitalized at closing.

62. Prior to the December 2023 senior preferred financing, there were approximately 237,383,120 Investment Preferred Units outstanding. Weisleder owned 6,000,000 Investment Preferred Units and 6,000,000 Class A Common Units, issued as part of the EcoKind transaction.

63. In the December 2023 financing, PDPP issued approximately 56,000,000 new Senior Preferred Units. These Senior Preferred Units were expressly senior to the existing

Investment Preferred Units and carried a 2.5x liquidation preference, entitling the new investors to receive 2.5 times their invested capital before any distributions could be made to prior equity holders. Following the transaction, the total outstanding equity increased materially, and the newly issued Senior Preferred Units sat structurally ahead of Weisleder's units in the capital stack.

64. The issuance of the Senior Preferred Units demonstrated that PDPP required substantial new capital on terms senior to existing equity in order to sustain operations. The structure and timing of the financing directly contradicted Defendants' pre-closing representations that PDPP possessed sufficient liquidity and runway to operate without sponsor rescue capital and to pursue a near-term exit.

65. Following his discovery of the December 2023 preferred financing on April 29, 2024, Weisleder requested a complete and updated capitalization table from Tuttle to assess the impact of the transaction. Tuttle provided Weisleder with a capitalization table reflecting the newly issued Senior Preferred Units, but informed Weisleder that the Amended and Restated Agreement did not require that he be notified of, or included in, the financing. This reinforced that Weisleder had no automatic access to capital-structure information and had not been provided advance notice of the transaction that materially subordinated his equity. A copy of the updated capitalization table is attached as **Exhibit F**.

66. In January 2025, Weisleder learned from a then-current senior executive that PDPP had exhausted the approximately $56 million raised in the December 2023 preferred financing before the end of 2024 and that Kinderhook had begun self-financing the Company's ongoing operations, with plans to continue doing so pending a future sale. This confirmed that PDPP was unable to sustain itself through operations or third-party borrowing and required continuing sponsor capital support.

67. Within weeks after closing, Weisleder personally observed significant quantities of visibly defective inventory at the HDC facility. Mold-contaminated yak chews were being washed and dried in an attempt to salvage them, a process that frequently produced large quantities of cracked and dried-out chews as by-products. Weisleder was told that certain defective chews, including the cracked products, could potentially be ground down and reworked into new product, although that process required significant time, labor, and specialized ingredients that were difficult and expensive to obtain. At that time, however, Weisleder did not have access to the Company's internal financial reporting and had no visibility into how such inventory was reflected on PDPP's balance sheet.

68. By late summer 2023, while still employed by PDPP, Weisleder learned that impaired inventory remained carried on the Company's books at full wholesale value and had not been written down. In or around October 2023, he raised this issue by email with Tuttle and the Company's CEO, Balousek. At that time, however, Weisleder understood the issue as further evidence of operational dysfunction and weak financial controls, not as evidence that PDPP had been materially undercapitalized at the time of closing.

69. By January 2025, Weisleder further learned that impaired inventory at HDC had grown to approximately $3 million, and that additional impaired inventory existed at Primal Pet Foods during 2022. Upon information and belief, these inventory balances were included in borrowing-base reporting and factored into lender availability calculations. By doing so, the Company submitted borrowing base certificates to its lender wherein 30% of the inventory it borrowed against was not saleable. The inclusion of impaired inventory at full value materially overstated the Company's reported asset base and liquidity position.

70. Following closing, Defendants progressively limited Weisleder's access to operational and financial visibility. He was removed from the Board without explanation and excluded from leadership reporting channels, cutting off access to internal reporting systems, financial systems, and performance metrics.

71. Defendants further restricted Weisleder's access to information concerning liquidity, financing, governance, and lender status. Although he continued to receive occasional high-level operational updates, he was not provided with lender communications or status, capital planning materials, borrowing-base reporting, cash flow projections or comprehensive shareholder financial statements sufficient to evaluate PDPP's liquidity position.

72. Despite his entitlement under the Amended and Restated Agreement to regular financial reporting, Weisleder did not receive complete shareholder-level financial statements — including balance sheets and cash flow statements for 2022 and 2023 — until February 2026, after repeated requests. Those financial statements reflected material increases in liabilities, the addition of significant new debt in 2022, and capital restructuring activity in 2023. These developments were inconsistent with Defendants' prior representations that PDPP was adequately capitalized and possessed sufficient runway to operate without sponsor rescue capital.

73. Throughout this period, the relevant financial and lender information remained within the exclusive control of Defendants.

*Defendants' Material Misstatements and Omissions*

74. As described above, at or before closing, Defendants made misrepresentations concerning PDPP's liquidity, capital structure, lender relationships, and ability to fund operations through the represented runway period. Defendants omitted material information necessary to make those statements not misleading, including information concerning PDPP's true liquidity

position, borrowing-base capacity, lender posture, and the foreseeability of near-term sponsor financing. These misrepresentations and omissions were made to induce Weisleder to accept equity consideration in PDPP in connection with the EcoKind transaction.

75. In truth, at the time of closing PDPP's liquidity position, borrowing-base capacity, and lender posture were materially weaker than represented. Contemporaneous internal reporting reflected a cash burn and working capital profile that did not support the represented runway through 2022. Comerica had imposed constraints on credit availability, and borrowing-base calculations included inventory of impaired or limited realizable value. Given PDPP's liquidity trajectory at closing, near-term sponsor financing was reasonably foreseeable.

76. At closing, PDPP was materially undercapitalized relative to its operating cash burn and debt structure. Based on contemporaneous liquidity forecasts, working capital requirements, and lender constraints available to Defendants at that time, the need for additional capital in the near term was known or recklessly disregarded. Any such capital raise would necessarily dilute or subordinate existing equity holders, including Weisleder. Consistent with this liquidity profile, PDPP required sponsor bridge financing within months of closing.

77. Defendants also represented that PDPP was positioned for a near-term exit within approximately 18–24 months at a 5–6x return. Given PDPP's undisclosed liquidity constraints, lender posture, and foreseeable need for dilutive or senior capital, such an exit was not reasonably attainable at the time the representation was made. The Company's capital structure and liquidity profile at closing were inconsistent with the represented timeline and return expectations.

78. The information necessary to evaluate PDPP's true liquidity position, borrowing-base capacity, lender posture, and capital planning remained within Defendants' exclusive control. At or before closing, that information was not disclosed to Weisleder. After closing, financial

information was provided sporadically and typically only after specific requests referencing the Amended and Restated Agreement. Weisleder did not receive standard shareholder-level financial reporting for 2022 or 2023, including complete balance sheets and cash flow statements. Nor was he provided lender communications, borrowing-base reporting, or liquidity forecasts sufficient to assess PDPP's liquidity or capitalization.

79. Upon information and belief, HDC's President held a majority ownership stake in Manaram, a principal supplier to HDC, and Manaram supplied product to HDC at marked-up prices without disclosure of the related-party nature of that relationship. In addition to the impaired and reworked inventory, the marked-up inventory was also included in borrowing-base calculations supporting lender availability. These practices materially overstated PDPP's reported inventory value and liquidity position at or before closing.

80. Weisleder understood the operational and inventory issues described above as execution challenges that could be addressed through improved management and controls. He did not understand those issues to reflect that PDPP had been materially undercapitalized at the time he accepted equity consideration. Without access to complete liquidity reporting, lender communications, and capital planning materials, he had no basis to conclude that the Company's capital structure and runway had been misrepresented at closing.

81. At the time of closing, Defendants possessed internal cash flow statements, balance sheets reporting, borrowing-base calculations, and lender communications that reflected PDPP's actual liquidity position and capital constraints. Those materials, which were not provided to Weisleder, showed a cash burn and working capital profile inconsistent with the represented runway through the end of 2022. Upon information and belief, internal projections also reflected

operating assumptions and cost structures materially more aggressive than those conveyed during diligence.

82. The December 2023 senior preferred financing—raised on terms senior to existing preferred equity—later confirmed the severity of the Company's capital fragility. The nature and structure of that financing support the inference that the Company's liquidity and capital position at closing were materially weaker than represented.

83. Defendants' misstatements and omissions concerning PDPP's liquidity, capital adequacy, lender posture, and runway were made in connection with the issuance of equity to Weisleder as part of the EcoKind transaction, and made to induce Weisleder to enter into the transaction, including by accepting equity in PDPP.

84. By failing to disclose material information necessary to make their representations not misleading, Defendants presented an inaccurate picture of PDPP's liquidity, capital stability and financing risk at closing. Weisleder reasonably relied on those representations in accepting equity consideration, and as a direct result of the Company's undisclosed capital fragility and subsequent dilutive financing, his equity interest was materially impaired.

## Count I

Violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5

85. Plaintiff incorporates by reference and realleges each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

86. The securities at issue include the 6,000,000 Investment Preferred Units and 6,000,000 Class A Common Units issued to Weisleder under the Contribution Agreement in connection with the EcoKind transaction.

87. In connection with the sale and issuance of those securities, and by use of the instrumentalities of interstate commerce, Defendants, directly or indirectly and with scienter:

a. Employed devices, schemes, or artifices to defraud;

b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities, including Plaintiff.

88. The material misstatements and omissions included, *inter alia*, representations concerning PDPP's liquidity runway through 2022, the stabilizing effect of the anticipated Texas transaction, the strength of the borrowing base and lender posture, the stability of the capital structure, and the absence of foreseeable need for senior or rescue financing.

89. Defendants made these statements and omissions knowingly or with reckless disregard for their falsity, given their access to contemporaneous cash-flow reporting, balance sheets information, borrowing-base calculations, internal projections, and lender communications reflecting PDPP's actual liquidity position at closing.

90. Plaintiff reasonably and justifiably relied on Defendants' representations and omissions in agreeing to sell EcoKind, accept equity consideration in PDPP, and enter into the related transaction documents.

91. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including material impairment of his equity interest, dilution and subordination resulting from subsequent senior financing, loss of negotiated economic consideration, and other damages to be proven at trial.

92. By reason of the foregoing, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, Devin B. Weisleder, respectfully requests that the Court enter judgment in his favor and award:

a. Compensatory damages in an amount to be proven at trial but no less than $6,000,000.00, plus pre- and post-judgment interest;

b. Plaintiff's costs and reasonable attorneys' fees as allowed by law; and

c. Such other and further relief as the Court deems appropriate.

DEVIN B. WEISLEDER

*/s/ Eric H. Feiler*

Eric H. Feiler (VSB No. 44048)
Jacqueline Hahn (VSB No. 101614)
WHITEFORD, TAYLOR & PRESTON LLP
1021 East Cary Street, Suite 2001
Richmond, Virginia 23219
Telephone: (804) 977-3300 | (804) 977-1243
Facsimile: (804) 793-8648 | (804) 977-1276
E-Mail: efeiler@whitefordlaw.com
jhahn@whitefordlaw.com