EXHIBIT C

**EXECUTION VERSION**

# ASSET PURCHASE AGREEMENT

**BY AND AMONG**

**HIMALAYAN DOG CHEW LLC,**

**DEVIN WEISLEDER**

**and**

**ECOKIND, LLC**

**DATED AS OF MARCH 31, 2022**

# TABLE OF CONTENTS

**Page**

ARTICLE I
TRANSFER OF TRANSFERRED ASSETS AND ASSUMED LIABILITIES; DETERMINATION OF PURCHASE PRICE; CLOSING; CLOSING TRANSACTIONS; TAX TREATMENT

Section 1.1 Transfer of Transferred Assets and Assumed Liabilities ........ 1
Section 1.2 Determination and Payment of the Estimated Purchase Price; Payment of the Equity Investment Amount ........ 2
Section 1.3 Closing; Closing Date ........ 3
Section 1.4 Deliveries at the Closing ........ 3
Section 1.5 Determination of Final Purchase Price ........ 5
Section 1.6 Allocation of Purchase Price; Tax Treatment ........ 7
Section 1.7 Withholding ........ 8

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF SELLER AND OWNER

Section 2.1 Organization and Power ........ 8
Section 2.2 Authorization of Transactions ........ 9
Section 2.3 Ownership ........ 9
Section 2.4 No Subsidiaries or Investments ........ 9
Section 2.5 Absence of Conflicts ........ 10
Section 2.6 Financial Statements ........ 10
Section 2.7 Undisclosed Liabilities ........ 11
Section 2.8 Certain Developments ........ 11
Section 2.9 Real Property ........ 13
Section 2.10 Tax Matters ........ 14
Section 2.11 Contracts and Commitments ........ 16
Section 2.12 Proprietary Rights ........ 19
Section 2.13 Litigation; Proceedings ........ 21
Section 2.14 Brokerage ........ 21
Section 2.15 Governmental Permits ........ 21
Section 2.16 Employees ........ 21
Section 2.17 ERISA ........ 23
Section 2.18 Affiliate Transactions ........ 24
Section 2.19 Compliance with Laws ........ 24
Section 2.20 Environmental Matters ........ 26
Section 2.21 Assets ........ 27
Section 2.22 Inventory ........ 27
Section 2.23 Accounts Receivable ........ 27
Section 2.24 Product Warranty; Product Recalls ........ 28
Section 2.25 Product Liability ........ 28
Section 2.26 Product Compliance ........ 28
Section 2.27 Material Customers ........ 29

Section 2.28 Material Vendors ....................29
Section 2.29 Insurance ....................30
Section 2.30 No Indebtedness; Pandemic-Relief Debt ....................30
Section 2.31 Business Names ....................31
Section 2.32 No Additional Representations ....................31

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF BUYER

Section 3.1 Organization and Power ....................31
Section 3.2 Authorization of Transaction ....................31
Section 3.3 Absence of Conflicts ....................31
Section 3.4 Brokerage ....................32
Section 3.5 Litigation ....................32
Section 3.6 No Additional Representations ....................32
Section 3.7 Independent Investigation ....................32
Section 3.8 Sufficiency of Funds ....................32
Section 3.9 Solvency ....................32

ARTICLE IV
CERTAIN COVENANTS AND AGREEMENTS

Section 4.1 Notices and Consents ....................32
Section 4.2 Certain Tax Matters ....................33
Section 4.3 Press Releases and Announcements; Confidentiality ....................34
Section 4.4 Further Assurances ....................35
Section 4.5 Accounts Receivable Payment ....................35
Section 4.6 Use of Marks ....................35
Section 4.7 Assignment of Property ....................35
Section 4.8 Employee Matters ....................35
Section 4.9 Insurance ....................36
Section 4.10 Business Premises ....................36
Section 4.11 Foreign Supplier Verification Programs ....................37

ARTICLE V
SURVIVAL; INDEMNIFICATION AND RELATED MATTERS

Section 5.1 Survival ....................37
Section 5.2 Indemnification ....................37
Section 5.3 Limitations on Indemnification ....................38
Section 5.4 Indemnification Procedure ....................39
Section 5.5 Knowledge No Affect ....................40
Section 5.6 Adjustment Treatment ....................40
Section 5.7 Exclusion of Other Remedies ....................40

ARTICLE VI
DEFINITIONS

Section 6.1 Defined Terms ....................40
Section 6.2 Interpretation ....................58

ARTICLE VII
MISCELLANEOUS

Section 7.1 Amendment and Waiver ....................59
Section 7.2 Notices ....................59
Section 7.3 Binding Agreement; Assignment ....................60
Section 7.4 Severability ....................60
Section 7.5 No Strict Construction ....................61
Section 7.6 Captions ....................61
Section 7.7 Entire Agreement ....................61
Section 7.8 Nondisclosure Agreement ....................61
Section 7.9 Counterparts ....................61
Section 7.10 Schedules and Exhibits ....................61
Section 7.11 No Third-Party Beneficiaries ....................61
Section 7.12 Governing Law ....................61
Section 7.13 Specific Performance ....................61
Section 7.14 Expenses ....................62
Section 7.15 Parties in Interest ....................62
Section 7.16 Waiver of Jury Trial ....................62
Section 7.17 Jurisdiction ....................62

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | – | Estimated Closing Net Working Capital Statement |
| Exhibit B | – | Estimated Purchase Price Statement |
| Exhibit C | – | Example Calculation of Net Working Capital |

Why was Agreement with Himalayan when assigned ownership to Holdings?

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**") is entered into as of March 31, 2022, by and among EcoKind, LLC, a Virginia limited liability company ("**Seller**"), Devin Weisleder ("**Owner**"), and Himalayan Dog Chew LLC, a Delaware limited liability company ("**Buyer**"). Buyer, Owner, Seller are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

WHEREAS, Seller is engaged in the Business (as defined herein);

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase and receive from Seller all of the Purchased Assets (as defined herein), in exchange for the consideration provided for in this Agreement, upon the terms of and subject to the conditions of this Agreement;

PDP is Parent of Himalayan.

WHEREAS, Seller desires to contribute to PDPP Holdings, LLC, a Delaware limited liability company that is the ultimate parent company of Buyer ("**Holdings**"), and Buyer desires to accept all of the Contributed Assets (as defined herein), pursuant to that Contribution Agreement, dated as of the date hereof (the "**Contribution Agreement**"), upon the terms of and subject to the conditions of the Contribution Agreement;

→ Includes Driving Equity.

WHEREAS, Owner holds all of the Equity Interests (as defined herein) of Seller and shall receive significant economic benefits from the sale of the Purchased Assets to Buyer and contribution of the Contributed Assets to Holdings;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition to the willingness of Buyer to enter into this Agreement, Seller and Owner shall enter into a restrictive covenant agreement with Buyer (the "**Restrictive Covenant Agreement**"); and

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition to the willingness of Buyer to enter into this Agreement, Owner shall enter into a new consulting agreement with Buyer (the "**Consulting Agreement**").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## TRANSFER OF TRANSFERRED ASSETS AND ASSUMED LIABILITIES; DETERMINATION OF PURCHASE PRICE; CLOSING; CLOSING TRANSACTIONS; TAX TREATMENT

Section 1.1 Transfer of Transferred Assets and Assumed Liabilities. Subject to the satisfaction of the conditions herein:

(a) Transfer of Contributed Assets. Upon the terms of and subject to the conditions of the Contribution Agreement, Seller agrees to contribute or otherwise to convey,

assign, transfer, deliver and set over to Holdings, at the Closing, all rights in, to and under all of the Contributed Assets, in each case free and clear of any Lien (other than Permitted Liens) or restrictions on transfer. Immediately after the receipt thereof, Holdings shall, without any further action, contribute the Contributed Assets to Buyer.

(b) Transfer of Purchased Assets. Seller agrees to sell or otherwise to convey, assign, transfer, deliver and set over to Buyer, at the Closing, all rights in, to and under all of the Purchased Assets (including the Business as a going concern), in each case free and clear of any Lien (other than Permitted Liens) or restrictions on transfer.

(c) Assumption of Assumed Liabilities. Except as specifically excluded pursuant to the provisions of this Agreement, Buyer agrees to assume, at the Closing, and thereafter pay, perform or discharge when due or required to be performed, as the case may be, the Assumed Liabilities. Buyer shall not assume or otherwise be responsible at any time for any Excluded Liability. Seller hereby covenants and agrees to satisfy and discharge each of the Excluded Liabilities as the same shall become due. Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Seller had this Agreement not been consummated.

(d) Method of Conveyance. The transfer and conveyance: (i) by Seller of the Contributed Assets to Holdings in accordance with Section 1.1(a) shall be effected on the Closing Date at the Closing by Seller's execution and delivery to Holdings of the Contribution Agreement and a bill of sale and contribution in a form reasonably acceptable to the Parties (the "**Bill of Sale**"); and (ii) by Seller of the Purchased Assets to Buyer in accordance with Section 1.1(b) shall be effected on the Closing Date at the Closing by Seller's execution and delivery to Buyer of instruments of transfer, including: (i) the Bill of Sale, (ii) one or more assignments of the Proprietary Rights in favor of Buyer in a form reasonably acceptable to Buyer (the "**Proprietary Rights Assignments**") and (iii) the Required Consents and Notices. The assumption by Buyer of the Assumed Liabilities from Seller in accordance with Section 1.1(c) shall be effected on the Closing Date at the Closing by Buyer's execution and delivery to Seller of an assumption agreement in a form reasonably acceptable to the Parties (the "**Assumption Agreement**").

Section 1.2 Determination and Payment of the Estimated Purchase Price; Payment of the Equity Investment Amount.

(a) For purposes of this Agreement, the following terms have the following meanings:

"**Adjustment Escrow Amount**" means an amount equal to $185,000.

"**Base Purchase Price**" means $21,122,500.

"**Estimated Purchase Price**" means the Base Purchase Price (i) decreased by the amount, if any, that the Target Net Working Capital exceeds the Estimated Closing Net Working Capital, or (ii) increased by the amount, if any, that the Estimated Closing Net Working Capital exceeds the Target Net Working Capital.

"**Target Net Working Capital**" means an amount equal to $1,850,416.72.

(b) Attached hereto as Exhibit A is a statement setting forth, based upon the books and records of the Business, Seller's reasonable good faith calculation of the Closing Net Working Capital (the "**Estimated Closing Net Working Capital**" and, such statement, the "**Estimated Closing Net Working Capital Statement**"), which shows that the Estimated Closing Net Working Capital is $2,299,174.75.

(c) Attached hereto as Exhibit B is a statement setting forth, the Estimated Purchase Price based on the Estimated Closing Net Working Capital, along with the allocation of how the Estimated Purchase Price is to be paid by Buyer in accordance with Section 1.2(d) (the "**Estimated Purchase Price Statement**").

(d) At the Closing (and as further described on the Estimated Purchase Price Statement), Buyer shall pay the Estimated Purchase Price in the following manner:

(i) the Adjustment Escrow Amount shall be deposited into the Adjustment Escrow Account pursuant to wire instructions provided by the Escrow Agent to Buyer;

(ii) any other payments to be made at Closing by Buyer, on behalf of Seller, as set forth on the Estimated Purchase Price Statement; and

(iii) subject to Section 1.2(e), the remaining amount of the Estimated Purchase Price minus the Rollover Amount to Seller pursuant to wire instructions provided by Seller to Buyer (such remaining amount, the "**Seller Payment Amount**").

(e) Issuance of Equity Consideration. At the Closing, as consideration for the contribution by Seller to Holdings of the Contributed Assets pursuant to the Contribution Agreement, Holdings shall issue to Seller the Equity Consideration pursuant to the Contribution Agreement.

Section 1.3 Closing; Closing Date. The consummation of the Contemplated Transactions (the "**Closing**") shall take place remotely via the electronic exchange of documents and signatures on the date hereof, unless another time, date or place is agreed in writing by the Parties. The date upon which the Closing actually occurs is referred to herein as the "**Closing Date.**"

Section 1.4 Deliveries at the Closing.

(a) Seller Closing Actions and Deliverables. At the Closing, Seller shall have delivered, or cause to be delivered, to Buyer all of the following duly executed documents and other items:

(i) Conveyance Documents. The Bill of Sale, the Proprietary Rights Assignments and the Assumption Agreement, each duly executed by Seller, and such other deeds, bills of sale and other instruments of assignment as Buyer reasonably deem

necessary in order to effect the sale of the Purchased Assets to Buyer and the contribution of the Contributed Assets to Holdings;

(ii) Required Consents and Notices. (A) Copies of all Consents (including those Consents set forth on Schedule 1.4(a)(ii), which shall be in full force and effect) in a form reasonably acceptable to Buyer and (B) evidence that all notices and filings identified on Schedule 1.4(a)(ii) have been made (collectively, the "**Required Consents and Notices**");

(iii) Domain Name Transfer. All documents, forms and authorizations, and such other actions as are necessary to: (A) effectuate the transfer of ownership and control of the Domain Name to Buyer, (B) cause the Domain Name to be registered or enable Buyer to register the Domain Name in the name of Buyer with the domain name registry designated in writing by Buyer; and (C) grant to Buyer the administrative and technical access to the Domain Name, and sole control over where the Domain Name points;

(iv) Escrow Agreement. An escrow agreement by and among Seller, Buyer and Escrow Agent (the "**Escrow Agreement**"), duly executed by Seller, which establishes an "adjustment" escrow account (the "**Adjustment Escrow Account**") into which the Adjustment Escrow Amount will be deposited;

(v) UCC-3's; Payoff Letters. Fully executed payoff letters and Lien and guarantee releases, in form and substance reasonably acceptable to Buyer, for all Indebtedness of Seller set forth on Schedule 1.4(a)(v), and evidence of the release of all Liens (other than Permitted Liens) on any Transferred Asset;

(vi) Form W-9. A properly completed and duly executed IRS Form W-9 from Seller (or, if Seller is disregarded as an entity separate from Owner for U.S. federal income tax purposes, from Owner);

(vii) Contribution Agreement. The Contribution Agreement, duly executed by Seller;

(viii) Officer's Certificate. A certificate, dated as of the Closing Date, of an officer of Seller with respect to Seller's Governing Documents and the resolutions adopted by its sole member authorizing and approving Seller's execution of this Agreement, the Transaction Documents and the consummation of the Contemplated Transactions;

(ix) Good Standing Certificate(s). A certificate, dated not earlier than the tenth (10th) Business Day prior to the Closing Date, of the Secretary of State of Virginia and any other states under the Laws of which Seller is qualified to conduct business stating that Seller is in good standing;

(x) Consulting Agreement. The Consulting Agreement duly executed by Owner;

(xi) Books and Records. Physical possession of all books and records, Permits, policies, Contracts, plans or other instruments of the Business;

(xii) Restrictive Covenant Agreements. The Restrictive Covenant Agreement, duly executed by Seller and Owner; and

(xiii) Other Closing Deliveries. Such other deliverables, certificates and documents as may be called for by this Agreement or any of the other Transaction Documents, or as Buyer shall reasonably request.

(b) Buyer Closing Actions and Deliverables. At the Closing, Buyer shall have delivered, or cause to be delivered, to Seller all of the following duly executed documents and other items:

(i) Escrow Agreement. The Escrow Agreement duly executed by Buyer;

(ii) Assumption Agreement. The Assumption Agreement duly executed by Buyer;

(iii) Contribution Agreement. The Contribution Agreement, duly executed by Holdings;

(iv) Consulting Agreement. The Consulting Agreement duly executed by Buyer;

(v) Restrictive Covenant Agreement. The Restrictive Covenant Agreement, duly executed by Buyer; and

(vi) Other Closing Deliveries. Such other deliverables, certificates and documents as may be called for by this Agreement or any of the other Transaction Documents, or as Seller shall reasonably request.

Section 1.5 Determination of Final Purchase Price.

(a) Following the Closing Date and in accordance with this Section 1.5, the Estimated Purchase Price shall be (i) increased by the amount, if any, by which the Closing Net Working Capital exceeds Estimated Closing Net Working Capital or (ii) reduced by the amount, if any, by which Closing Net Working Capital is less than the Estimated Closing Net Working Capital (such increase or reduction in accordance with clauses (i) or (ii) shall be referred to herein as the "**Adjustment Amount**").

(b) Within one hundred twenty (120) days following the Closing Date, Buyer shall prepare, or cause to be prepared, and deliver to Seller a proposed calculation of the Closing Net Working Capital (the "**Closing Net Working Capital Statement**"). During the thirty (30) days immediately following Seller's receipt of the Closing Net Working Capital Statement, Seller and its advisors shall have full reasonable access to the working papers and books and records relating to the Closing Net Working Capital Statement; *provided*, that any such access or

furnishing of such information shall be conducted during normal business hours under the reasonable supervision of Buyer's agents and in such a manner as not to interfere in any material respect with the normal operations of Buyer; and *provided*, *further*, that Seller shall treat all such information as confidential and hereby waives any right to use such information for any purpose other than in connection with the transactions contemplated by this Agreement and agrees to execute and deliver such customary waivers, limitations of liability and indemnification as are requested by Buyer to provide access to such work papers and records. The Closing Net Working Capital Statement shall become final and binding upon the Parties on the thirtieth (30th) day following receipt thereof by Seller unless Seller gives written notice of its disagreement (a "**Notice of Disagreement**") to Buyer prior to such date. Any Notice of Disagreement shall (x) specify in reasonable detail the nature and amount of any disagreement so asserted (and an alternative amount for each such disputed item) and (y) include a proposed calculation by Seller of the Closing Net Working Capital.

(c) If a timely Notice of Disagreement is received by Buyer, then the Closing Net Working Capital Statement shall become final and binding upon the parties on the earlier of (i) the date Buyer and Seller resolve in writing any differences they have with respect to any matter specified in the Notice of Disagreement and (ii) the date any matters properly in dispute are finally resolved in writing by the Accounting Firm pursuant to Section 1.5(d). During the thirty (30) days immediately following the delivery of a Notice of Disagreement, Buyer and Seller shall consult in good faith to resolve in writing any differences which they may have with respect to any matter specified in the Notice of Disagreement. During such consultation period, Buyer shall have full access to the books and records of Seller and the working papers of Seller's accountants prepared in connection with the Notice of Disagreement; *provided*, that any such access shall be conducted during normal business hours under the reasonable supervision of Seller's agents; and *provided*, *further*, that Buyer shall treat all such information as confidential and hereby waives any right to use such information for any purpose other than in connection with the transactions contemplated by this Agreement and agrees to execute and deliver to Buyer's accountants such customary waivers, limitations of liability and indemnification as are requested by such parties or their advisors to provide access to such work papers and records.

(d) At the end of such thirty (30) day consultation period, if Buyer and Seller have not resolved their disputes, Buyer and Seller shall submit any and all matters which remain in dispute to BDO USA, LLC (the "**Accounting Firm**"). The Accounting Firm shall work to resolve such dispute promptly and, in any event, within thirty (30) days from the date the dispute is submitted to the Accounting Firm. Any item not specifically referred to the Accounting Firm for evaluation shall be deemed final and binding on the Parties. In resolving the issues set forth in the Notice of Disagreement, the Accounting Firm shall (i) be limited to the unresolved issues set forth in the Notice of Disagreement, (ii) base its determination upon the terms and conditions of this Agreement and (iii) select with respect to each item in dispute an amount between or equal to Buyer's position as set forth in the Closing Net Working Capital Statement or Seller's position as set forth in the Notice of Disagreement. The Accounting Firm shall act as an expert (and not as an arbitrator) to determine the Closing Net Working Capital, based solely on presentations by Buyer and Seller (and not by independent review). The determination of the Closing Net Working Capital by the Accounting Firm shall be binding on the Parties.

(e) In the case of any dispute concerning the Closing Net Working Capital and/or Adjustment Amount, the fees and expenses of the Accounting Firm acting under Section 1.5(d) shall be borne proportionately by Buyer and Seller on the basis of the discrepancy (in dollars) between such Party's determination of disputed items (in the aggregate) as presented to the Accounting Firm and the final and binding determination of such disputed items (in the aggregate) by the Accounting Firm (*e.g.*, if Buyer is awarded 60% of the difference between its claim and the claim of Seller as presented to the Accounting Firm, then Buyer must pay 40% of the Accounting Firm's fees and expenses, and Seller must pay the remaining 60% of the Accounting Firm's fees and expenses). Buyer and Seller shall otherwise each bear their own costs and expenses incurred in connection with the preparation of the Closing Net Working Capital Statement and the Notice of Disagreement, as the case may be, and the determination of the Closing Net Working Capital and the Adjustment Amount, as the case may be, by the Accounting Firm.

(f) If the Adjustment Amount is an increase to the Estimated Purchase Price, (i) Buyer shall make (or cause to be made) a payment by wire transfer or delivery of other immediately available funds in the amount equal to such increase to Seller within ten (10) days of the final determination of the Adjustment Amount pursuant to this Section 1.5, and (ii) Buyer and the Seller shall deliver joint written instructions to, and shall take all other action required to cause, the Escrow Agent to pay to Seller (within ten (10) days of the final determination of the Adjustment Amount pursuant to this Section 1.5) the funds then remaining in the Adjustment Escrow Account by wire transfer of immediately available funds to the account designated by the Seller.

(g) If the Adjustment Amount is a decrease to the Estimated Purchase Price, Buyer and Seller shall deliver joint written instructions to, and shall take all other action required to cause, the Escrow Agent to pay to Buyer (within ten (10) days of the final determination of the Adjustment Amount pursuant to this Section 1.5) from the Adjustment Escrow Account by wire transfer of immediately available funds to the account designated by Buyer, an amount equal to such decrease. In the event that the Adjustment Escrow Account has insufficient funds to satisfy payment to Buyer of the entire amount of the Adjustment Amount, then the Seller and Owner shall, jointly and severally, make a payment to Buyer by wire transfer of immediately available funds in an amount (such amount, the "**Excess Adjustment Amount**") equal to (A) the Adjustment Amount minus (B) the amount delivered to Buyer from the Adjustment Escrow Account pursuant to this Section 1.5(g) within ten (10) days of the final determination of the Adjustment Amount pursuant to this Section 1.5.

(h) The Estimated Purchase Price as adjusted, if at all, pursuant to this Section 1.5, and the assumption of the Assumed Liabilities (to the extent not included in the final determination of the Closing Net Working Capital) shall be referred to herein as the "**Purchase Price.**"

Section 1.6 Allocation of Purchase Price; Tax Treatment. The Purchase Price (including any Liabilities that are considered to be an increase to the Purchase Price for federal income tax purposes and any other items that are required to be taken into account under the Code) shall be allocated among the assets of Seller in accordance with Schedule 1.6. The Parties agree to file (or cause to be filed) (i) all required Internal Revenue Service Forms 8594, Asset Acquisition Statement under Code Section 1060, and (ii) all other Tax Returns (including amended Tax

Returns and claims for refund) in a manner consistent with such allocation of the Purchase Price described in this Section 1.6 unless otherwise required by a determination within the meaning of Section 1313(a) of the Code. No Party will take a position on any report, return or other document filed with any Governmental Entity in any judicial or administrative proceeding, that is in any manner inconsistent with such allocation except as otherwise required by a determination pursuant to Section 1313(a) of the Code.

Section 1.7 Withholding. Buyer, Seller, the Escrow Agent and any other applicable withholding agent shall be entitled to withhold and deduct from the amounts otherwise payable to any recipient pursuant to this Agreement such amounts as may be required to be withheld or deducted under the Code or any other provision of federal, state, local or foreign Tax Laws (collectively, the "**Withholding Amount**"). To the extent a Withholding Amount is deducted or withheld, such Withholding Amount shall be treated for all purposes under this Agreement as having been paid to the Person to whom such Withholding Amount otherwise would have been paid.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER AND OWNER

As a material inducement to Buyer to enter into this Agreement and to consummate the Contemplated Transaction, Seller and Owner hereby, jointly and severally, make the representations and warranties set forth in this Article II as of the date hereof, or such other date as set forth below, except as otherwise set forth in written disclosure schedules (the "**Schedules**") delivered to Buyer prior to the execution hereof, a copy of which is attached hereto. The Schedules are numbered to correspond to the various sections of this Article II setting forth certain exceptions to the representations and warranties contained in this Article II and certain other information called for by this Agreement. No disclosure of a particular matter made in any particular Schedule shall be deemed made in any other Schedule unless expressly made therein (by cross-reference or otherwise) unless, and to the extent that a reasonable person reviewing such Schedule would conclude that a disclosure of a particular matter pursuant to a particular Schedule would also constitute a disclosure of such matter pursuant to another Schedule. The mere listing or inclusion of a copy of a document or other item shall not be deemed adequate to disclose an exception to any representation or warranty made herein (unless and only to the extent that such a representation or warranty pertains to the existence of the document or other item itself).

Section 2.1 Organization and Power. Seller is a limited liability company duly incorporated, formed or organized and validly existing and in good standing under the Laws of its jurisdiction of incorporation, formation or organization and, to the Seller's Knowledge, is qualified to do business in every jurisdiction in which the nature of its business or its ownership of property requires it to be qualified. Schedule 2.1 sets forth each jurisdiction in which the nature of the Business or the ownership of the Transferred Assets makes such qualification necessary. Seller has the full power necessary to own and operate its properties and carry on the Business as now conducted and as proposed by it to be conducted. The copies of Seller's Governing Documents which have been delivered to Buyer pursuant to this Agreement reflect all amendments made thereto at any time prior to the date of this Agreement and are true, complete and correct. The minute books of Seller are true, complete and correct (with respect to the subject matters contained therein) and have been made available to Buyer.

Section 2.2 Authorization of Transactions. Seller has full power and authority and Owner has full legal capacity to execute and deliver this Agreement and all other Transaction Documents to which they are a party, to perform their obligations hereunder and thereunder and to consummate the Contemplated Transactions. Seller and Owner have duly approved this Agreement and all other Transaction Documents to which they are a party and each of Seller and Owner is duly authorized to execute and delivery this Agreement and such Transaction Documents and the performance of its obligations hereunder and thereunder. No other proceeding or action on the part of Seller or Owner is necessary to approve and authorize the execution and delivery of this Agreement or any other Transaction Document to which Owner or Seller is a party to or the performance his, her or its obligations hereunder or thereunder. This Agreement constitutes, and each of the other Transaction Documents to which Owner or Seller is a party will when executed constitute, a valid and binding obligation of such Owner or Seller, as applicable, enforceable in accordance with its terms, except as the enforceability may be limited by (i) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar Laws in effect which affect the enforcement of creditors' rights generally or (ii) general principles of equity, whether considered in a Proceeding at law or in equity.

Section 2.3 Ownership. Owner directly owns all of the outstanding Equity Interests of Seller. Other than the ownership by Owner of outstanding Equity Interests of Seller, no other Person directly or indirectly owns any Equity Interest in any company, corporation or other Person that is in any portion of the Business. Except as set forth on Schedule 2.3, other than Seller, no other Person directly or indirectly owns any assets that are used in the Business, whether by Seller or otherwise. There are no outstanding or authorized options, warrants, rights, Contracts, calls, puts, rights to subscribe, conversion rights or other agreements or commitments to which Seller is a party, or which are binding upon Seller, providing for the issuance, disposition or acquisition of any Equity Interests of Seller. The Transferred Assets do not include any Equity Interests, investment in, or loan to (other than extensions of trade credit in the Ordinary Course) any other Person or any right which is exercisable or exchangeable for or convertible into any Equity Interest or investment in any other Person.

Section 2.4 No Subsidiaries or Investments.

(a) Seller does not own or control, directly or indirectly, any Equity Interest or similar interest in, or any interest convertible into or exchangeable or exercisable for, at any time, any Equity Interest or similar interest in, any Person.

(b) Seller does not have, and never has had, any Subsidiaries. Except as set forth on Schedule 2.4(b)(1), (i) Seller has not made, and does not hold the right to make, an Investment in any other Person, (ii) Seller does not have any obligation to acquire any Equity Interest or similar interest or make an Investment in any other Person, (iii) the business operations of Seller and the Business are not conducted through any Person other than Seller and (iv) no Insider owns or holds any beneficial interest in any other Person relating to the business operations of Seller or the Business. As of the Closing, neither Owner nor any of his respective Affiliates (other than Seller) shall (A) hold any tangible personal property or Proprietary Rights or (B) have any operations, in each case, that contribute to the conduct of the Business during the periods set forth in the Financial Statements.

Section 2.5 Absence of Conflicts. Except as set forth on Schedule 2.5, neither the execution, delivery and performance of this Agreement or any other Transaction Document by Seller or Owner nor the consummation by Seller or Owner of the Contemplated Transactions:

(a) does or will conflict with or result in any breach of any of the provisions of, constitute a default under, result in a violation of, give any third party the right to modify, terminate or accelerate any obligation under, trigger, in whole or in part, any material payment or material increased cost of the Business under, or result in the creation of any Lien upon any Transferred Asset, in each case, whether with or without the passage of time, the giving of notice or both, in each case under the provisions of:

(i) the Governing Documents of Seller;

(ii) any indenture, mortgage, lease, loan agreement or other agreement, instrument or Contract to which Seller is party to or is subject to or by which any Transferred Asset is bound;

(iii) any Permit or Certification owned or possessed by Seller or used in the Business; or

(iv) any Law by which Seller or any Transferred Asset is affected, or to which Seller or any Transferred Asset is subject to or bound by; or

(b) without limiting clause (a) above, requires any Consent of, other action by or notice or declaration to, or filing with, any Governmental Entity or any other Person.

Section 2.6 Financial Statements. Attached to this Agreement as Schedule 2.6 are true, complete and correct copies of the following financial statements (collectively, the "**Financial Statements**"):

of Seller.

(a) the internally prepared balance sheet of Seller as of the Three Most Recent Fiscal Year Ends and the related statements of profit and loss for the Three Most Recent Fiscal Years, together with the notes and other financial information included therewith; and

(b) the internally prepared balance sheet of the Business (the "**Latest Balance Sheet**") dated as of February 28, 2022, and the related statement of profit and loss for the two (2)-month period ended on such date.

Each such Financial Statement (in each case including the notes and other financial information included therewith, if any) has been prepared in accordance with GAAP (other than with respect to those referred to in clause (b), the absence of footnotes thereto and an accompanying statement of cash flows and subject to normal and customary year-end adjustments for recurring accruals (which shall not be material, either individually or in the aggregate)) and Seller's past practice (with consistent application of all rules, methods, policies, practices and procedures), is based upon the information contained in Seller's books and records, is true and correct in all material respects and presents fairly the financial condition of the Business as of such dates and the statements of income and cash flows of the Business for such periods are correct and complete. No accountant

of Seller has notified Seller of any weaknesses in internal accounting or other controls of Seller or the Business.

Section 2.7 Undisclosed Liabilities. Except as set forth on Schedule 2.7, neither Seller nor the Business has any material Liability of any nature (including any off-balance sheet liabilities or obligations other than (a) Liabilities specifically reflected in, fully reserved against or otherwise described in the Latest Balance Sheet; (b) Liabilities which have arisen after the date of the Latest Balance Sheet in the Ordinary Course (none of which is a Liability resulting from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, environmental matter, infringement, misappropriation, lawsuit or violation of Law); (c) Liabilities of Seller incurred pursuant to or in connection with this Agreement; (d) Liabilities that have been disclosed in the Schedules.

Section 2.8 Certain Developments. Since December 31, 2020, (i) there has not been any Material Adverse Effect and (ii) Seller has conducted the Business in the Ordinary Course. Without limiting the foregoing, except as set forth on Schedule 2.8, since December 31, 2020, Seller has not:

(a) except in the Ordinary Course, (i) incurred Indebtedness, (ii) assumed, guaranteed, endorsed or made other accommodations of the obligations of any other Person, any loans or advances to any other Person, or sales to customers on credit in connection with the Business, or (iii) incurred any known or asserted Liabilities in connection with the Business;

(b) suffered any material theft, damage, destruction or casualty loss to any portion of its assets (whether or not covered by insurance), experienced any changes in the amount and scope of insurance coverage or suffered any destruction of the books and records (in each case whether or not covered by insurance) of the Business;

(c) sold, leased, subleased, assigned, licensed, sublicensed, transferred, abandoned, permitted the cancellation of, or otherwise disposed of any portion of its assets (other than (i) dispositions of tangible assets in the Ordinary Course for fair consideration, and dispositions of tangible assets which have been replaced with assets of equal or greater value and utility, (ii) abandonment of immaterial Business Proprietary Rights that are no longer used in the Business, or (iii) non-exclusive licenses of Business Proprietary Rights granted to customers in the Ordinary Course);

(d) intentionally waived any right of material value in connection with the Business;

(e) accelerated, terminated, modified, amended, canceled or elected not to renew any Contract (or series of related Contracts) involving more than $10,000 (individually or in the aggregate) to which Seller is a party or by which Seller is bound;

(f) changed, in any material respect, the cash management practices or accounting methods or principles of the Business (including reporting income, deductions or other material items for financial accounting purpose), except as required by Law or by GAAP;

(g) created, imposed or otherwise incurred any Lien (other than a Permitted Lien or any Lien for which Seller has delivered to Buyer on the Closing Date an executed authorization for Buyer (or its senior lender) to file all appropriate UCC termination statements) upon any of its assets, tangible or intangible;

(h) incurred or committed to incur any capital expenditure (or any obligations or Liabilities in connection therewith) in connection with the Business (or series of related capital expenditures) either involving more than $10,000;

(i) made any capital investment in, any loan to, or any acquisition of (whether by merger, consolidation, purchase of Equity Interests, purchase of assets or otherwise) the securities or assets of, any other business or Person (or series of related capital investments, loans and acquisitions);

(j) delayed or postponed the payment of account payable and other Liabilities of the Business outside the Ordinary Course;

(k) cancelled the scheduled replacement, repair or maintenance of any of its assets outside the Ordinary Course;

(l) entered into any Labor Agreement, or modified, amended or extended the terms of any such existing agreement in connection with the Business;

(m) recognized or certified any labor union, labor organization, or group of employees of Seller as the bargaining representative for any employees of Seller;

(n) implemented any employee layoffs, plant closings, reductions in force, furloughs, temporary layoffs, salary or wage reductions, work schedule changes or other such actions that could implicate the WARN Act;

(o) hired, engaged, terminated (without cause), furloughed, or temporarily laid off any employee or independent contractor;

(p) waived or released any noncompetition, nonsolicitation, nondisclosure, noninterference, nondisparagement, or other restrictive covenant obligation of any current or former employee or independent contractor;

(q) established, adopted, entered into, amended or modified in any material respect or terminated any Plan;

(r) entered into any other transaction involving the Business in excess of $10,000 other than in the Ordinary Course, or materially changed any material business practice;

(s) entered into or amended any severance, retention, employment or change of control Contract for the benefit of any of its current or former directors, officers, employees, consultants or contractors;

(t) made or granted any bonus or any wage, salary or compensation increase or decrease in excess of $10,000 per year other than in the Ordinary Course to any employee or independent contractor of Seller, its Affiliates or the Business, except pursuant to the express terms of any Contract which is described on Schedule 2.11(a);

(u) intentionally omitted;

(v) declared, set aside or made any payments, dividend or distribution of cash or other property with respect to its Equity Interests, or purchased, redeemed or otherwise acquired any of its Equity Interests (including any capital stock, warrants, options or other rights to acquire its Equity Interests);

(w) made any material change in the manner in which the Business markets its products or services;

(x) made any material change in the manner in which the Business extends discounts or credits to, or otherwise deals with, customers;

(y) made any material changes in its cash management practices;

(z) to Seller's Knowledge, taken any action that could reasonably be expected to result in the loss, lapse, abandonment, invalidity or unenforceability of any Business Proprietary Rights, or disclosed any Trade Secrets included in the Business Proprietary Rights (except pursuant to a written confidentiality agreement in the Ordinary Course with reasonable protections of, and preserving all rights in, such Trade Secrets);

(aa) other than compensation and rent paid in the Ordinary Course, directly or indirectly engaged in any transaction or entered into, amended or terminated, any arrangement between Seller and any Insider;

(bb) (i) cancelled, compromised, forgiven, released or waived any claims other than those involving only the payment of monetary damages not in excess of $10,000, (ii) instituted any Proceeding or (iii) entered into any settlement, compromise, consolation or similar agreement with any Person (including any Governmental Entity);

(cc) made, changed or revoked any Tax election, changed any annual accounting period, adopted or changed any accounting method, amended any Tax Return, entered into any closing agreement, settled any Tax claim or assessment relating to Seller, surrendered any right to claim a refund of Taxes, or consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to Seller; or

(dd) to Seller's Knowledge, agreed or committed, whether in writing or orally, to do any of the foregoing.

Section 2.9 Real Property.

(a) Leased Real Property. Seller does not, nor has Seller ever owned, any real property. Schedule 2.9(a)(1) sets forth the address of each Leased Real Property, and a true and

complete list of all Leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each such Leased Real Property (including the date and name of the parties to such Lease document). Seller has delivered to Buyer a true and complete copy of each such Lease document, and in the case of any oral Lease, a written summary of the material terms of such Lease. Except as set forth on Schedule 2.9(a)(2), with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) the assignment of the Lease to Buyer pursuant to this Agreement does not require the consent of any other party to such Lease, will not result in a breach of or default under such Lease, or otherwise cause such Lease to cease to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (iii) Seller's possession and quiet enjoyment of the Leased Real Property under such Lease has not been disturbed, and there are no disputes with respect to such Lease; (iv) neither Seller nor, to Seller's Knowledge, any other party to the Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease; (v) no security deposit or portion thereof deposited with respect such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (vi) Seller does not, and will not in the future, owe any brokerage commissions or finder's fees with respect to such Lease; (vii) the other party to such Lease is not an affiliate of, and otherwise does not have any economic interest in, Seller; (viii) Seller has not subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; (ix) Seller has not collaterally assigned or granted any other security interest in such Lease or any interest therein; and (x) there are no Liens on the estate or interest created by such Lease.

(b) Real Property Used in the Business. The Leased Real Property identified in Schedule 2.9(a) and the Leasehold Improvements identified in Schedule 2.9(c) (collectively, the "**Real Property**") comprise all of the real property used by Seller in its operation of the Business. Other than Seller, there are no parties in possession or parties having any current or future right to occupy any of the Real Property. To Seller's Knowledge, the Real Property and Improvements and Seller's use thereof conform in all material respects to all applicable building, zoning and other Laws. All certifications necessary to Seller's current occupancy and use of the Real Property have been obtained, are in full force and effect and, to Seller's Knowledge, have not been violated. To Seller's Knowledge, there is no pending or threatened condemnation or other Proceedings affecting any portion of the Real Property or the Seller's use thereof.

(c) Improvements. Schedule 2.9(c) sets forth a description of all material Leasehold Improvements for each Leased Real Property. All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Real Property (the "**Improvements**") are reasonably sufficient for the operation of the Business as currently conducted by Seller. To Seller's Knowledge, there are no structural deficiencies or latent defects affecting any of the Improvements.

Section 2.10 Tax Matters.

(a) All Tax Returns required to be filed by or with respect to Seller or otherwise with respect to the Business have been timely filed, taking into account any applicable extensions. All Taxes due and owing by (or with respect to the operations of) Seller or otherwise with respect

to the Business (whether or not shown on any Tax Return) have been timely paid. With respect to the Business or any Transferred Asset, neither Seller nor any of its Affiliates is the beneficiary of any extension of time within which to file any Tax Return. Seller has not received notice of any claim, and to Seller's Knowledge no claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns with respect to the Business and/or the Transferred Assets that Seller is or may be subject to taxation by that jurisdiction. To Seller's Knowledge, there are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of Seller.

(b) Seller has timely withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party. Seller has complied in all material respects with applicable information returns or reporting requirements that are required to have been filed or provided by or with respect to the Business or any assets of Seller.

(c) No foreign, federal, state, or local Tax audits or administrative or judicial Tax Proceedings are pending or being conducted with respect to Seller, the Business and/or the Transferred Assets. Seller has not received from any foreign, federal, state, or local Taxing Authority (including jurisdictions where Seller has not filed Tax Returns) any (i) notice indicating an intent to open an audit or other review, or (ii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted, or assessed by any Taxing Authority against Seller.

(d) Seller has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e) Seller is not a party to any agreement, Contract, arrangement or plan that has resulted or could result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local or foreign Tax Law). Seller is not a party to or bound by any Tax allocation, indemnification or sharing agreement. Seller does not have any Liability for Taxes of any other Person as a transferee or successor, by contract, assumption, or otherwise.

(f) Seller has not participated in any "listed transaction" within the meaning of Treasury Regulations Section 1.6011-4(b)(2) and has not received or requested any letter ruling from any Tax authority regarding non-income Taxes or entered into any "closing agreement" within the meaning of Section 7121 of the Code (or applicable or analogous state Law) with any Taxing Authority.

(g) Seller does not have any obligation to gross-up, reimburse or indemnify any individual with respect to any Taxes, including those imposed pursuant to Sections 409A or 4999 of the Code.

(h) None of the Transferred Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code.

(i) Seller is not subject to, nor has Seller applied for, any private letter ruling, request for administrative relief, request for technical advice, request for a change of any method of accounting of the IRS or comparable rulings of any Governmental Entity, in each case, with respect to the Business.

(j) Seller, with respect to the Business, does not have a permanent establishment in any foreign country other than the country in which Seller is organized and does not and has not engaged in a trade or business in any foreign country other than the country in which Seller is organized. Seller, with respect to the Business, does not have any Tax nexus or other taxable presence in any jurisdiction other than jurisdictions in which Seller files Tax Returns.

(k) Seller is registered for the purposes of sales Tax, use Tax, Transfer Taxes, value-added Taxes, or any similar Tax in all jurisdictions where it is required by Law to be so registered, and has complied in all material respects with all Laws relating to such Taxes (including by receiving and retaining any appropriate Tax exemption certificates and other applicable documentation).

Section 2.11 Contracts and Commitments.

(a) Generally. Except for the Transaction Documents and as set forth on Schedule 2.11(a), Seller is not party to or bound by, and Seller is not, in each case, in connection with the Business, nor is any Transferred Asset subject to any written or oral:

(i) collective bargaining agreement or any other Contract with any labor union, labor organization, works council or employee association or other bargaining representative (each, a "**Labor Agreement**"), or severance plans, agreements, programs, policies or arrangements;

(ii) pension, bonus, synthetic equity, sale bonus, profit sharing, stock option, employee Equity Interest purchase or other plan, program, policy, agreement or arrangement providing for deferred or other compensation to employees;

(iii) (A) Contract for the employment or engagement of any individual employee or service provider or other Person (including as an independent contractor, part-time laborer or on a consulting basis), (B) any agreement to provide severance or similar benefits upon any termination of employment or other engagement, or (C) any Contract with any employee staffing or leasing agency, temp agency, labor agency, or similar provider of contingent workers;

(iv) indenture or other Contract relating to Indebtedness or the mortgaging, pledging or otherwise placing a Lien (other than a Permitted Lien or any Lien for which Seller has delivered to Buyer on the Closing Date an executed authorization for Buyer (or its senior lender) to file all appropriate UCC termination statements) on any asset or group of assets of Seller;

(v) agreement that provides for any Person to be the exclusive or preferred provider of any product or service to Seller or the Business, or the exclusive or preferred recipient of any product or service of Seller or the Business during any period of time or that otherwise involves the granting by Seller of exclusive or preferred rights of any kind during any period of time;

(vi) any surety bond, letter of credit, banker's guarantee or performance bond or similar instrument or any indemnity or other agreement governing any surety bond, letter of credit, banker's guarantee or performance bond or similar instrument;

(vii) guaranty of any obligation of any other Person, other than endorsements made for collection made in the Ordinary Course;

(viii) agreement or other Contract involving Proprietary Rights (other than licenses for commercially available, off-the-shelf software with a replacement cost or aggregate annual license, maintenance or subscription fees of less than $10,000 in the aggregate), including any licenses or other rights with respect to Proprietary Rights granted by Seller to any other Person or by any other Person to Seller, franchise, royalty, indemnity, research, development, collaboration or assignment Contracts, and Contracts affecting Seller's or any other Person's ability to enforce, own, register, license, use, disclose, transfer or otherwise exploit or dispose of any Proprietary Right (including any covenant not to sue or co-existence or settlement agreements);

(ix) joint venture or partnership Contract;

(x) Contract which involves a sharing of revenues, profits, losses, costs or liabilities by the Business with any other Person;

(xi) Contract which is material to Seller's operations and business or which could require aggregate payments by or to Seller, or involve an unperformed commitment or services having a value in excess of $10,000 annually, whether or not in the Ordinary Course;

(xii) agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services, in each case, in connection with the Business (including exclusive distribution agreements with manufacturers), the performance of which will extend over a period of more than six (6) months from the date hereof and is not terminable by the Seller upon thirty (30) days or less notice without penalty and pursuant to which Seller has (A) either paid or been paid consideration in excess of $10,000 in the twelve (12) months prior to the date hereof or (B) reasonably anticipates either paying or being paid in excess of $10,000 in the twelve (12) months following the date hereof;

(xiii) agreement or other Contract granting to any Person an option or a first refusal or similar preferential right to purchase or acquire any material asset of the Business;

(xiv) agreement or other Contract concerning non-competition or that otherwise restricts or limits any Transferred Asset, the Business or Seller, or any officer or key employee of Seller from engaging in any business similar to or related to the Business in any jurisdiction (including any agreement with provisions regarding non-solicitation of employees, co-existence agreements and settlement agreements) or any material agreement concerning confidentiality;

(xv) agreement under which it has advanced or loaned any amount to any of the officers or employees of the Business;

(xvi) lease or agreement under which Seller is (A) lessee of or holds or operates any personal property owned by any other party or (B) lessor of or permits any third party to hold or operate any personal property owned or controlled by Seller;

(xvii) Contract under which Seller or any of its Affiliates is lessor of or permits any third party to hold or operate any Transferred Asset;

(xviii) agreement or other Contract with any Material Customers;

(xix) agreement or other Contract with any Material Vendors;

(xx) agreement or other Contract or understanding pursuant to which Seller subcontracts work to a third party in connection with the Business;

(xxi) any agent, sales representative, sales or distribution Contract;

(xxii) power of attorney or other similar agreement or grant of agency;

(xxiii) Contract with any Governmental Entity;

(xxiv) settlement, conciliation or similar agreement (A) with any Governmental Entity or (B) pursuant to which Seller will be required to pay any amount or satisfy any material non-monetary obligation after the execution date of this Agreement;

(xxv) any other agreement material to the Business or under which the consequences of a default could have a Material Adverse Effect on the Business, the Transferred Assets or the business, operations, financial condition or results of operations of the Business, taken as a whole, or on the ability of Seller or Owner to perform its material obligations under this Agreement or any other Transaction Document; or

(xxvi) any commitment or arrangement to enter into any of the foregoing.

(b) Absence of Breach. Each of the items which is described or required to be described on Schedule 2.11(a) (collectively, the "**Material Contracts**") is a valid, binding and enforceable obligation of the parties thereto in accordance with their respective terms except as the enforceability thereof may be limited by (A) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar Laws in effect which affect the enforcement of creditors' rights generally or (B) general principles of equity, whether considered in a Proceeding at law or in equity. Each Material Contract shall be in full force and effect without penalty in accordance with its terms upon consummation of the Contemplated Transactions and will continue to be in full force and effect on identical terms immediately following the Closing. Seller is not in default under or in material breach of, or in receipt of any claim of default or breach under, any Material Contract and, to Seller's Knowledge, the other parties thereto are not in default or material breach thereunder. Except as set forth on Schedule 2.11(b), no event has occurred which (with the passage of time or the giving of notice or both) would result in a default or breach by Seller under

any Material Contract. Neither Seller nor Owner has received any notice that any other party to a Material Contract intends not to renew, or to renew on materially different terms, or to breach, cancel, terminate or renegotiate the existing terms of, any Material Contract.

(c) Copies. Seller has furnished to Buyer (i) a true, complete and correct copy of each written Material Contract together with all amendments, waivers, extension, renewals or other changes thereto (all of which amendments, waivers, extension, renewals or other changes are described on Schedule 2.11(a)) and (ii) an accurate and complete description of all material terms of all oral Material Contracts and other oral items which are described or required to be described thereon.

Section 2.12 Proprietary Rights.

(a) Schedule 2.12(a) sets forth a complete and correct list of: (i) all registered Proprietary Rights (including Internet domain names) owned by Seller (identifying for each, the owner); (ii) all pending patent applications and applications for other Proprietary Rights owned by Seller ((i) and (ii) collectively, the "**Registered Proprietary Rights**"); (iii) all material proprietary software owned by Seller; (iv) all trade or corporate names used by Seller; and (v) material unregistered trademarks and service marks owned by Seller (for each, indicating, as applicable, the owner(s), filing or registration number, title, jurisdiction, date of issuance, and current record applicant(s) and registrants and, for Internet domain names, the registrant, registrar and expiration date).

(b) Seller exclusively owns and possesses all right, title and interest in and to all Proprietary Rights owned or purported to be owned by Seller (including all Registered Proprietary Rights), and has a valid and enforceable right to use pursuant to an agreement set forth on Schedule 2.11(a), all other Proprietary Rights used in or held for use in the conduct of the Business, in each case free and clear of all Liens, and all such Proprietary Rights are included in the Business Proprietary Rights. All of the Business Proprietary Rights are valid, subsisting, and enforceable, and Seller has paid all maintenance fees, made all filings and taken all other necessary actions with respect to all patents, registrations, and applications for registration or patent of Business Proprietary Rights. No Trade Secrets of Seller have been disclosed to any Person (except pursuant to a written confidentiality agreement in the Ordinary Course with reasonable protections of, and preserving all rights in, such Trade Secrets). The Business Proprietary Rights are not subject to any outstanding consent, settlement, decree, order, injunction, judgment or ruling restricting the use, ownership, enforcement or other exploitation or disposition thereof. All of the Business Proprietary Rights and Business Systems shall be owned or available for use by Buyer immediately after the Closing Date on terms and conditions identical to those under which Seller owned or used the Business Proprietary Rights and Business Systems immediately prior to the Closing Date.

(c) No claim by any third party (i) contesting the validity, enforceability, use, ownership, patentability or registrability of any of the Business Proprietary Rights or (ii) regarding any infringement or misappropriation by, or any other conflict with, any third party with respect to any Proprietary Rights (including any cease and desist letters or demand or request that Seller license rights from a third party) has been made, is currently outstanding or, to Seller's Knowledge, is Threatened, Seller has not received any notice of any such claim, and, to Seller's Knowledge,

there is no reasonable basis for such claim. Neither Seller nor the operation of the Business has infringed, misappropriated or otherwise conflicted with, or infringes or misappropriates, or otherwise conflicts with, any Proprietary Rights of any Person. To Seller's Knowledge, no Person has infringed, misappropriated or otherwise conflicted with any Business Proprietary Rights, and Seller has not brought any claim alleging the same.

(d) All Persons that have authored, developed or otherwise created any Proprietary Rights for or on behalf of Seller, and all past and present employees, consultants and contractors of Seller have executed valid and enforceable agreements pursuant to which such Person (i) is bound to maintain and protect the confidential information of Seller and (ii) assigns, pursuant to a present assignment, to Seller, sole ownership of all Proprietary Rights authored, developed or otherwise created by such Person in the course of such Person's employment or other engagement with Seller, in accordance with all Laws and without further consideration or any restrictions or obligations on Seller, and such agreements are valid and enforceable in accordance with their terms. To Seller's Knowledge, no Person has breached any agreement referenced in this Section 2.12(d).

(e) The computer and other information technology systems, including the software, hardware, networks, platforms and related systems, owned, leased or licensed by Seller in the Business (collectively, "**Business Systems**") are reasonably sufficient for the needs of the Business as currently conducted by Seller, including as to capacity and ability to process current and anticipated peak volumes in a timely manner. All Business Systems are included in the Transferred Assets. In the last three (3) years, there has been no disruption, interruption, outage or continued substandard performance affecting any Business System that have caused a material disruption or interruption in or to the use of any Business Systems or to the Business. Seller has taken commercially reasonable steps, consistent with normal industry practices, to protect the confidentiality, integrity and security of the Business Systems against any unauthorized use, access, interruption, modification or corruption, including the implementation of commercially reasonable back-up and recovery procedures, disaster avoidance procedures and business continuity procedures, and acts in compliance therewith. Seller has purchased a sufficient number of license seats (and scope of rights) for all software that is used or held for use in the conduct of the Business, and Seller has complied in all material respects with the terms and conditions of the agreements corresponding to such software.

(f) Seller has not, and to Seller's Knowledge, no vendor or supplier of the Business has, violated any applicable Data Security Requirements in any material respect, and the operation of the Business (including the collection, storage, processing, use, and sharing of personal or sensitive information or data) complies in all material respects with all Data Security Requirements. No notices have been received by Seller, and no claims have been asserted or threatened by any third party against Seller, alleging any violation of any Data Security Requirements, and Seller has not been subject to any investigations or audits concerning any Data Security Requirements. There have not been any incidents of security breaches to, or other unauthorized access to or use of, (i) any of the Business Systems (including with respect to any data or other information stored or contained therein or accessed, transmitted or processed thereby), or (ii) any data, trade secrets or other personal, sensitive, or confidential information of Seller, including any business information and any personally-identifying information and data of

any Person. To Seller's Knowledge, the Contemplated Transactions and the consummation thereof will not violate any applicable Data Security Requirement.

Section 2.13 Litigation; Proceedings. Except as set forth on Schedule 2.13, there currently are no, and have not been for the past five (5) years any, Proceedings (a) pending or (to Seller's Knowledge) Threatened against Seller or Owner or any of Seller's directors, officers, managers, independent contractors, consultants, employees, agents or Affiliates affecting or relating to the Business or Seller's assets or the Contemplated Transactions, or (b) pending or Threatened by Seller or Owner against any third party related to the Business, the Transferred Assets or the Contemplated Transactions, in each case, at law or in equity, or before or by any Governmental Entity. Neither Seller nor Owner is or has been subject to any judgment, order, injunction, writ or decree of any Governmental Entity related to the Business, the Transferred Assets or the Contemplated Transactions.

Section 2.14 Brokerage. Except for the fees and expenses of The Peakstone Group (all of which will be the obligation of Seller), no agent, broker, investment banker, finder, financial advisor or other Person is or will be entitled to any brokerage commissions, finders' fees or similar compensation in connection with the Contemplated Transactions and any other Transaction Documents based on any arrangement or agreement made by or on behalf of Owner or Seller or their respective Affiliates or to which any of the foregoing entities is subject. Seller shall pay any and all fees and expenses to The Peakstone Group and any Person listed on Schedule 2.14.

Section 2.15 Governmental Permits. Schedule 2.15 sets forth a true, correct and complete listing and summary description of all material Permits held by Seller and used in connection with the conduct of the Business. Seller owns or possesses all right, title and interest in and to all of the Permits which are necessary for the lawful conduct of the Business as currently conducted by Seller. All of such Permits are valid, in good standing and in full force and effect. No loss or expiration of any Permit is pending, reasonably foreseeable or, to Seller's Knowledge, Threatened (including as a result of the Contemplated Transaction and any other Transaction Documents) other than by reason of expiration in accordance with the terms thereof or applicable Law.

Section 2.16 Employees.

(a) The Company does not now have nor has it ever had any employees.

(b) Seller is and has been in compliance in all material respects with all applicable Laws relating to the employment of personnel, employment practices and labor, including all Laws relating to terms and conditions of employment, workers' compensation, health and safety, wages and hours (including the classification of independent contractors and exempt and non-exempt employees), equal opportunity, affirmative action, employment discrimination, harassment or retaliation, whistleblowing, disability rights or benefits, collective bargaining and labor relations, paid time off and employee leave, employee trainings and notices, the payment of social security and other Taxes, including withholding requirements, unemployment insurance, plant closures and layoffs (including the WARN Act), COVID-19, and immigration including the Immigration Reform and Control Act of 1986, as amended and, to Seller's Knowledge, no Proceeding been filed, or has been threatened against Seller alleging a violation of any Law relating to any of the foregoing.

(c) Seller does not have any material Liability for (i) any unpaid wages, salaries, wage premiums, commissions, bonuses, fees, or other compensation to its current or former directors, officers, employees and independent contractors under applicable Law, Contract or policy; and/or (ii) any fines, Taxes, interest, or other penalties for any failure to pay or delinquency in paying such compensation.

(d) Seller has promptly, thoroughly and impartially investigated all sexual harassment, or other discrimination, retaliation or policy violation allegations of which it is aware, with respect to each such allegation with potential merit, Seller has and taken prompt corrective action that is reasonably calculated to prevent further improper action. Seller does not reasonably expect any material Liabilities with respect to any such allegations and is not aware of any allegations relating to officers, directors, employees, contractors or agents of Seller, that, if known to the public, would bring Seller, the Business or the Transferred Assets into material disrepute.

(e) To Seller's Knowledge, there is no outstanding workers' compensation liability or pending or threatened workers' compensation outside the Ordinary Course.

(f) Seller is not a party to or bound by any collective Labor Agreement. No employees of Seller are represented by any labor union or other labor organization with respect to their employment with Seller.

(g) Seller has not experienced or been affected by any strike, labor grievance, unfair labor practice charge, labor arbitration, lockout, work stoppage, slowdown, picketing, handbilling or other material employee or labor dispute. In the past five (5) years, no labor union, works council, other labor organization, or group of employees of Seller has made a demand for recognition or certification, and there are no representation or certification proceedings presently pending or threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority. To Seller's Knowledge, in the past five (5) years, there have been no labor organizing activities.

(h) Schedule 2.16(h) sets forth a true, correct and complete list as of the date of this Agreement of (i) the employees employed by Seller (each, an "**Employee**") by name or employee identification number, (ii) the title and date of hire or engagement, as applicable, for each such Employee, (iii) the rate of all current compensation payable by Seller to each such Employee, including annual salary or hourly wage rate (as applicable) and eligibility for any bonus, commission or other contingent or deferred compensation, (iv) whether each such Employee is classified as exempt or non-exempt under the federal Fair Labor Standards Act, (v) the work location of each such Employee, (vi) the full-time or part-time status of each such Employee, (vii) the vacation/PTO balance of each such Employee, and (viii) status as active employee or on leave status. Schedule 2.16(h) separately sets forth all individuals currently engaged by Seller as individual independent contractors.

(i) To Seller's Knowledge, no Person is in any respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, nonsolicitation agreement, restrictive covenant or other obligation: (i) to Seller or (ii) with respect to any Person who is an Employee or current independent contractor of Seller, to any third party with respect to such Person's right to be

employed or engaged by Seller or to the knowledge or use of trade secrets or proprietary information.

(j) No employee layoff, facility closure or shutdown (whether voluntary or by Law), reduction-in-force, furlough, temporary layoff, material work schedule change or reduction in hours, or reduction in salary or wages, or other workforce changes affecting employees or individual independent contractors of Seller has occurred since March 1, 2020 or is currently contemplated, planned or announced, including as a result of COVID-19 or any Law, directive, guidelines or recommendations by any Governmental Entity in connection with or in response to COVID-19. Seller has not otherwise experienced any material employment-related liability with respect to COVID-19.

(k) No employee will suffer an "employment loss" under the WARN Act within the ninety (90) days immediately preceding the Closing Date.

Section 2.17 ERISA.

(a) Schedule 2.17(a) sets forth an accurate and complete list of each Benefit Plan that is maintained, sponsored, or contributed or required to be contributed to by Seller or otherwise with respect to which Seller has any Liability (each, a "**Plan**" and, collectively, the "**Plans**"). With respect to each Plan, Seller has provided Buyer with true, correct and complete copies (to the extent applicable): (i) the plan documents, (ii) the most recent summary plan description (and any summaries of material modifications thereto), (iii) the most recent IRS determination or opinion letter, and (iv) copies of any non-routine correspondence with any Governmental Entity regarding any Plan.

(b) No Plan is, and neither Seller nor any ERISA Affiliate maintains, sponsors, contributes to or has any Liability under (or with respect to): (i) any "defined benefit plan" (as such term is defined in ERISA § 3(35)) or any other plan that is or was subject to Title IV of ERISA or Sections 412 or 430 of the Code, (ii) any "multiemployer plan" (as such term is defined in ERISA § 3(37)), (iii) a "multiple employer plan" (within the meaning of Section 210 of ERISA or Section 413(c) of the Code), or (iv) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA). Seller does not have any Liability by reason of at any time being treated as a single employer with any other Person under Section 414 of the Code. Each Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS, and nothing has occurred that could reasonably be expected to adversely affect such Plan's qualified status. There are no pending or, to Seller's Knowledge, Threatened, actions, suits, investigations or claims with respect to any Plan (other than routine claims for benefits), and, except as could not result in any Liability to the Business, no "prohibited transactions" within the meaning of Section 4975 of the Code or Sections 406 or 407 of ERISA and not otherwise exempt under Section 408 of ERISA and no breaches of fiduciary duty (as determined under ERISA) have occurred with respect to any Plan. No event has occurred or is reasonably expected to occur that has resulted in or would subject the Transferred Assets to a lien under ERISA the Code.

(c) Each of the Plans and all related trusts, insurance Contracts and funds have been established, maintained, funded and administered in all material respects (i) in compliance

with their terms and (ii) in compliance with the applicable provisions of ERISA, the Code and any other applicable Laws. With respect to each Plan, all required payments, premiums, contributions, distributions, or reimbursements for all periods ending prior to or as of the Closing Date have been timely made (to the extent due) or properly accrued (to the extent not yet due).

(d) Each Plan which is subject to the health care continuation requirements of Part 6 of Subtitle B of Title I of ERISA or Code § 4980B or any similar state of local Law ("**COBRA**") has been administered in compliance in all material respects with such requirements. No Plan provides post-ownership, post-employment or post-termination medical or life or other welfare or welfare-type benefits other than as required pursuant to COBRA for which the covered Person pays the full cost of coverage. The Business has not incurred (whether or not assessed) and is not expected to incur any Taxes or penalties under Sections 4980B, 4980D, 4890H, 6721 or 6722 of the Code.

(e) The Contemplated Transactions will not (either alone or together with any other event), directly or indirectly, (i) entitle any current or former employee, officer, director or independent contractor of Seller or any of its Affiliate to any severance pay or other compensation or benefits under any Plan or otherwise; (ii) accelerate the time of payment, funding or vesting of any compensation or equity-based award; (iii) trigger any funding (through a grantor trust or otherwise) of compensation or benefits under any Plan or otherwise or restrict or limit the rights of Seller to administer, amend or terminate any Plan; or (iv) trigger any payment (whether in cash, property or the vesting of property) or benefit, increase the amount payable or trigger any other obligation pursuant to any Plan or otherwise

(f) Each Plan that constitutes in any part a "nonqualified deferred compensation plan" (as defined under Section 409A(d)(1) of the Code) subject to the Section 409A of the Code has been operated and administered in material compliance with Section 409A of the Code, and no amounts under any such plan, agreement or arrangement is or has been subject to the interest and additional tax set forth under Section 409A(a)(1)(B) of the Code. Neither Seller nor any of its Affiliates has any obligation to gross-up, reimburse or indemnify any individual with respect to any Taxes imposed, including pursuant to Sections 409A or 4999 of the Code.

Section 2.18 Affiliate Transactions. Except as set forth on Schedule 2.18, no Insider (i) is or was a party to any Contract, commitment or transaction with Seller or which pertains to the Business (other than in such Insider's capacity as an employee of Seller, the compensation for which is reflected on Schedule 2.16), or (ii) owns or otherwise has any rights to or interest in any Transferred Asset, other than indirectly, as an equityholder of Seller (any such transaction referred to in clause (i) and (ii), an "**Affiliate Transaction**").

Section 2.19 Compliance with Laws.

(a) Except as set forth in Schedule 2.19(a), each of Owner and Seller is, and at all times within the last five (5) years has been, in compliance in all material respects with all applicable Laws and Data Security Requirements, and no claim, complaint, inquiry has been filed against, nor any written or oral notice given to, Owner or Seller alleging a violation of any such Law or Data Security Requirement. Schedule 2.19(a) sets forth a true and accurate description of any claim (whether material or immaterial) that is unresolved as of the date hereof.

(b) Seller is not now subject (nor has Seller been subject) to any investigation, penalty assessment or audit by any Governmental Entity as a result of any allegation that Seller (including any agent, representative or broker or other third party acting on behalf of Seller or the Business) has violated the regulations of any such Governmental Entity or made a material false statement or omission to any Governmental Entity.

(c) Seller has complied in all material respects with all Laws relating to immigration, work authorization compliance and confirmation of employee visas and Seller maintains an Employment Eligibility Form on Form I-9 for each current and former employee that is or was employed by Seller in the United States in accordance with all applicable Laws. The documentation required to be presented by each of current or former employees of Seller in connection with such employee's Form I-9s reasonably appeared to Seller to be genuine and to relate to the employee who presented such documentation. No Form I-9 for any current employee will be invalidated as a result of the Contemplated Transactions.

(d) Seller owns or possesses all right, title and interests in and to all Permits required for the conduct of the Business (as presently conducted) and the ownership of its properties, and Schedule 2.19(d) sets forth a true, correct and complete list of all of Permits held by Seller. No notices have been received by Seller alleging the failure to hold any Permit. Seller is in compliance with all terms and conditions of all Permits which it holds and all such Permits are valid, in good standing and in full force and effect. Except as disclosed on Schedule 2.19(d), all of the Permits held by Seller will be available for use by Buyer immediately after the Closing and no loss or expiration of any Permit is pending, reasonably foreseeable or, to Seller's Knowledge, Threatened (including as a result of the Contemplated Transactions and the Transaction Documents).

(e) Except as set forth on Schedule 2.19(e), all material reports, statements, documents, registrations, filings or submissions (including any sales material) required to be filed with any Governmental Entity have been properly and timely filed and is accurate and correct in all material respects. Except as set forth on Schedule 2.19(e), all such reports, registrations, filings and submissions were in compliance with Law in all material respects when filed or as amended or supplemented, and no deficiencies have been asserted in writing by any such Governmental Entity with respect to such reports, registrations, filings or submissions that have not been remedied.

(f) Neither Seller nor any officer, director or employee of Seller (or, to Seller's Knowledge, any agent or other third parties acting on behalf of the Business or Seller) nor Owner has, directly or indirectly, (i) made or agreed to make any contribution, payment or gift to any official, employee or agent (in each case, whether of a Governmental Entity, private entity or otherwise) where either the contribution, payment or gift or the purpose thereof was in violation of Anti-Corruption Laws, (ii) established or maintained any unrecorded fund or asset for any purpose or made any false entries on the books and records of Seller or the Business for any reason, (iii) made or agreed to make any contribution, or reimbursed any political gift or contribution made by any other person, to any candidate for federal, state, local or foreign public office, (iv) paid or delivered any fee, commission or any other sum of money or item of property, however characterized and regardless of value, to any finder, agent, government official or other party, in

the United States or any other country, which in any manner relates to the assets, business or operations of Seller, or (v) has violated or is violating in any respect Anti-Corruption Laws.

(g) Neither the Seller nor any officer, director, employee, agent or third party representative is currently or has in the last five (5) years been: (A) a Sanctioned Person; (B) operating in, organized in, conducting business with, or otherwise engaging in dealings with or for the benefit of any Sanctioned Person or in or for the benefit of any Sanctioned Country; or (C) otherwise in violation of any Sanctions and Export Control Laws, including, without limitation, valuation, classification, or duty treatment requirements of imported merchandise and other U.S. import laws administered by U.S. Customs and Border Protection, or of U.S. antiboycott requirements (collectively, "**Trade Controls**").

(h) Neither the Seller nor any officer, director, employee, agent or third party representative is or has been the subject of any Proceedings by any Governmental Entity regarding any offense or alleged offense under Trade Controls or Anti-Corruption Laws (including by virtue of having initiated any internal investigation or made any disclosure relating to any offense or alleged offense), and no such Proceedings have been Threatened or are pending and there are no circumstances likely to give rise to any such Proceedings.

Section 2.20 Environmental Matters.

(a) Each of Seller and the Business has at all times complied, and is in compliance, in all material respects with all Environmental and Safety Requirements applicable to the Seller and the Business, which compliance includes and has included obtaining and complying at all times and in all material respects with all permits, licenses and other authorizations required pursuant to applicable Environmental and Safety Requirements for the occupation of the Leased Real Property and the operation of the Business.

(b) Seller has not received any written, or to Seller's Knowledge, any oral notice, report, order, directive or other information from any Person regarding any actual or alleged violation by Seller or the Business in any material respect of, or any material or potentially material Liability under, any Environmental and Safety Requirements applicable to the Seller and the Business.

(c) Each of Seller and the Business has not treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, released, or exposed any Person to, any Hazardous Substance in violation of applicable Environmental and Safety Requirements, or owned or operated any property or facility which, to Seller's Knowledge, is or has been contaminated by any Hazardous Substance, so as to give rise to any material Liabilities of Seller pursuant to any applicable Environmental and Safety Requirements.

(d) Neither Seller nor any other Person in relation to the Business has assumed, undertaken, or provided an indemnity with respect to any material Liability of any other Person relating to Environmental and Safety Requirements.

(e) Seller has furnished to Buyer true and correct copies of all environmental, health and safety audits, reports and assessments relating to the past or current operations,

properties or facilities of the Business (including the Leased Real Property), in each case which are in its possession or under its reasonable control.

Section 2.21 Assets.

(a) Title. Seller owns, leases or licenses all of the Transferred Assets and has good and marketable title to, or a valid leasehold in or license to, all such Transferred Assets free and clear of any Liens (other than Permitted Liens). Upon consummation of the Contemplated Transactions, Buyer will acquire good title to all of the Transferred Assets, free and clear of any Liens (other than Permitted Liens).

(b) Condition. Except as otherwise set forth on Schedule 2.21(b), each tangible asset owned or leased by the Seller or the Business is free from material defects, is not obsolete or in need of replacement (except in the Ordinary Course), and is in good operating condition and repair (subject to normal wear and tear) and is suitable for the purposes for which it is used.

(c) Owned Equipment. Schedule 2.21(c) lists each item of machinery, equipment, vehicles, furniture, fixtures, computers or other tangible personal property that is used in the Business, as it is presently conducted, all of which are owned by Seller and is included in the Transferred Assets.

(d) Adequacy. The Transferred Assets (with the exception of any non-assignable Permits) (i) constitute all of the assets and properties necessary to permit Buyer to carry on the Business as presently conducted by Seller and (ii) constitute all of the properties and assets (real or personal, tangible and intangible) used or held for use by Seller in the conduct of the Business as presently conducted by Seller and in the achievement by the Business of the financial results contained in the Financial Statements. Neither Owner nor any of his respective Affiliates owns or holds any asset used by the Business or Seller. For the sake of clarity, none of the Scheduled Excluded Assets have been or are used in the Business.

Section 2.22 Inventory. Schedule 2.22 attached hereto sets forth a list of all of the Inventory as of March 30, 2022. The Inventory reflected on the Latest Balance Sheet and Schedule 2.22 is merchantable and fit for the purpose for which it was procured or manufactured, and is not damaged, defective or obsolete, subject only to the reserve for inventory write-downs taken into account in determining the Adjustment Amount and is of a quality and quantity usable and saleable by the Business in the Ordinary Course and is at a level sufficient to maintain the requirements of the Business, based on the Business's past practices. Since December 31, 2020, Seller has not sold, used or otherwise transferred any portion of the Inventory except in the Ordinary Course to a bona fide purchaser. No Inventory is held on a consignment basis.

Section 2.23 Accounts Receivable. Schedule 2.23 attached hereto sets forth a list of all Accounts Receivable as of March 30, 2022. All Accounts Receivable (i) have been legally and validly incurred pursuant to bona fide transactions in the Ordinary Course and (ii) represent bona fide indebtedness incurred by the applicable account debtor for goods sold or services performed prior to the Closing by Seller. Except as set forth on Schedule 2.23, Seller has not received written notice of any claim or dispute with respect to any of its accounts receivable. All notes and Accounts Receivable are valid notes and Accounts Receivables, are not subject to any set-offs or

counterclaims, are current and are collectible net of any reserves taken into account in determining the Adjustment Amount, which reserves are adequate and were calculated on a basis consistent with past practices.

Section 2.24 Product Warranty; Product Recalls.

(a) All Company Products have been in conformity in all material respects with all applicable contractual commitments and all express and implied warranties. Except as set forth on Schedule 2.24(a), Seller does not have, to Seller's Knowledge, any Liability in connection with the Business (and has not received written notice of any actual or Threatened Proceeding against it giving rise to any such Liability) for replacement, return or refund of any Company Product, or for other damages related to any Company Product, other than such Liabilities for warranty claims arising in the Ordinary Course. Seller has no Knowledge of any facts or circumstances that would reasonably be expected to result in or form the basis of any claim against Seller or the Business for material Liability on account of any expressed or implied warranty to any third party in connection with the Company Products or services rendered by Seller or the Business. Except as set forth on Schedule 2.24(a), no Company Product and no services rendered by Seller are subject to any guarantee, warranty or other indemnity beyond the applicable industry standard terms and conditions of such sale or service.

(b) Seller has not voluntarily or involuntarily initiated, conducted or issued, or caused to be initiated, conducted or issued, any recall, market withdrawal or replacement whether or not relating to an alleged lack of safety or regulatory compliance of any of the Company Products.

Section 2.25 Product Liability. Except as set forth on Schedule 2.25, Seller has not had, and currently does not have, any Liability in connection with the Business (and to the Knowledge of Seller, no event has occurred which provides a basis for any Proceeding against Seller in connection with the Business) arising out of any injury to individuals or property as a result of the ownership, possession or use of any Company Product.

Section 2.26 Product Compliance.

(a) Except as set forth in Schedule 2.26(a), Seller, the Seller's facilities and the Company Products are in compliance in all material respects with all applicable Laws in the relevant governing jurisdiction(s) in which Seller conducts its business, including, (i) the applicable provisions of the Federal Food, Drug, and Cosmetic Act, as amended, and the applicable regulations and requirements adopted by the U.S. Food and Drug Administration (the "**FDA**") thereunder (including the Current Good Manufacturing Practice, Hazard Analysis, and Risk-Based Preventative Controls for Food for Animals), the applicable statutes, regulations and requirements of the U.S. Department of Agriculture (the "**USDA**"), all applicable statutes enforced by the U.S. Federal Trade Commission ("**FTC**") and the applicable FTC regulations and requirements and any applicable requirements established by any state, local or foreign Governmental Entity responsible for regulating food products and other consumer protection statutes and regulations, (ii) all terms and conditions imposed in any Permits granted to Seller by any Governmental Entity and (iii) all non-Governmental Entity certifications, certificates and accreditations that Seller publicly represents to possess. The foregoing includes, but is not limited to, any applicable good

manufacturing practices and sanitation requirements, labeling and advertising requirements, requirements relating to direct or indirect food or color additives, food standards, product composition requirements, labeling and analysis required for bioengineered and organic products, animal welfare and veterinary care requirements, testing requirements or protocols, recordkeeping or reporting requirements, monitoring requirements, packaging (including co-packing and re-packing) requirements, laboratory controls, storage and warehousing procedures, shipping requirements and shelf-life requirements.

(b) During the five (5) years prior to the date hereof, Seller has not received any Notice of Suspension or Notice of Intended Enforcement, warning letter, or other adverse correspondence or notice from the USDA or any warning letter, FDA Form 483 inspectional observation, import alert or detention, penalty for corrective or remedial action or corrective action plan, investigation, suspension or withdrawal of inspection or registration, penalty assessment or other compliance or enforcement action by any Governmental Entity, except for those to which Seller responded and resolved. During the five (5) years prior to the date hereof, Seller has not, with respect to its products, voluntarily or involuntarily initiated, conducted or issued, or caused to be initiated, conducted or issued, any recall, field alert, field correction, market withdrawal or replacement, safety alert, or other notice or action relating to an alleged lack of safety or regulatory compliance of any Company Products. Seller has no plans to initiate a voluntary product recall.

(c) The Company Products are marketed in all material respects in compliance with Law and none of the marketing and promotional materials used, including sales brochures, product labels and labeling, advertising and promotional claims in any format (whether print or website content or otherwise) is, or has been, materially false or misleading.

Section 2.27 Material Customers. Schedule 2.27 sets forth a true, correct and complete list of the top ten (10) customers of the Business by dollar volume of sales for each of the Three Most Recent Fiscal Years (each, a "**Material Customer**") and sets forth the dollar amount of sales for each of the Three Most Recent Fiscal Years. Since December 31, 2020, Seller has not received any notice from any Material Customer to the effect that (and there are no facts or circumstances indicating that) such Material Customer (i) has stopped, materially decreased the rate of or materially changed the terms (whether related to payment, price or otherwise) with respect to, or will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to the purchase of materials, products or services of Seller or the Business (whether as a result of the consummation of the Contemplated Transactions or otherwise) or (ii) intends not to renew, or to renew on materially different terms from the existing terms of any Contract between Seller and such Material Customer. The terms under which each Material Customer purchases materials, products or services from Seller and/or the Business are at market rates and are the result of arm's length transactions. There are no disputes between Seller and any Material Customer.

Section 2.28 Material Vendors. Schedule 2.28 sets forth a true, correct and complete list of the top ten (10) vendors or suppliers of the Business by dollar volume of purchases for each of the Three Most Recent Fiscal Years (each, a "**Material Vendor**") and sets forth the dollar amount of purchases for each of the Three Most Recent Fiscal Years. Since December 31, 2020, Seller has not received any notice from any Material Vendor to the effect that (and there are no facts or circumstances indicating that) such Material Vendor (i) has stopped, materially decreased the rate

of or materially changed the terms (whether related to payment, price or otherwise) with respect to, or will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to the supply of materials, products or services of Seller or the Business (whether as a result of the consummation of the Contemplated Transactions or otherwise) or (ii) intends not to renew, or to renew on materially different terms from the existing terms of any Contract between Seller and such Material Vendor. The terms under which each Material Vendor supplies materials, products or services to Seller and/or the Business are at market rates and are the result of arm's length transactions. There are no disputes between Seller and any Material Vendor.

Section 2.29 Insurance. Schedule 2.29 sets forth an accurate description of each insurance policy currently maintained by or on behalf of Seller with respect to its properties, assets and business. Each such policy is in full force and effect, all premiums have been paid, and no notice of default, cancellation, termination or nonrenewal has been received by Seller or any of its Affiliates with respect to any such policy. Each such policy shall be in full force and effect as of and immediately following the Closing or a substituted policy shall have been obtained therefor. To Seller's Knowledge, such policies are sufficient for compliance with all Contracts to which Seller is a party or by which Seller is bound. The scope and amount of such insurance policies are reasonable for the Business as presently conducted. There is no claim pending or, to Seller's Knowledge, Threatened which could reasonably be expected to materially exhaust the coverage limits under or otherwise adversely affect any such policy. Seller is not in breach or default with respect to its obligations under any insurance policy maintained by Seller or on behalf of Seller, and Seller has never been denied insurance coverage. There are currently no pending claims under any insurance policies as to which the respective insurer has denied, questioned or disputed coverage or reserved rights. Seller does not have any self-insurance or co-insurance program. The insurance policies will not lapse or be affected or terminated by reason of the consummation of the Contemplated Transactions.

Section 2.30 No Indebtedness; Pandemic-Relief Debt.

(a) Seller and the Business have no Indebtedness. The SBA Loan was paid in full by Seller and satisfied on February 8, 2022.

(b) Except as set forth on Schedule 2.30(b), Seller has not applied for or incurred any Pandemic-Relief Debt. As to any Pandemic-Relief Debt incurred by Seller, (i) Seller meets (and, as applicable, continues to meet) the eligibility requirements for receipt of such Pandemic-Relief Debt under Pandemic-Relief Debt Documentation (including, without limitation, with application of all applicable affiliation requirements under applicable Law), (ii) all representations and warranties made by Seller pursuant to the Pandemic-Relief Debt Documentation are true and correct, (iii) Seller is in compliance with all Pandemic-Relief Debt Documentation and, without limiting the generality of the foregoing, has used, if it has ever used, the proceeds of any such Pandemic-Relief Debt exclusively for purposes permitted by the Pandemic-Relief Debt Documentation (including, as to any PPP Loan exclusively for PPP Specified Forgivable Uses), (iv) Seller has maintained all records required to be submitted in connection with applying for, obtaining, using the proceeds of, or seeking forgiveness of such Pandemic-Relief Debt and (v) Seller has provided to Buyer true, correct and complete copies of

all Pandemic-Relief Debt Documentation included in subsections (i) and (iii) of the definition of such term with respect to such Pandemic-Relief Debt.

Section 2.31 Business Names. Except as set forth on Schedule 2.31, with respect to the Business, Seller has done business as, represented or identified itself as, or otherwise used, in any context, any other names (including trade names) other than the name of Seller.

Section 2.32 No Additional Representations. Except for the representations and warranties of Seller and Owner expressly set forth in this Article III (including related portions of the Schedules), absent fraud or intentional or willful misrepresentation, neither Seller or Owner nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Business or the Purchased Assets.

HIMALAYAN DOG CHOW, NOT HOUSING.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Seller and Owner to enter into this Agreement and to consummate the Contemplated Transactions, Buyer hereby makes the representations and warranties set forth in this Article III as of the date hereof, or such other date as set forth below.

Section 3.1 Organization and Power. Buyer is a limited liability company duly formed and validly existing and in good standing under the Laws of the State of Delaware and is qualified to do business in every jurisdiction in which the execution, delivery and performance of its obligations under this Agreement requires it to be so qualified.

Section 3.2 Authorization of Transaction. Buyer has full power and authority to execute and deliver this Agreement and all other Transaction Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions. Buyer has duly approved this Agreement and all other Transaction Documents to which it is a party and has duly authorized its execution and delivery of this Agreement and such other Transaction Documents and the performance of its obligations hereunder and thereunder. No other proceedings or actions on the part of Buyer is necessary to approve and authorize Buyer's execution and delivery of this Agreement or any other Transaction Documents to which it is a party or the performance of Buyer's obligations hereunder or thereunder. This Agreement constitutes, and each of the other Transaction Documents to which Buyer is or will be a party will constitute when executed, a valid and binding obligation of Buyer enforceable in accordance with their terms, except as enforceability hereof may be limited by (a) applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar Laws in effect which affect the enforcement of creditors' rights generally or (b) general principles of equity, whether considered in a Proceeding at law or in equity.

Section 3.3 Absence of Conflicts. Neither the execution, delivery and performance of this Agreement or any other Transaction Document by Buyer nor the consummation by Buyer of the Contemplated Transactions does or will (i) conflict with or result in a breach of any of the provisions of, (ii) constitute a default under, (iii) result in the violation of, (iv) give any third party the right to terminate or to accelerate any obligation under, or (v) require any Consent of any Governmental Entity or other Person, in each case under Buyer's Governing Documents, or under

the provisions of any indenture, mortgage, lease, loan agreement or other agreement or instrument to which Buyer is bound or by which it or any of its assets are affected, or any Law to which any of Buyer or any of their respective assets are subject.

Section 3.4 Brokerage. Except as set forth on Schedule 3.4, no agent, broker, investment banker, finder, financial advisor or other Person is or will be entitled to any brokerage commissions, finders' fees or similar compensation in connection with the Contemplated Transactions based on any arrangement or agreement made by or on behalf of Buyer or its Affiliates or to which any of the foregoing entities is subject.

Section 3.5 Litigation. There are no Proceedings pending or, to Buyer's Knowledge, Threatened, against or affecting Buyer at law or in equity, or before or by any Governmental Entity, which could reasonably be expected to adversely affect Buyer's performance under this Agreement or the other Transaction Documents to which Buyer is a party or its ability to consummate of the Contemplated Transactions.

CARVE OUT FOR FRAUD

Section 3.6 No Additional Representations. Except for the representations and warranties of Buyer expressly set forth in this Article III (as modified by the Schedules), absent fraud or intentional or willful misrepresentation, neither Buyer nor any other Person makes any other express or implied representation or warranty with respect to Buyer.

Section 3.7 Independent Investigation. Buyer has conducted its own independent investigation, review and analysis of the Business and the Purchased Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller and Owner set forth in Article II (including related portions of the Schedules).

DEVIN WAS PROVIDED ACCESS - ALLOWS + RELYING ON HIS OWN INVESTIGATION, BUT CAN'T RELY ON BOOKS + RECORDS.

Section 3.8 Sufficiency of Funds. Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

Section 3.9 Solvency. As of the Closing Date, assuming the accuracy of the representations and warranties set forth in Article II and the accuracy of the financial information provided to Buyer by Seller and Owner prior to the date hereof, immediately after giving effect to the Contemplated Transactions, Buyer shall be solvent, meaning as of the Closing Date, Buyer shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business.

ARTICLE IV
CERTAIN COVENANTS AND AGREEMENTS

Section 4.1 Notices and Consents. From and after the Closing, upon the request of Buyer, Owner and Seller shall give any notices to third parties, and shall use commercially reasonable efforts to obtain any third party consents (including all consents from Governmental

Entities) required in connection with the consummation of the Contemplated Transactions. Nothing in this Agreement shall be construed as an attempt to assign any Contract, agreement, guaranty, Permit, Certification, warranty or claim included in the Transferred Assets which is by its terms or by Law is nonassignable without the consent of the other party or parties thereto, unless such consent shall have been given, or as to which all the remedies for the enforcement thereof enjoyed by Seller and their Affiliates would, as a matter of law, pass to Buyer as an incident of the assignments provided for by this Agreement. In order, however, to provide Buyer the full realization and value of every Contract, agreement, guaranty, Permit, Certification, warranty and claim of the character described in the immediately preceding sentence, each of Seller and Owner agrees that after the Closing, it will, at the reasonable request of Buyer, in the name of Seller or otherwise as Buyer shall specify, provide such cooperation and take such commercially reasonable actions as are necessary or proper (a) to assure that the rights of Seller or any of their Affiliates under such Contracts, agreements, guaranties, Permits, Certifications, warranties and claims shall be preserved for the benefit of Buyer and (b) to facilitate receipt of the consideration to be received by Seller or any of their Affiliates in and under every such Contract, agreements, guaranty, Permit, Certification, warranty or claim, which consideration shall be held for the benefit of, and shall be delivered promptly to, Buyer; provided, however, that in no event shall Seller or Owner be required to incur any out of pocket expense. Nothing contained in this Section 4.1 or elsewhere in this Agreement shall be deemed to constitute (x) an agreement to exclude from the Transferred Assets any Contract, agreement, guaranty, Permit, Certification, warranty or claim as to which a consent may be necessary for its transfer, or (y) a waiver by Buyer of its right to have received on the Closing Date an effective assignment of all of the Transferred Assets or of the covenant of Seller and Owner to obtain consents necessary to assign or transfer the Contracts, agreements, Permits, guaranties, Certifications, warranties and claims included in the Transferred Assets.

Section 4.2 Certain Tax Matters.

(a) Each Party shall, and shall cause its Affiliates to, provide to each of the other parties hereto such cooperation and information as any of them reasonably may request in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to refund of Taxes or in conducting any audit or other proceeding in respect of Taxes. Such cooperation and information shall include providing copies of all relevant portions of relevant Tax Returns, together with relevant accompanying schedules and relevant work papers, relevant documents relating to rulings or other determinations by Taxing Authorities and relevant records concerning the ownership and Tax basis of property, which any such Party may possess and making their financial officers available on a mutually convenient basis to provide explanation of any documents or information provided hereunder.

(b) Each of Seller and Buyer is responsible for its pro-rata share of the current year's personal property, real property, ad valorem and similar Taxes with respect to the Transferred Assets, prorated on a calendar year basis as of the Closing Date.

(c) Seller shall timely pay, before the same shall become delinquent and before penalties accrue thereon, all Taxes relating to the Business and the Transferred Assets (including any Taxes incurred in connection with the Contemplated Transactions) (i) shown or required to be shown on any Tax Return (or amendment thereto) filed or required to be filed by Seller with respect to taxable periods of Seller for any taxable period or portion thereof ending on or before the

Closing Date relating to the Business or the Transferred Assets whether such Tax Returns are required to be filed on, before or after the Closing Date or (ii) that become due from or payable by Seller relating to the Business or the Transferred Assets with respect to such periods. All such Tax Returns shall be filed or caused to be filed by Seller and shall be prepared using accounting methods that were used in preparing the relevant Tax Returns for prior taxable periods.

(d) Following the Closing, Seller shall not amend or cause to be amended any Tax Returns relating to Seller which could affect the amount of any Taxes for which Buyer is liable without the prior approval of Buyer.

Section 4.3 Press Releases and Announcements; Confidentiality.

(a) Press Releases and Announcements. After the date hereof, neither Owner nor Seller will make any press release or other public announcement of or with respect to the Business, this Agreement or any of the Contemplated Transactions without Buyer's prior written consent.

(b) Confidentiality. From and after the Closing Date, Owner, Seller and their respective Affiliates shall maintain the confidentiality of, and shall not use for the benefit of themselves or others (other than Owner in his capacity as a consultant of, and for the benefit of, Buyer or any Affiliate thereof), any proprietary, non-public or confidential information concerning the Business, the Transferred Assets, the Assumed Liabilities, Buyer or any of its Affiliates (the "**Confidential Information**"). Owner and Seller agree not to divulge, communicate, use to the detriment of Buyer or any of its Affiliates, for Seller's, Owner's or any of their respective Affiliates' benefit or the benefit of any other Person, or misuse in any way, in whole or in part, any Confidential Information. Seller and Owner acknowledge that the list of the customers of the Business as it may exist from time to time, and the Business' proprietary information, including trade secrets related to the Business or the Transferred Assets, as they may exist from time to time, are valuable, special and unique assets of the Business and are Confidential Information. In the event that Seller or Owner is requested or required pursuant to written or oral question or request for information or documents in any Proceeding, by interrogatory, subpoena or similar process, to disclose any Confidential Information, Seller or Owner, as applicable, will notify Buyer promptly in writing of the request or requirement so that Buyer may, at its sole cost and expense, seek an appropriate protective order or waive compliance with the provisions of this Section 4.3(b). If, in the absence of a protective order or the receipt of a waiver hereunder, Seller or Owner is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal, Seller or Owner, as applicable, may disclose the Confidential Information to the tribunal; *provided, however*, that Seller or Owner, as applicable, shall use it, his or her best efforts to obtain, at the request of Buyer and at Buyer's sole cost and expense, an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as Buyer shall designate. The foregoing provisions shall not apply to and Confidential Information shall not include any information that is generally available to the public immediately prior to the time of disclosure unless such Confidential Information is so available due to the actions of Seller or Owner in violation of this Section 4.3(b).

(c) No Discouraging Actions. Neither Owner nor Seller shall, directly or indirectly, in any manner take any action which is designed, intended or would reasonably be

anticipated to have the effect of discouraging customers, suppliers, vendors, service providers, employees, licensee, licensor, lessors, franchisee and other business relations from maintaining the same business relationships with Seller, Buyer or the Business after the date of this Agreement and/or after the Closing.

Section 4.4 Further Assurances. Each Party will execute and deliver such further instruments of conveyance and transfer and, provided that it is at no out of pocket expense to Seller or Owner, take such additional actions (including updating title of the Business Proprietary Rights) as any other Party may reasonably request to effect, consummate, confirm or evidence the transfer to Buyer of, or the ownership by Buyer of, the Transferred Assets, the assumption by Buyer of the Assumed Liabilities and the other Contemplated Transactions (including, but not limited to, evidence of third party consents and notices and any documents necessary to terminate, release or assign all Liens (other than Permitted Liens) on the Transferred Assets).

Section 4.5 Accounts Receivable Payment. If any Party (or any Affiliate thereof) at any time receives any funds from any third party that are properly payable to another Party (including any payments with respect to the Accounts Receivable), the Party receiving such funds shall promptly remit such funds to the Party entitled to such funds.

Section 4.6 Use of Marks. Owner and Seller agree that, as of and after the Closing Date, they will cease to use, will cause each of their Affiliates to cease using, and will not permit or authorize any Person (including any of its Affiliates) to use, in any manner (including on the Internet, or as a company name or d/b/a in any sales literature, sales material or in connection with any products or services or otherwise) any Marks used in the Business or included in the Transferred Assets, any variation, adaptation or combination thereof, and/or any Mark similar thereto or derived therefrom (including, the "ECOKIND" Marks) (collectively, "**Company Marks**"). Within ten (10) days of the Closing, Owner and/or Seller, as applicable, shall make, or cause to be made, all filings necessary or requested by Buyer with all Governmental Entities, including with the State of Virginia, as necessary to change the name of Seller to a name that does not include any Company Marks, and amend, eliminate from and terminate any organizational documents, certificates of assumed names or "doing business as" filings and any other similar documents, certificates and filings of Seller and each other Affiliate of Seller or Owner so as to remove from such documents, certificates and filings and to terminate its right to use, or any other rights with respect to, any Company Marks. Owner and Seller agree that, as of and after the Closing Date, they shall not seek to register any Company Mark or to oppose, cancel or otherwise challenge the ownership, registrability, use, enforceability or validity of any Company Mark in any jurisdiction.

Section 4.7 Assignment of Property. Owner hereby agrees that if any assets (other than Excluded Assets, but including any Business Proprietary Rights) necessary for the conduct of the Business as it is currently conducted are owned by Owner or its Affiliate (other than Seller), Owner shall immediately assign, all right, title and interest in and to such assets to Seller so that such assets shall be deemed part of the Transferred Assets.

Section 4.8 Employee Matters.

(a) Unless included specifically within the Assumed Liabilities, Seller shall retain liability for any Employees under any severance pay program of Seller incurred on or before the date hereof and Buyer shall not assume such severance pay program or any liabilities thereunder and such shall be deemed Excluded Liabilities.

(b) No provision of this Agreement shall create any third party beneficiary rights in any current or former employee (including any beneficiary or dependent thereof). No provision of this Agreement is intended to, or does: (i) constitute the establishment or adoption of, or amendment to, or termination of, any Benefit Plan or any other compensation or benefit plan, program, policy, contract, agreement or arrangement, (ii) limit the ability of Buyer or any of their Affiliates to amend, modify, terminate, or adopt any benefit or compensation plan, program, policy, contract, agreement or arrangement, (iii) confer on any Person any right to employment or service or continued employment or service or any term or condition of employment or service, or (iv) limit Buyer's or any of its Affiliates' right to terminate the employment or service of any Person at any time and for any or no reason.

(c) During the period prior to the Closing Date, Seller shall use commercially reasonable efforts to make individual natural person independent contractors related to the Business and directly engaged by Seller available to Buyer for the purpose of allowing Buyer to interview each such contractor and determine the nature and extent of each such person's continuation with Buyer, if any; provided, however, that Owner shall have the right to be present at any such interview. Seller shall provide to Buyer contact information for third-party service providers providing contingent personnel to the Business and reasonably cooperate in identifying and transferring such contingent work force to the extent requested by Buyer.

Section 4.9 Insurance. With respect to claims, acts, omissions, events or circumstances which occurred prior to the Closing Date that are covered by Seller's occurrence-based insurance policies in effect as of the Closing Date (collectively, the "**Policies**"), Buyer may tender claims that may be made under such Policies to Seller, subject to the terms and conditions of such Policies, and only to the extent such coverage and limits are available under such Policies (collectively, the "**Insurance Claims**" and, each, an "**Insurance Claim**") by providing a written notice to Seller describing in reasonable detail the nature and circumstances surrounding such Insurance Claim. Thereafter, Seller shall tender such Insurance Claim to the relevant insurance carrier for the applicable Policy, but only to the extent Seller is permitted to do so pursuant to the terms of the applicable Policy.

Section 4.10 Business Premises. Simultaneously with the Closing, Seller shall, and Owner shall cause Neo-Classic Cars, LLC to, permit Buyer to continue to occupy and use the real property located at 1801 Ellen Road, Richmond, Virginia 23230 (the "**Business Premises**") for the duration of the Business Premises Lease at no cost or expense to Buyer. Following the Closing, each of Seller and Owner shall use best efforts to cooperate with Buyer to transfer possession of any and all Transferred Assets (*provided*, that Seller or Owner is not obligated to bear any out-of-pocket costs associated with such physical transfer) from the Business Premises to certain location(s) (as determined by Buyer in its sole discretion) prior to the expiration and/or termination of the Business Premises Lease.

Section 4.11 Foreign Supplier Verification Programs. Following the Closing but prior to Seller's FDA inspection in or around May 2022, Seller shall use best efforts to promptly complete any and all plans that may be required by the Foreign Supplier Verification Program regulations (collectively, the "**FSVP Plans**") and shall promptly transfer or assign the FSVP Plans to Buyer. In the event that the FSVP Plans are not transferrable or assignable, Seller shall use best efforts to assist Buyer with the production of its own FSVP Plans related to the Business prior to Seller's FDA inspection in or around May 2022.

## ARTICLE V
## SURVIVAL; INDEMNIFICATION AND RELATED MATTERS

Section 5.1 Survival. The representations and warranties of Buyer, Seller and Owner contained herein shall survive for the Survival Period, except for (i) the representations and warranties set forth in Sections 2.1 (Organization and Power), 2.2 (Authorization of Transaction), 2.3 (Ownership), 2.4 (No Subsidiaries or Investments), 2.5 (Absence of Conflicts), 2.14 (Brokerage), 2.18 (Affiliate Transactions), and 2.21(a) (Assets), which shall survive indefinitely; and (ii) the representations and warranties set forth in Section 2.10 (Tax Matters) which shall survive until ninety (90) days after the end of the applicable statute of limitations (the representations and warranties identified in clauses (i) and (ii) referred to collectively herein as the "**Material Representations**"); *provided*, that any representation or warranty in respect of which indemnity may be sought under this Article V, and the indemnity with respect thereto, shall survive the time at which it would otherwise terminate pursuant to this Article V if written notice of the breach or inaccuracy, or potential breach or inaccuracy, of such representation or warranty shall have been given prior to such time; *provided*, *however*, that such representation or warranty shall survive only with respect to the breach or inaccuracy, or potential breach or inaccuracy set forth in such written notice. The covenants and agreements of Buyer, Seller and Owner contained herein shall survive until fully discharged and performed. Claims relating to Excluded Liabilities, fraud, willful breach or intentional misrepresentation shall not expire.

Section 5.2 Indemnification.

(a) By Seller and Owner. Subject to the limitations set forth in Section 5.3, from and after the Closing, Seller and Owner, jointly and severally, shall indemnify Buyer and its Affiliates and each of their respective equity holders, members, partners, officers, directors, employees, lenders, agents, representatives, successors and assigns (each, a "**Buyer Indemnitee**" and, collectively, the "**Buyer Indemnitees**"), and hold each Buyer Indemnitee harmless from and against and in respect, and pay on behalf of or reimburse such Buyer Indemnitee as and when incurred for, any and all losses, Liabilities, disbursements, damages, injuries, demands, Proceedings, judgments, awards, settlements, assessments, deficiencies, Taxes, fines, penalties, fees, costs, expenses and reductions or diminution in value, in each case, whether or not arising out of a third party claim (including reasonable investigation and legal costs and expenses and any other reasonable cost or expense arising from or incurred in connection with any Proceeding or judgment relating to any matter described in this clause, or in enforcing the indemnity provided by this Section 5.2 (any such amount, a "**Loss**" and, collectively, "**Losses**")), which such Buyer Indemnitee may suffer, sustain or become subject to, as a result of or in connection with:

(i) any facts or circumstances which constitute an inaccuracy or breach of any representation or warranty of Seller or Owner set forth in this Agreement or in any other Transaction Document or in any certificate delivered by Owner or Seller in connection with the Closing;

(ii) any Excluded Liability;

(iii) any failure by Owner or Seller to perform any covenant or obligation of Owner or Seller set forth in this Agreement or in any certificate, document or instrument delivered by Owner or Seller hereunder; or

(iv) any violation of or Liability under any applicable bulk sales Law in connection with the transfer of the Transferred Assets.

(b) By Buyer. After the Closing, Buyer will indemnify Owner and Seller (each, a "**Seller Indemnitee**" and, collectively, the "**Seller Indemnitees**") and hold each Seller Indemnitee harmless from and against any Losses which such Seller Indemnitee may suffer, sustain or become subject to, as the result of or in connection with:

(i) any breach by Buyer of any representation, warranty, covenant or agreement of Buyer set forth in this Agreement;

(ii) any Assumed Liability; or

(iii) any failure by Buyer to perform any covenant or obligation of Buyer set forth in this Agreement; or

(iv) any Proceeding by any Person other than a Party or any Affiliates of any Party arising out of Buyer's operation of the Business following the Closing, provided and to the extent that the Loss arising therefrom is not subject to indemnification by Seller or Owner under Section 5.2(a) above.

(c) Determination of Loss and Amount. If any representation, warranty, covenant or agreement contained in this Agreement is qualified or limited based on materiality, including the term "material" or any similar qualifier, or any dollar amount, such qualification and/or limitation shall be considered for purposes of determining whether any breach or inaccuracy has occurred but in the event such breach or inaccuracy is determined to have occurred, shall be given no effect for purposes of determining the amount of any related Losses. If and to the extent any provision of Sections 5.2(a) or 5.2(b) is unenforceable for any reason, Seller, Owner and Buyer, as applicable, hereby agree to make the maximum contribution to the payment and satisfaction of the Losses for which indemnification is provided for in Sections 5.2(a) or 5.2(b) which is permissible under applicable Law.

Section 5.3 Limitations on Indemnification.

(a) In no event shall Seller and Owner be required to make any indemnification payments hereunder for Losses pursuant to Section 5.2(a)(i) (other than with respect to any Material Representation) unless the aggregate of all Losses would exceed, on a cumulative basis,

an amount equal to $50,000 (the "**Basket**"), in which case Seller and Owner shall be liable for the amount of all such Losses (expressly not taking into account the Basket).

(b) In no event shall Seller and Owner be required to make indemnification payments hereunder for Losses pursuant to Section 5.2(a)(i) (other than with respect to any Material Representation) in excess of $2,122,500.

(c) In no event shall Seller and Owner be required to make indemnification payments hereunder for Losses pursuant to Section 5.2(a) (including with respect to any Material Representation) in excess of the Estimated Purchase Price as adjusted pursuant to Section 1.5.

(d) In no event shall Buyer be required to make any indemnification payments hereunder for Losses pursuant to Section 5.2(b)(i) (other than with respect to any Material Representation) unless the aggregate of all Losses would exceed the Basket, on a cumulative basis, in which case Buyer shall be liable for the amount of all such Losses (expressly not taking into account the Basket).

(e) In no event shall Buyer be required to make indemnification payments hereunder for Losses pursuant to Section 5.2(b)(i) in excess of $2,122,500.

(f) Notwithstanding any limitations set forth herein, none of the limitations set forth in this Section 5.3 apply to any claim involving fraud, willful breach or intentional misrepresentation.

Section 5.4 Indemnification Procedure.

(a) Intentionally omitted.

(b) Any indemnification owing to the Buyer Indemnitees pursuant to this Article V shall be effected by wire transfer of immediately available funds from Seller and/or Owner, jointly and severally, to an account designated in writing by the Buyer Indemnitees within fifteen (15) days after the final determination thereof; *provided,* that any indemnification owing to the Buyer Indemnitees pursuant to Section 5.2(a)(i) (other than with respect to any Material Representation) shall be effected (i) first, by recovery of such indemnification amount by set-off by Holdings from Seller (or the holder(s) thereof) the Equity Consideration held at such time by Seller (or the holder(s) thereof) the aggregate value of which is equal to the amount of such indemnification and (ii) second, to the extent that the Equity Consideration held at such time by Seller (or the holder(s) thereof) is insufficient to satisfy the entire amount of such indemnification amount, then Seller and Owner shall, jointly and severally, make a payment to Buyer by wire transfer of immediately available funds to an account designated in writing by the Buyer Indemnitees within fifteen (15) days after the final determination thereof in an amount equal to (y) such indemnification amount minus (z) the portion of the Equity Consideration recovered by Holdings from Seller (or the holder(s) thereof) pursuant to clause (i) above. The value of the Equity Consideration for purposes of this Article V shall be equal to the Equity Consideration Per Unit Amount and the Equity Consideration shall be forfeited in pairs of 1 Holdings Class A Common Unit and 1 Holdings Investment Preferred Unit.

Section 5.5 Knowledge No Affect. No knowledge of any breach, claim, Liability, or other obligation, whether obtained by notice hereunder or otherwise, will affect any Party's right to indemnification or other remedy provided for in this Agreement in respect of any such matter of which it obtains knowledge or receives such notice unless the relevant Party expressly waives such right or remedy in writing.

Section 5.6 Adjustment Treatment. To the extent permitted by applicable Law, each Party will treat all indemnification payments made pursuant to this Article V as adjustments to the Purchase Price for all purposes unless otherwise required by applicable Law.

Section 5.7 Exclusion of Other Remedies. Subject to Section 1.5 and Section 7.13, the Parties agree that, from and after the Closing Date, the indemnification or reimbursement obligations of the Parties set forth in this Article V shall constitute the sole and exclusive remedies of the Parties for any Losses based upon, arising out of or otherwise in respect of the matters set forth in this Agreement and the other Transaction Documents and the Contemplated Transactions, in each case, other than the Restrictive Covenant Agreement, the Consulting Agreement, the Contribution Agreement and the Holdings LLC Agreement. The provisions of this Section 5.7 will not, however, prevent or limit a cause of action on account of fraud, willful breach or intentional misconduct.

## ARTICLE VI
## DEFINITIONS

Section 6.1 Defined Terms. In this Agreement, the following terms shall have the following respective meanings:

"**Accounting Firm**" has the meaning set forth in Section 1.5(d).

"**Accounts Receivable**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Adjustment Amount**" has the meaning set forth in Section 1.5(a).

"**Adjustment Escrow Account**" has the meaning set forth in Section 1.4(a)(iv).

"**Adjustment Escrow Amount**" has the meaning set forth in Section 1.2(a).

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"**Affiliate Transactions**" has the meaning set forth in Section 2.18.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Anti-Corruption Laws**" means any Law (including common law) in any part of the world related to combating bribery, corruption and money laundering, including the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions and the UN Convention Against Corruption; the Foreign Corrupt Practices Act of 1977, as amended; and the UK Bribery Act 2010.

"**Assumed Contracts**" means the Contracts specifically listed on Schedule A.

"**Assumed Liabilities**" means all obligations of Seller related solely to the Business, other than Excluded Liabilities, that are to be paid or performed after the Closing Date solely arising out of:

(a) the Assumed Contracts (in each case, in no event to include any obligations of Seller, Owner or any of their respective Affiliates that relate to any breach of representation, warranty, covenant or agreement that arose on or prior to the Closing Date under any Assumed Contract); and

(b) each current liability of the Business as of immediately prior to Closing to the extent included, and in an amount not to exceed the amount set forth with respect to such current liability, in the final determination of the Closing Net Working Capital.

"**Assumption Agreement**" has the meaning set forth in Section 1.1(d).

"**Base Purchase Price**" has the meaning set forth in Section 1.2(a).

"**Benefit Plan**" means any "employee benefit plan" (as such term is defined in ERISA § 3(3)) and any other pension, retirement, profit-sharing, savings, health, welfare, bonus, incentive, commission, stock option, equity or equity-based, deferred compensation, severance, retention, accident, disability, employment, change of control, stock purchase, restricted stock, separation, consulting, vacation, paid time off, fringe benefit. or other benefit or compensation plan, policy, agreement, program or arrangement of any kind.

"**Bill of Sale**" means has the meaning set forth in Section 1.1(d).

"**Business**" means the business of Seller as conducted as of the date hereof and during the immediately preceding twelve (12) months, including, but not limited to the business of distributing, developing, marketing and/or selling (including to any wholesaler, retailer or through any e-commerce platform or marketplace) of pet food products and pet food treats including, without limitation, natural or eco-friendly pet products, dog chews (including bully sticks and yak chews) and treats (from any of beef, lamb, poultry, fish, water buffalo, other small game or other animals, cheese, yak milk, cow milk, peanut butter and plants) and small bite treats and body parts (including, without limitation, bones, ears, antlers and other animal consumable parts).

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks in New York, New York are open for the general transaction of business.

"**Business Premises**" has the meaning set forth in Section 4.10.

"**Business Premises Lease**" means that certain Deed of Lease, dated as of May 1, 2019, by and between 1801 Ellen Rd OZ Business, LLC (as assignee to JDJ Empire LLC) and Neo-Classic Cars LLC, together with the Assignment of Leases, dated January 26, 2022.

"**Business Proprietary Rights**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Business Systems**" has the meaning set forth in Section 2.12(e).

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Buyer Indemnitee**" has the meaning set forth in Section 5.2(a).

"**CARES Act**" shall mean Public Law Number 116-136, and any rules, regulations or guidance promulgated thereunder, or published with respect thereto, by any Governmental Entity.

"**Certifications**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Closing**" has the meaning set forth in Section 1.3.

"**Closing Date**" has the meaning set forth in Section 1.3.

"**Closing Net Working Capital**" means the Net Working Capital as of immediately prior to the Closing.

"**Closing Net Working Capital Statement**" has the meaning set forth in Section 1.5(b).

"**COBRA**" has the meaning set forth in Section 2.17(d).

"**Code**" means the United States Internal Revenue Code of 1986, as amended.

"**Company Marks**" has the meaning set forth in Section 4.6.

"**Company Products**" means all products developed, manufactured, marketed, sold, distributed, sourced, procured or delivered by or on behalf of Seller on or prior to the Closing Date.

"**Confidential Information**" has the meaning set forth in Section 4.3(b).

"**Consent**" means any consent, order, approval, authorization or other action of, or any filing with or notice to or other action with respect to, any Governmental Entity or any other Person which is (a) required or necessary for any of (i) the execution, delivery or performance of this Agreement or any other Transaction Document, (ii) the consummation of the Contemplated Transaction or other transaction contemplated hereby or thereby or (iii) the conduct of the Business by Buyer after Closing in the same manner as presently conducted or the holding or utilization of any Transferred Asset thereafter, whether such requirement or necessity arises pursuant to any

Law, Contract, Permit, or Certification (including any of the foregoing which is required in order to prevent a breach of or a default under or a termination or modification of any Contract) or (b) set forth on Schedule 2.5.

"**Consulting Agreement**" has the meaning set forth in the recitals to this Agreement.

"**Contemplated Transactions**" means all of the transactions contemplated by this Agreement and the Transaction Documents, including the performance by the Parties of their respective covenants and obligations under this Agreement and the Transaction Documents.

"**Contract**" means any agreement, contract, lease, sublease, license, sublicense, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, purchase order, franchise, permit, joint venture agreement, partnership agreement or other arrangement, understanding, permission, obligation or commitment, including any commitment to enter into any of the foregoing, in each case, whether written or oral.

INTANGIBLE ASSETS

"**Contributed Assets**" means an undivided ownership interest in the goodwill and going concern value of this Business, which for purposes of this Agreement are deemed to have a value equal to the Rollover Amount.

$6 Million.

"**Contribution Agreement**" has the meaning set forth in the recital to this Agreement.

"**COVID-19**" means the novel coronavirus, SARS-CoV-2 or COVID-19 (and all related strains and sequences), including any intensification, resurgence or any evolutions or mutations thereof, and/or related or associated epidemics, pandemics, disease outbreaks or public health emergencies.

"**Data Security Requirements**" means all of the following, to the extent relating to any personal or sensitive information or data (including credit card information), data treatment (including the access, collection, storage, transfer and use of data) or otherwise relating to privacy, security, or security breach notification requirements: (i) applicable Laws; (ii) Contracts to which Seller is a party or is otherwise bound (including with respect to the Payment Card Industry Data Security Standard (PCI DSS)); and (iii) any industry standards applicable to the Business.

"**Domain Name**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Employee**" has the meaning set forth in Section 2.16(h).

"**Environmental and Safety Requirements**" means, whenever in effect, all Laws, and all contractual obligations, in each case concerning public or worker health or safety, pollution or protection of the environment.

"**Equity Consideration**" means the 6,000,000 Holdings Investment Preferred Units and 6,000,000 Holdings Class A Common Units issued to Seller pursuant to the Contribution Agreement.

"**Equity Consideration Per Unit Amount**" means for each $1.00 of the Rollover Amount, one (1) Holdings Investment Preferred Unit and one (1) Holdings Class A Common Unit, subject to equitable adjustments in the event of unit splits, unit dividends, spin-off transactions, reorganizations or extraordinary distributions (whether in cash, securities or other property), unit combinations or other similar transactions affecting the outstanding Holdings Investment Preferred Units or Holdings Class A Common Units without Holdings' receipt of consideration.

"**Equity Interests**" means issued and outstanding capital stock, partnership interests, limited liability company interests or other indicia of equity ownership (including any profits interest).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person that, together with the Seller or any of its Subsidiaries, at any relevant time would be treated as a single employer under Section 414 of the Code.

"**Escrow Agent**" means JPMorgan Chase Bank, N.A.

"**Escrow Agreement**" has the meaning set forth in Section 1.4(a)(iv).

"**Estimated Closing Net Working Capital**" has the meaning set forth in Section 1.2(a).

"**Estimated Closing Net Working Capital Statement**" has the meaning set forth in Section 1.2(a).

"**Estimated Purchase Price**" has the meaning set forth in Section 1.2(a).

"**Estimated Purchase Price Statement**" has the meaning set forth in Section 1.2(c).

"**Example Calculation of Net Working Capital**" means the calculation of Net Working Capital (but as of the dates indicated, instead of as of immediately prior to the Closing) set forth on Exhibit C.

"**Excess Adjustment Amount**" has the meaning set forth in Section 1.5(g).

"**Excluded Assets**" means Seller's rights in, to and under the following, in each case to the extent existing immediately prior to the Closing Date:

(a) Cash. Cash and cash equivalents;

(b) Corporate Books and Records. All minutes of meetings of the board of directors, managers or members of Seller, and all organizational documents, minute books, books of account or other records having to do with the company organization of Seller,

(c) Transaction Documents. The Transaction Documents and all rights which accrue or will accrue to Seller thereunder;

(d) Equity Interests. The Equity Interests of Seller;

(e) Benefit Plans. Sponsorship of any Plan and any other benefit or compensation plan, program, policy, agreement or arrangement of any kind at any time maintained, sponsored or contributed to or required to be contributed to by the Sellers or any ERISA Affiliate of the Sellers, or with respect to which the Sellers or any ERISA Affiliate has any current or contingent liability, and all assets attributable thereto;

(f) Business Records. The original personnel records, all financial, accounting and Tax records and all other records, in each case that the Seller is required by Law to retain in its possession and provided in each such case the Buyer has copies of all such records that are reasonably necessary for its operation of the Business after the Closing;

(g) Insurance Policies. All insurance policies of Seller and all rights to applicable claims and proceeds thereunder;

(h) Tax Assets. All Tax assets (including duty and Tax refunds and prepayments) of Seller or any of its Affiliates except to extent any such items included in the Net Working Capital as finally determined pursuant to Section 1.5;

(i) Claims. To the extent applicable to an Excluded Liability, all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise; and

(j) Other. All items set forth on Schedule D (collectively, the "**Scheduled Excluded Assets**").

"**Excluded Liabilities**" means all Liabilities and obligations of Seller (whether or not arising out of or relating to the Business) or its respective Affiliates (or otherwise relating to Seller or Owner, their Affiliates, the Business, the Real Property or the Transferred Assets), in each case, whether or not disclosed to Buyer, including on the Schedules to this Agreement, other than the Assumed Liabilities, including all Liabilities and obligations:

(a) relating to or arising under or in connection with any Plan, any "employee benefit plan" (as defined in ERISA § 3(3)), or any other benefit or compensation plan, program, policy, agreement or arrangement of any kind at any time maintained, sponsored or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any Liability;

(b) pertaining to the employment or service with, or termination from employment or service from, Seller or any ERISA Affiliate, of any individual;

(c) relating to Liabilities of Seller for injury to or death of persons or damage to or destruction of property (including any worker's compensation claim) with respect to acts or omissions by Seller which occur on or prior to the Closing Date regardless of when said claim or

Liability is asserted, including any claim for consequential damages in connection with the foregoing; it being understood and agreed that any such claim or Liability asserted after the Closing Date, but arising from acts or omissions by Seller which occur before the Closing Date shall be considered to be a claim against or a Liability of Seller for injury to or death of persons or damages to or destruction of property and therefore not assumed hereunder by Buyer;

(d) relating to any claims or Liabilities with respect to any Company Products on or prior to the Closing Date; it being understood and agreed that any such claim or Liability asserted after the Closing Date arising out of any such Company Product prior to the Closing Date shall be considered to be a claim against or a Liability of Seller and therefore not assumed hereunder by Buyer;

(e) relating to any claims (whether asserted before or after the Closing Date) for any breach of a representation, warranty or covenant, or for any claim for indemnification, contained in any Assumed Contract agreed to be performed pursuant to this Agreement by Buyer, to the extent that such breach or claim arises out of or by virtue of Seller's performance or nonperformance thereunder prior to the Closing Date, it being understood that, as between the Parties hereto, this subsection shall apply notwithstanding any provision which may be contained in any form of consent to the assignment of any such Assumed Contract, which by its terms, imposes such Liabilities upon Buyer and which assignment is accepted by Buyer notwithstanding the presence of such a provision, and that Seller's failure to discharge any such Liability shall entitle Buyer to indemnification in accordance with the provisions of Article V hereof;

(f) relating to product warranty or other warranty Liabilities of Seller with respect to any products, merchandise or services of the Business sold or rendered on or prior to the Closing Date, including product recalls as a result of design defects or defective materials; it being understood and agreed that any such claim or Liability asserted after the Closing Date arising out of any such sale or service prior to the Closing Date shall be considered to be a claim against or a Liability of Seller and therefore not assumed hereunder by Buyer, except for product warranty Liabilities explicitly included in Assumed Liabilities;

(g) relating to any Liabilities of Seller with respect to Seller's failure to take reasonable steps to safeguard the Business Systems used in the Business by Seller;

(h) in respect of any Proceeding involving Seller or related to the Business or any Transferred Asset, or any infringement, misappropriation of or other conflict with the Proprietary Rights of any Person, arising on or prior to the Closing Date (whether or not asserted or commenced before or after the Closing Date);

(i) relating to the Excluded Assets;

(j) arising out of violations occurring on or prior to the Closing Date of any Law;

(k) arising out of or relating to Seller's violation of any Environmental and Safety Requirement on or prior to the Closing Date;

(l) with respect to Indebtedness of Seller (including with respect to the SBA Loan) or dividends payable by Seller whether incurred or accrued before or after the Closing Date;

(m) relating to the Equity Interests of Seller, or any equityholders agreement or partnership operating agreement to which Seller is party;

(n) relating to obligations of Seller under this Agreement or any Transaction Document;

(o) relating to any transactions between Seller and any of its Insiders whether occurring before or after the Closing Date;

(p) for or on account of any Tax;

(q) under capitalized leases (other than any capitalized leases that are Assumed Contracts) with respect to which Seller is liable, contingently or otherwise, as obligor, guarantor or otherwise, or with respect to which Seller assures a creditor against loss;

(r) relating to Liens on the Transferred Assets arising on or before the Closing Date;

(s) any amounts payable for fees or expenses incurred by Seller in respect to this Agreement, any other Transaction Document or agreement contemplated hereby and/or the Contemplated Transactions or otherwise in connection with Seller's sale of the Business;

(t) any amounts payable to any Affiliate of Seller;

(u) all items set forth on Schedule E (collectively, the "**Scheduled Excluded Liabilities**");

(v) excluded under Section 4.9 of this Agreement; and

(w) without limitation by the specific enumeration of the foregoing, any other obligation or Liability not expressly included in the definition of Assumed Liabilities.

"**Financial Statements**" has the meaning set forth in Section 2.6.

"**FSVP Plans**" has the meaning set forth in Section 4.11.

"**GAAP**" means generally accepted accounting principles, consistently applied, as in effect from time to time, in the United States as promulgated by all relevant accounting authorities.

"**Governing Documents**" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation would be its articles of incorporation (or certificate of incorporation, as applicable) and bylaws, the "Governing Documents" of a limited partnership would be its certificate of formation and limited partnership agreement and the "Governing

Documents" of a limited liability company would be its certificate of formation and operating agreement.

"**Governmental Entity**" means any government, agency, governmental department, commission, board, body, department, authority, bureau, court, tribunal, administrative hearing body or instrumentality of the United States of America or any other country or any state or other political subdivision thereof (whether now or hereafter constituted and/or existing) and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any arbitration panel or body or similar dispute-resolving panel (public or private).

"**Hazardous Substance**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is or is defined as hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental and Safety Requirements; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, per- or polyfluoroalkyl substances, and polychlorinated biphenyls.

"**Holdings**" has the meaning set forth in the recitals to this Agreement.

"**Holdings Class A Common Units**" means Holdings' Class A Common Units (as such term is defined in the Holdings LLC Agreement).

"**Holdings Investment Preferred Units**" means Holdings' Investment Preferred Units (as such term is defined in the Holdings LLC Agreement).

"**Holdings LLC Agreement**" means the Second Amended and Restated Limited Liability Agreement of Holdings, dated December 29, 2020.

"**Improvements**" has the meaning set forth in Section 2.9(c).

"**Indebtedness**" means, without duplication, (i) any indebtedness or obligation (whether created, incurred, assumed, guaranteed or otherwise borne) for borrowed money or issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness or obligation evidenced by any note, bond, mortgage, debenture or other debt security, (iii) any indebtedness or obligation for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables and other current liabilities incurred in the Ordinary Course), (iv) any commitment by which a Person assures a creditor against loss (including contingent reimbursement obligations with respect to letters of credit), (v) any indebtedness or obligation guaranteed in any manner by a Person (including guarantees in the form of an agreement to repurchase or reimburse), (vi) any indebtedness or obligation secured by a Lien on a Person's assets, (vii) any obligations of a Person under capitalized leases according to GAAP, (viii) any Liability (including increase in obligations) of a Person arising under any Contract or arrangement to which such Person is party arising in whole or in part as a result of the Contemplated Transactions, (ix) any payment to be made pursuant to sale-leaseback transactions, (x) any payment to be made pursuant to a non-compete payment obligation, consulting, employment, deferred compensation, change of control payment

obligation or similar arrangements, (xi) net Liabilities associated with reconciled intercompany balances, (xii) any Liabilities related to acquisition of or by Seller and including earn-out or similar contingent purchase amounts, (xiii) any unsatisfied obligation for "withdrawal liability" to a "multiemployer plan" as such terms are defined under ERISA, (xiv) any amounts outstanding under any letters of credit, bankers acceptance or similar instrument, in each case, including interest, fees and prepayment premiums or penalties thereon and (xv) all "applicable employment taxes" (as defined in Section 2302(d)(1) of the CARES Act) that the Sellers have elected to defer pursuant to Section 2302 of the CARES Act and all Taxes (including withholding Taxes) deferred pursuant to IRS Notice 2020-65 or any related or similar order or declaration from any Governmental Entity (including without limitation the Presidential Memorandum, dated August 8, 2020, issued by the President of the United States) and (xvi) any Liabilities arising under any interest rate, currency, commodity or other similar swap, cap, collar, futures contract or other hedging arrangement (in each case, including all principal, interest, premiums, penalties, fees, expenses, indemnities and breakage costs).

"**Insider**" means (i) Seller, (ii) Owner, (iii) each employee, officer, director, equityholder or other Affiliate of Seller or the Business or Owner, (iv) any individual related by blood, marriage or adoption to any individual listed in clause (i), (ii) or (iii), and (v) any entity in which any of the foregoing owns, directly or indirectly, any beneficial interest.

"**Insurance Claims**" has the meaning set forth in Section 4.9.

"**Inventory**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Investment**" as applied to any Person means (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, Equity Interest, securities or other ownership interest (including partnership interests and joint venture interests) of any other Person and (ii) any capital contribution by such Person to any other Person.

"**Knowledge**" means, with respect to any Person, that such Person will be deemed to have "**Knowledge**" of a particular fact or other matter if (i) such Person is actually aware of such fact or other matter; or (ii) a prudent Person could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter or after due inquiry of all employees in the direct reporting line of such Person. Without limiting the foregoing, as it relates to Seller, "**Knowledge**" shall mean the Knowledge (as defined herein) of Owner.

"**Labor Agreement**" has the meaning set forth in Section 2.11(a)(i).

"**Latest Balance Sheet**" has the meaning set forth in Section 2.6(b).

"**Laws**" means all federal, state and local laws, statutes, codes, ordinances, regulations, rules, orders, rulings, awards, judgments, writs, injunctions, acts or decrees of any Governmental Entity, including common law.

"**Leased Real Property**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Leasehold Improvements**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Leases**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Liability**" means any direct or indirect liability, obligation, Indebtedness, claim, loss, damage, deficiency, penalty, responsibility, cost or expense (whether known or unknown, whatever kind or nature whether asserted or unasserted, whether absolute contingent, whether accrued or unaccrued, whether choate or inchoate, whether secured or unsecured, whether liquidated or unliquidated, and whether due or to become due or otherwise), including any liability for Taxes.

"**Lien**" means any mortgage, pledge, hypothecation, lien (statutory or otherwise), preference, priority, charge, adverse claim of ownership or use, restriction on transfer (such as a right of first refusal or similar right), defect of title, security interest, license or other encumbrance of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing and any assignment or deposit arrangement in the nature of a security device).

"**Loss**" or "**Losses**" has the meaning set forth in Section 5.2(a).

"**Mark**" has the meaning set forth in the definition of "**Proprietary Rights**" herein.

"**Material Adverse Effect**" means with respect to the Business, the Transferred Assets and Seller, any fact, circumstance, event, change, development or effect that, individually or in the aggregate, has had, or would reasonably be expected to have, a material and adverse effect on the Business, the Transferred Assets taken as a whole, or the financial condition, operations or results of operations of the Business taken as a whole; *provided*, that the foregoing clause shall not include any such fact, circumstance, event, change, development or effect to the extent resulting from (i) general economic or market conditions, (ii) conditions generally affecting the industries in which the Business or Seller operates; (iii) changes in, or the interpretation of, applicable Law or accounting rules or principles, (iv) changes in political conditions (including acts of war, whether or not declared, armed hostilities and terrorism), (v) natural disasters and other "acts of God", (vi) any matter in the Schedules, (vii) actions required by this Agreement, (viii) the announcement or completion of any of the Contemplated Transactions, or (ix) any failure by the Business to meet any projections, forecasts or revenue or earnings predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded); in each case, except to the extent that any such fact, circumstance, event, change, development or effect has materially disproportionate effect on the Business or Seller relative to other comparable businesses in the industries in which the Business or Seller operates.

"**Material Contracts**" has the meaning set forth in Section 2.11(b).

"**Material Customer**" has the meaning set forth in Section 2.27.

"**Material Representations**" has the meaning set forth in Section 5.1.

"**Material Vendor**" has the meaning set forth in Section 2.28.

"**Net Working Capital**" means the net book value of those current assets of the Business as of immediately prior to the Closing that are included in the line item categories of current assets specifically identified in the Example Calculation of Net Working Capital, less the net book value of those current liabilities of the Business as of immediately prior to the Closing that are included in the line item categories of current liabilities specifically identified on the Example Calculation of Net Working Capital, in each case, without duplication as determined (A) in accordance with GAAP and, to the extent consistent with GAAP, the accounting methods, policies, practices, and procedures, with consistent classification, judgments, and estimation methodology, as were used in preparing the in the Example Calculation of Net Working Capital, and (B) without giving effect to the transactions contemplated by this Agreement.

"**Notice of Disagreement**" has the meaning set forth in Section 1.5(b).

"**Ordinary Course**" means, with respect to any Person, an action taken by such Person will be deemed to have been taken in the "**Ordinary Course**" only if (i) such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person; (ii) such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority) and is not required to be specifically authorized by the parent company (if any) or equityholders of such Person; and (iii) such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of the normal day-to-day operations of other Persons that are in the same line of business as such Person.

"**Owner**" has the meaning set forth in the preamble to this Agreement.

"**Pandemic-Relief Debt**" means any Indebtedness incurred in connection with any Law or program involving any Governmental Entity providing or expanding any loan, guaranty, investment, participation, grant, program or other assistance in response to or to provide relief for the COVID-19 pandemic, including, without limitation, any PPP Loan, any U.S. Small Business Administration Economic Injury Disaster Loan, any loan under the Main Street Lending Program announced by the U.S. Department of Treasury and Board of Governors of the Federal Reserve, or any other similar federal, state or local Governmental Entity program.

"**Pandemic-Relief Debt Documentation**" means as to any Pandemic-Relief Debt, all (i) documents, instruments and agreements evidencing or related to such Pandemic-Relief Debt, any collateral provided in respect thereof or any indemnity and/or hold-harmless agreement related thereto, (ii) any Law governing such Pandemic-Relief Debt or that require certain action or inaction as a result of incurring such Pandemic-Relief Debt or the forgiveness thereof (including, without limitation, the requirement prohibiting the deferral of any employer's portion of Social Security Taxes pursuant to Section 2302 of the CARES Act or the requirement prohibiting the claiming of any Employee Retention Credit under Section 2301 of the CARES Act), and (iii) applications (and all attachments, exhibits, addenda the like with respect thereto, including without limitation, information with respect to affiliation), submissions, reports, or other documentation (including, without limitation, payroll documentation and affiliation documentation) provided by or on behalf of Seller to any lender, lender agent or Governmental Entity in connection with

applying for, obtaining, using the proceeds of, or seeking forgiveness of such Pandemic-Relief Debt.

"**Party**" or "**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permit**" or "**Permits**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Permitted Liens**" means:

(a) Liens on Transferred Assets arising by operation of Law and securing the payment of Taxes which are not yet due and payable;

(b) restrictions on transfer imposed under state or federal securities Laws;

(c) the lessors' and sublessors' rights under leases of personal property by Seller as lessee which are part of the Transferred Assets; and

(d) mechanics', carriers', workers', repairers', and similar non-consensual Liens arising by operation of Law and relating to obligations which are incurred in the Ordinary Course and which secure only Assumed Liabilities which are not yet due and payable and which shall be paid in full and released at Closing.

"**Person**" means an individual, a partnership, a corporation, a limited liability company, a limited partnership, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Governmental Entity or any department, agency or political subdivision thereof.

"**Plan**" and "**Plans**" each have the meaning set forth in Section 2.17(a).

"**Policies**" has the meaning set forth in Section 4.9.

"**PPP Loan**" means a loan incurred under 15 U.S.C. 636(a)(36) (as added to the Small Business Act by Section 1102 of the CARES Act).

"**PPP Specified Forgivable Uses**" means uses of proceeds of an PPP Loan that are eligible for forgiveness under Section 1106 of the CARES Act (including, without limitation, "payroll costs" as defined in 15 U.S.C. 636(a)(36)(A)(viii) (as added to the Small Business Act by Section 1102 of the CARES Act)).

"**Proceeding**" means any action, arbitration, audit, charge, claim, complaint, decree, demand, dispute, hearing, investigation, inquiry, judgment, litigation, order or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity.

"**Proprietary Rights**" means all intellectual property and proprietary rights, and all associated or corresponding rights, throughout the world, including: (i) patents, patent applications, patent disclosures and inventions and all industrial designs registrations and

applications (including utility model rights, design rights and industrial property rights) and any reissue, continuation, continuation-in-part, divisional, revision, extension or reexamination of the foregoing; (ii) trademarks, service marks, certification marks, trade dress, logos, trade names, slogans, Internet domain names, corporate names, business names, and all other indicia of origin, all registrations, applications and renewals for any of the foregoing, and all goodwill associated with the foregoing (collectively, "**Marks**"); (iii) copyrights, databases, database rights, and other works of authorship (whether or not copyrightable, including "**look and feel**") and moral rights, and all registrations, applications and renewals for any of the foregoing; (iv) trade secrets, know-how, confidential information and other proprietary rights and information (whether or not patentable or reduced to practice), including inventions and improvements thereto, discoveries, methods, processes, technologies, techniques, protocols, recipes, formulae, algorithms, compositions, industrial models, architectures, layouts, designs, drawings, plans, specifications, methodologies, ideas, research and development, technical data, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals (collectively, "**Trade Secrets**"); (v) software (including source code, executable code, systems, tools, data, databases, firmware, interfaces, and related documentation); (vi) rights of publicity and privacy, including the right to use names, likenesses, voices and biographical information of real Persons; and (vii) all copies and tangible embodiments of the foregoing (in whatever form or medium).

"**Proprietary Rights Assignment**" has the meaning set forth in Section 1.1(d).

"**Purchase Price**" has the meaning set forth in Section 1.5(h).

"**Purchased Assets**" means Seller's rights, title and interest in, to and under all assets, rights and properties of the Business (whether real, personal or mixed, tangible and intangible, and of every kind, character and description), which are used, or held for use, in the Business (including the Business as a going concern) or otherwise (other than the Excluded Assets and the Contributed Assets), including Seller's rights in, to and under the following, in each case to the extent existing as of the Closing Date:

(a) Inventory. All inventories of the Business, which are held at, or are in transit from or to, the locations at which the Business is conducted, or located at suppliers' premises on consignment, in each case, which are used or held for use by Seller in the conduct of the Business, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person, together with all rights of Seller against suppliers of such inventories ("**Inventory**");

(b) Tangible Personal Property. In addition to the Inventory separately described above, all equipment, furniture, fixtures, machines, hardware, networks, office materials and supplies, spare parts and other tangible personal property of every kind and description owned, leased or subleased as of the date of this Agreement by Seller and used, or held for use, in the conduct of the Business at the locations at which the Business is conducted or at suppliers' premises or customers' premises on consignment, and any additions, improvements, replacements, and alterations thereto made on or prior to the Closing Date;

(c) Contracts. All Assumed Contracts relating to the Business, but not including this Agreement, agreements with respect to the Contemplated Transactions or agreements relating

to the governance or ownership of Seller or to which Seller, Owner or one or more of their Affiliates is a party or otherwise bound on the Closing Date;

(d) Rights Under Restrictive Covenants. All rights of Seller or any Affiliate of Seller under any non-disclosure agreement, non-solicitation agreement, non-competition agreement, confidentiality agreement or other restrictive agreement or restrictive covenant entered into with any former or current employee or independent contractor of the Business, in each case, whether or not such agreement is an Assumed Contract, including all such rights under the agreements listed on Schedule C;

(e) Proprietary Rights. All Proprietary Rights, and all goodwill associated therewith, owned by Seller or used, or held for use, in connection with the Business, including the items set forth on Schedule 2.12(a) and the Company Marks, together with all rights to collect income, royalties, damages, products, proceeds and payments due or payable at the Closing or thereafter with respect to the foregoing, including all claims against third parties for past, present or future infringements or misappropriations thereof or other conflicts therewith, and the right to sue and recover for past, present or future infringements or misappropriations of or other conflicts with any of the foregoing, the right to recover damages or lost profits in connection therewith, and all corresponding rights throughout the world (the "**Business Proprietary Rights**");

(f) Files and Records. All files, data and other records of Seller which relate to the Business, including all consumer mail, email, phone number and other data and lists and records pertaining to customers, suppliers, distributors, personnel and agents, all related books, records, accounts, canceled checks, payment records, Tax Returns for the Business and other Tax records relating to the Business (including payroll, unemployment, real estate and all other similar books and records of Seller relating to the Business other than to the extent relating exclusively to any Excluded Asset or Excluded Liability) (the "**Transferred Records**");

(g) Prepaid Items. Deposits and other similar assets related to or made in connection with any of the Transferred Assets as well as prepayments and all other prepaid expenses of the Business;

(h) Accounts Receivable. All trade receivables, accounts receivable, accrued receivable and notes receivable and other monies receivable relating to or arising out of the Business or any Transferred Asset (the "**Accounts Receivable**");

(i) Permits. All licenses, notifications, permits, permits by rule, franchises, certificates, registrations, approvals, accreditations, permissions, clearances, exemptions, classifications, consents, certificates, authorizations, variances and similar rights obtained, or required to be obtained, or issued by any Governmental Entity or any accreditation agency, including all applications therefor and all renewals, extensions, or modifications thereof and additions thereto, to the extent assignable to Buyer (collectively, the "**Permits**");

(j) Communications. All transferable telephone exchange numbers, the right to receive and retain mail and other communications and collections, including the right to retain mail and communications from distributors, agents and all others, in each case relating to the Business;

(k) Security Deposits. All security deposits deposited by or on behalf of Seller as lessee or sublessee, under any leases or subleases of real or personal property relating to the Business or any Transferred Asset;

(l) Warranties. All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors in connection with products sold to or services provided to Seller for the Business, or affecting the property, machinery or equipment used in the conduct of the Business or any Transferred Asset;

(m) Claims. All claims, deposits, prepayments, warranties, guaranties, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature related to, or in connection with, the Business or any Transferred Asset;

(n) Certifications. All certifications, ratings, listings and similar rights or benefits obtained from any customer, product certification organization or Governmental Entity related to, or in connection with, the Business or the Transferred Assets (collectively, the "**Certifications**");

(o) Leases. All of Seller's right, title and interest in all leases, subleases, licenses, concessions and other agreements (written or oral) (the "**Leases**"), pursuant to which Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, any land, buildings, structures, improvements, fixtures or other interest in real property which is used or intended to be used in, or otherwise related to, the Business (the "**Leased Real Property**"), including the right to all security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder;

(p) Leasehold Improvements. All buildings, structures, improvements and fixtures located on any Leased Real Property which are owned by Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property (the "**Leasehold Improvements**");

(q) Websites. All rights to the website located at https://www.ecokindpettreats.com/ as well as any other website or domain name owned or used by Seller or the Business ("**Domain Name**");

(r) Other Assets. All other property owned by Seller, or as to which Seller has any right (irrespective of title), in each case, related to the Business, on the Closing Date, other than the Excluded Assets; and

(s) Goodwill. All of Seller's goodwill in, and going concern value of, the Business or otherwise associated with any of the foregoing.

"**Real Property**" has the meaning set forth in Section 2.9(b).

"**Registered Proprietary Rights**" has the meaning set forth in Section 2.12(a).

"**Required Consents and Notices**" has the meaning set forth in Section 1.4(a)(ii).

"**Restrictive Covenant Agreements**" has the meaning set forth in the recitals to this Agreement.

"**Rollover Amount**" means an amount equal to $6,000,000.

"**Sanctioned Country**" means a country or territory which is currently or has in the last five years been itself the subject of or target of any Sanctions and Export Control Laws (at the time of this Agreement, the Crimea region of Ukraine, Cuba, Iran, North Korea, Venezuela, Sudan and Syria).

"**Sanctioned Person**" means a Person (i) listed on any Sanctions and Export Control Laws-related list of designated Persons maintained by a Governmental Entity, (ii) greater than 50% owned or controlled by one or more Persons described in clause (i) above, or (iii) located, organized, or resident in a Sanctioned Country.

"**Sanctions and Export Control Laws**" means any Law (including common law) in any part of the world related to (i) export controls, including the U.S. Export Administration Regulations and the International Traffic in Arms Regulations, (ii) economic sanctions, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the European Union, any European Union Member State, the United Nations, and Her Majesty's Treasury of the United Kingdom.

"**SBA Loan**" means that certain Economic Injury Disaster Loan (SBA Loan #4616327809) made to Seller by the U.S. Small Business Administration (SBA) on May 28, 2020 (under Section 7(b) of the Small Business Act, as amended) pursuant to a Loan Authorization and Agreement entered into by Seller and the SBA effective May 28, 2020, and which obligation of Seller is evidenced by a Note of even date therewith executed by Seller in the amount of one hundred and fifty thousand and 00/100 Dollars ($150,000.00).

"**Scheduled Excluded Assets**" has the meaning set forth in the definition of "Excluded Assets".

"**Scheduled Excluded Liabilities**" has the meaning set forth in the definition of "Excluded Assets".

"**Schedules**" has the meaning set forth in the preamble to Article II.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller Indemnitees**" has the meaning set forth in Section 5.2(b).

"**Seller Payment Amount**" has the meaning set forth in Section 1.2(d)(iii).

"**Subsidiary**" means, with respect to any Person, any corporation, limited liability company, partnership, limited partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of Equity Interests entitled (without regard to the

occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, limited partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.

"**Survival Period**" means the period as of the date hereof until the later of: (i) twelve (12) months after the Closing Date and (ii) ten (10) Business Days following the issuance of Buyer's annual audit for the fiscal year 2022; provided, that if such audit is not issued by the fifteenth (15) month anniversary of the Closing, then the period shall terminate fifteen (15) months after the Closing Date.

"**Target Net Working Capital**" has the meaning set forth in Section 1.2(a).

"**Tax**" (and, with correlative meaning, "**Taxes**" and "**Taxing**") means all (i) United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature, including all income, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, severance, windfall profits, escheat or unclaimed property obligations, stamp, stamp duty reserve, license, payroll, withholding, backup withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest; (ii) any Liability for the payment of any amount of a type described in clause (i) arising as a result of being or having been a member of any consolidated, combined, unitary or other group or being or having been included or required to be included in any Tax Return related thereto; and (iii) any Liability for the payment of any amount of a type described in clause (i) or clause (ii) as a result of any obligation to indemnify or otherwise assume or succeed to the Liability of any other Person, including as a transferee or successor, by contract or otherwise.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of Taxes or the administration of any Law relating to any Taxes.

"**Taxing Authority**" means any Governmental Entity having or purporting to exercise jurisdiction with respect to any Tax.

"**Threatened**" means, in the case of a Proceeding, such Proceeding will be deemed to have been "**Threatened**" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a Proceeding is likely to be asserted, commenced, taken, or otherwise pursued in the future.

"**Three Most Recent Fiscal Year Ends**" means each of December 31, 2021, December 31, 2020 and December 31, 2019.

"**Three Most Recent Fiscal Years**" means the fiscal years ending on each of the Three Most Recent Fiscal Year Ends.

"**Trade Controls**" has the meaning set forth in Section 2.19(g).

"**Trade Secrets**" has the meaning set forth in the definition of "Proprietary Rights" herein.

"**Transaction Documents**" means this Agreement, the Bill of Sale, the Proprietary Rights Assignment, the Assumption Agreement, the Contribution Agreement, the Consulting Agreement, the Restrictive Covenant Agreement, the Escrow Agreement and any other agreements and documents executed and delivered in connection with this Agreement.

"**Transfer Taxes**" means sales, use, transfer, real property transfer, filing, recording, stock transfer, stamp, stamp duty reserve, value added, documentary and other similar Taxes.

"**Transferred Assets**" means the Purchased Assets and the Contributed Assets.

"**Transferred Records**" has the meaning set forth in the definition of "Purchased Assets" herein.

"**Treasury Regulations**" means the United States Treasury Regulations promulgated under the Code, and any reference to any particular Treasury Regulation section shall be interpreted to include any final or temporary revision of or successor to that section regardless of how numbered or classified.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2109, et seq., as amended, the regulations issued thereunder, and any similar Laws.

"**Withholding Amount**" has the meaning set forth in Section 1.7.

Section 6.2 Interpretation. The terms "hereof," "herein" and "hereunder" and terms of similar import will refer to this Agreement as a whole and not to any particular provision of this Agreement. Section, clause, exhibit and schedule references contained in this Agreement are references to sections, clauses, exhibits and schedules in or attached to this Agreement, unless otherwise specified. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. Each gender-specific term used in this Agreement has a comparable meaning whether used in a masculine, feminine or gender-neutral form. Each reference in this Agreement to any Law will be deemed to include such Law as it hereafter may be amended, supplemented or modified from time to time and any successor thereto, unless such treatment would be contrary to the express terms of this Agreement. Unless expressly stated otherwise, wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation" regardless of whether such words

are included in some contexts but not others. Any capitalized terms used in any schedule or exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement. Unless the express context otherwise requires, when calculating the period of time before which, within which or following which, any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1 Amendment and Waiver. This Agreement may be amended and any provision of this Agreement may be waived; *provided*, that any such amendment or waiver (a) will be binding upon Owner or Seller only if such amendment or waiver is set forth in a writing executed by Owner or Seller and (b) will be binding upon Buyer only if such amendment or waiver is set forth in a writing executed by Buyer. No course of dealing between or among any Persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement. No failure by any Party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof will constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 7.2 Notices. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when (a) delivered personally to the recipient, (b) when sent by electronic transmission (including by facsimile or electronic mail), or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to Buyer, Seller and Owner at the addresses indicated below or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. All notices, demands and other communications hereunder may be given by any other means (including telecopy or electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient.

To Seller or Owner:

EcoKind, LLC
c/o Devin Weisleder
1215 Laburnum Park Blvd
Richmond, VA 23227
Email: devin@weisleder.com
Attn: Devin Weisleder

Devin Weisleder
1215 Laburnum Park Blvd
Richmond, VA 23227

Email: devin@weisleder.com

with a copy to (which shall not constitute notice to Seller or Owner):

Lanciano & Associates, L.L.C.
2 Route 31 North
Pennington, NJ 08534
Facsimile No.: (609) 452-7100
Email: glanciano@lancianolaw.com
Attn: Gaetano C. Lanciano, Esq.

To Buyer:

Himalayan Dog Chew LLC
907 Ave R.
Grand Prairie, TX 75050
Telephone: (866) 281-5620
Email: tsimonds@primalpetgroup.com
Attn: Timothy Simonds

with a copy to (which shall not constitute notice to Buyer)

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Facsimile No.: (212) 446-6460
Email: brian.raftery@kirkland.com
Attn: Brian Raftery

Section 7.3 Binding Agreement; Assignment. This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the Parties and their respective successors and assigns; *provided*, that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by Owner or Seller without the prior written consent of Buyer. Any such assignment made by Owner or Seller without Buyer's prior written consent shall be null and void. Without limiting but subject to the foregoing, Buyer may at any time assign their rights under this Agreement, in whole or in part, (i) to any of its Affiliates, (ii) any subsequent purchaser of all or substantially all of Buyer's assets or business, or (iii) to or for the benefit of any lender as collateral, which lender shall be permitted to exercise any or all of such rights and transfer and assign all such rights to any purchaser, upon foreclosure or other exercise of remedies as to such collateral.

Section 7.4 Severability. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable Law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

Section 7.5 No Strict Construction. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Person by virtue of the authorship of any of the provisions of this Agreement.

Section 7.6 Captions. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and will not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement will be enforced and construed as if no caption had been used in this Agreement.

Section 7.7 Entire Agreement. This Agreement and the agreements and documents referred to herein contain the entire agreement and understanding among the Parties and supersede any prior understandings, agreements or representations, whether written or oral, which may have related to the subject matter hereof in any way, including the letter of intent dated September 9, 2021, as amended by the First Amendment, dated December 15, 2021, between Kinderhook Industries, LLC and Seller.

Section 7.8 Nondisclosure Agreement. The Confidentiality and Non-Disclosure Agreement dated as of May 11, 2021 between The Peakstone Group, on behalf of Seller, and Kinderhook Industries, LLC is hereby terminated in all respects and shall be of no further force or effect.

Section 7.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed an original but all of which taken together will constitute one and the same instrument.

Section 7.10 Schedules and Exhibits. All schedules and exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

Section 7.11 No Third-Party Beneficiaries. This Agreement is for the sole benefit of the Parties hereto and their permitted successors and assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the Parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

DE LAW.

Section 7.12 Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement (and all schedules and exhibits hereto) shall be governed by, and construed in accordance with, the internal Laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal Law of the State of Delaware shall control the interpretation and construction of this Agreement, even if under that jurisdiction's choice of law or conflict of law analysis, the substantive Law of some other jurisdiction would ordinarily apply.

Section 7.13 Specific Performance. Owner and Seller acknowledge that the Business and operations of Seller are unique, and recognizes and affirms that in the event of a breach of this

Agreement by Owner or Seller, monetary damages may be inadequate and Buyer may have no adequate remedy at law. Accordingly, in the event of any such breach, Buyer and/or its successors or assigns may, in addition to any other rights and remedies existing in their favor, enforce their rights and each of Owner's or Seller's obligations hereunder by an action or actions for specific performance, injunctive and/or other relief, without any requirement of proving actual damages or posting any bond or other security.

Section 7.14 Expenses. Each of Owner, Seller and Buyer will each pay all of their own fees, costs and expenses (including fees, costs and expenses of legal counsel, investment bankers, accountants, brokers or other representatives and consultants and appraisal fees, costs and expenses) in connection with the preparation and negotiation of this Agreement and the Contemplated Transactions. Seller will be responsible for all Transfer Taxes and will prepare and file, on or before the due dates thereof, any required Tax Returns or Tax forms with respect to any Transfer Taxes imposed by any Taxing jurisdiction by reason of the transactions contemplated by this Agreement. Buyer agrees to cooperate with Seller in connection with the preparation and filing thereof. Seller will be solely responsible for all Transfer Taxes imposed by reason of any transaction contemplated by this Agreement. If valuations of any property or leases are required to determine the amount of any Transfer Taxes, Seller and Buyer will reasonably determine such valuations, and the Parties agree that they will not take (or cause to be taken) any position inconsistent with such valuations in connection with any Tax Return or otherwise.

Section 7.15 Parties in Interest. Nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and permitted assigns any rights or remedies under or by virtue of this Agreement.

Section 7.16 Waiver of Jury Trial. AS A SPECIFICALLY BARGAINED INDUCEMENT FOR EACH OF THE PARTIES TO ENTER INTO THIS AGREEMENT (EACH PARTY HAVING HAD OPPORTUNITY TO CONSULT COUNSEL), EACH PARTY EXPRESSLY WAIVES THE RIGHT TO TRIAL BY JURY IN ANY LAWSUIT OR PROCEEDING RELATING TO OR ARISING IN ANY WAY FROM THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

Section 7.17 Jurisdiction.

(a) Each of the Parties hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the federal courts of the United States of America sitting in Delaware, and any appellate court thereof, in any action or proceeding arising out of or relating to this Agreement or for recognition or enforcement of any judgment relating to this Agreement, and each of the Parties hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such court or, to the extent such court does not have jurisdiction, in any state court sitting in Delaware. Each of the Parties agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b) Each of the Parties hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter

have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the Contemplated Transactions in any federal court sitting in Delaware, or to the extent such court does not have jurisdiction, then in any state court sitting in Delaware. Each of the Parties hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c) Each Party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 7.2; *provided*, that such service results in the Party being served actually receiving process. Nothing in this Section 7.17, however, shall affect the right of any party to serve legal process in any other manner permitted by Law.

* * * * *

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date first written above.

BUYER:

HIMALAYAN DOG CHEW LLC

DocuSigned by:
Timothy Simonds
A0A473E84E914A9...

By: ______________________________
Name: Timothy Simonds
Title: Chief Executive Officer

**IN WITNESS WHEREOF**, the Parties have executed this Asset Purchase Agreement as of the date first written above.

SELLER:

ECOKIND, LLC

By: ______________________________
Name: Devin Weisleder
Title: President

OWNER:

______________________________
Devin Weisleder

# EcoKind, LLC

*Exhibit A: Estimated Closing Net Working Capital Statement*

| ($000s) | Est. NWC at Close |
|---|---|
| **Current Assets** | |
| Bank Accounts | |
| Due from Amazon | $254,069.89 |
| Operating Account | 270,135.6 |
| Retail Account WF3592 | 5,659.2 |
| **Total Bank Accounts** | **$529,864.70** |
| Accounts Receivable | 215,848.74 |
| **Total Accounts Receivable** | **$215,848.74** |
| Other Current Assets | |
| Due from HPGM, LLC | $0.00 |
| Income Accrual | $0.00 |
| Inventory Asset | 2,211,667.86 |
| Loan | 0.00 |
| NeoClassic | 217,785.05 |
| Prepaid Expenses | 0.00 |
| Undeposited Funds | 0.00 |
| **Total Other Current Assets** | **$2,429,452.91** |
| **Total Current Assets** | **$3,175,166.35** |
| | |
| **Current Liabilities** | |
| Accounts Payable | $96,969.67 |
| **Total Accounts Payable** | **$96,969.67** |
| Credit Cards | |
| American Express | $28,916.70 |
| PayPal | 0.00 |
| **Total Credit Cards** | **$28,916.70** |
| Other Current Liabilities | |
| Accrued Expenses | $0.00 |
| Accrued Interest (PPP loan) | 2,455.48 |
| Inventory Offset Account | 0.00 |
| LOC - Wells Fargo $75k - 4278 | 0.00 |
| LOC - Wells Fargo $75k - 5836 (deleted) | 0.00 |
| ML Payable | 0.00 |
| Modern Living | 0.00 |
| Wells Line | 0.00 |
| **Total Other Current Liabilities** | **$2,455.48** |
| **Total Current Liabilities** | **$128,341.85** |
| | |
| **NWC Adjustments** | |
| Cash and Cash Equivalents | $529,864.70 |
| NeoClassic | $217,785.05 |
| | |
| **Estimated Closing Net Working Capital** | **$2,299,174.75** |
| | |
| **Target Net Working Capital** | **$1,850,416.72** |
| | |
| **Net Working Capital Adjustment** | **$448,758.03** |

# EcoKind, LLC

***Exhibit B: Estimated Purchase Price Statement***

| | | |
|---|---|---|
| 1) | Base Purchase Price | $21,122,500.00 |
| 2) | Minus: Target Net Working Capital exceeds the Estimated Closing Net Working Capital | $0.00 |
| 3) | Plus: Estimated Closing Net Working Capital exceeds the Target Net Working Capital | $448,758.03 |
| | **Estimated Purchase Price** | **$21,571,258.03** |
| 3) | Minus: Adjustment Escrow Amount | $185,000.00 |
| 4) | Minus: Other Closing Payments by Buyer, on behalf of Seller | $680,537.50 |
| | **Seller Payment Amount** | **$20,705,720.53** |
| 5) | Minus: Rollover Amount | $6,000,000.00 |
| | **Cash Portion of Seller Payment Amount** | **$14,705,720.53** |

***Exhibit C - Example Calculation of Net Working Capital***

**Illustrative calculation of closing net working capital**

**Illustrative calculation of closing net working capital**

| ($000s) | Ref. | Reported at Aug21 | At closing: Include | At closing: Exclude | Ref. | Closing at Aug21 | NWC target ref. |
|---|---|---|---|---|---|---|---|
| **Current assets** | | | | | | | |
| Due from Amazon | | 198 | | X | | - | |
| Operating Account | | 91 | | X | | - | |
| Retail Account WF3592 | | 1 | | X | | - | |
| Cash | | 290 | | | | - | |
| Accounts Receivable | | 141 | X | | | 141 | |
| Accounts receivable | | 141 | | | | 141 | |
| Inventory Asset | | 2,245 | X | | | 2,245 | |
| Inventory | | 2,245 | | | | 2,245 | |
| Due from HPGM, LLC | | - | X | | | - | |
| Income Accrual | | - | X | | | - | |
| Loan | | - | X | | | - | |
| NeoClassic | | 115 | | X | | - | |
| Prepaid Expenses | | - | X | | | - | |
| Undeposited Funds | | - | X | | | - | |
| Import Bond | | - | X | | | - | |
| Other current assets | | 115 | | | | - | |
| Current assets, unadjusted | **A** | 2,792 | | | **A** | 2,387 | |
| Adjustments | | | | | | | |
| Due from Amazon | | | | | | 198 | [1] |
| Related party receivables | | | | | | (115) | [2] |
| Freight-in capitalization | | | | | | 25 | [4] |
| Current assets, adjusted | | | | | | 2,495 | |
| **Current liabilities** | | | | | | | |
| Accounts payable | | 408 | X | | | 408 | |
| Accounts payable | | 408 | | | | 408 | |
| American Express | | 7 | X | | | 7 | |
| PayPal | | - | X | | | - | |
| Accrued Expenses | | - | X | | | - | |
| Accrued Interest (PPP loan) | | 2 | | X | | - | |
| Inventory Offset Account | | - | X | | | - | |
| LOC - Wells Fargo $75k - 4278 | | - | | X | | - | |
| LOC - Wells Fargo $75k - 5836 (deleted) | | - | | X | | - | |
| ML Payable | | - | X | | | - | |
| Modern Living | | - | X | | | - | |
| Wells Line | | - | X | | | - | |
| Accrued expenses and other current liabilities | | 9 | | | | 7 | |
| Current liabilities, unadjusted | | 418 | | | | 415 | |
| Adjustments | | | | | | | |
| Owner-related payables | | | | | | (15) | [3] |
| Current liabilities, adjusted | **B** | | | | **B** | 400 | |
| **Net working capital** | **= A - B** | **2,375** | | | **= A - B** | **2,095** | |