IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DEVIN B. WEISLEDER,
Plaintiff,

v.

Civil No. 3:26cv221 (DJN)

KINDERHOOK INDUSTRIES, LLC
and PDPP HOLDINGS, LLC,
Defendants.

**MEMORANDUM ORDER**
**(Granting Leave to Amend Complaint; Denying Motion to Dismiss)**

This matter comes before the Court on the Motion to Dismiss brought by Defendants Kinderhook Industries, LLC ("Kinderhook") and PDPP Holdings, LLC ("PDPP") (together, "Defendants") (ECF No. 13) and Plaintiff Devin B. Weisleder's ("Plaintiff") Motion for Leave to Amend the Complaint (ECF No. 17 ("Motion to Amend")). For the foregoing reasons, the Court hereby GRANTS Plaintiff's Motion to Amend (ECF No. 17)[1] and DENIES Defendants' Motion to Dismiss (ECF No. 13).

## I. BACKGROUND

In 2017, Plaintiff founded and operated EcoKind, a company that sells natural dog treats online. (ECF No. 17-1 ("Amended Complaint" or "Compl.") ¶ 26.) In 2022, Defendants

---

1 Rule 15 of the Federal Rules of Civil Procedure provides that a court "should freely give leave" to amend a complaint "when justice so requires." The Fourth Circuit "liberally allow[s] amendment in keeping with the spirit of" Rule 15. *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010). Plaintiff's motion must be granted absent "prejudice, bad faith, or futility." *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 (4th Cir. 2021). Here, Defendants raise no objections to Plaintiff's motion. (ECF No. 19.) They do not argue that amendment would result in "prejudice, bad faith, or futility." Accordingly, the Court follows the Fourth Circuit's policy to liberally allow amendment and hereby GRANTS Plaintiff leave to amend the complaint (ECF No. 17).

purchased EcoKind for equity shares of PDPP worth $6,000,000. (*Id.* ¶¶ 43–44.) Now, Plaintiff brings this action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 (*id.* at 22), alleging that Defendants made material misrepresentations and omissions that overvalued the PDPP equity and induced Plaintiff to sell EcoKind (*id.* ¶ 1).

Plaintiff's Complaint alleges the following facts.

**A. The EcoKind Sale**

Plaintiff founded EcoKind in 2017 to distribute "premium, all-natural dog chews" and did so successfully. (Compl. ¶ 2.) EcoKind registered $14 million in sales before the company's sale to Defendants in March 2022. (*Id.* ¶ 2, 37.) Kinderhook, a private equity company, entered the pet food and treats market in 2020 by buying a portfolio of companies, including Holistic Hound, Inc., Prairie Dog Pet Products, LLC and Primal Pet Foods, Inc. (*Id.* ¶¶ 3, 23.) Kinderhook then established PDPP as the parent holding company above its other pet food and treat subsidiaries. (*Id.* ¶ 25.)

Kinderhook and PDPP soon set their sights on EcoKind. (*Id.* ¶ 27.) In approximately June 2021, the parties began discussing the terms of a deal and conducting due diligence. (*Id.* ¶¶ 29–30.) Defendants assured Plaintiff of PDPP's financial strength and stability in the months leading up to closing. (*Id.* ¶¶ 30–43.) On March 31, 2022, the parties closed on the deal. (*Id.* ¶ 37.) Plaintiff agreed to sell EcoKind for $15,122,500 cash and PDPP equity valued at $6,000,000 at the time of the transaction. (*Id.* ¶ 27.) That equity took the form of 6,000,000 Investment Preferred Units and 6,000,000 Class A Common Units that Defendants issued to EcoKind. (*Id.*) Additionally, Plaintiff agreed to join one of Defendants' pet food companies as a consultant for two years. (*Id.*)

Plaintiff alleges that Defendants committed securities fraud by making misrepresentations and omissions that "materially overvalued and impaired" the equity that he accepted due to PDPP's "undisclosed liquidity distress, capital fragility, and structural subordination risk existing at or before closing." (*Id.* ¶ 47.) Plaintiff alleges that these misrepresentations and omissions induced him to accept PDPP equity as consideration for selling EcoKind. (*Id.* ¶ 1.)

**B. Defendants' Representations Before Closing**

On June 7, 2021, Weisleder spoke with Kinderhook's chairman, Tom Tuttle. (*Id.* ¶¶ 7, 30). During their conversation, Tuttle represented that PDPP "had lending capacity through Comerica Bank . . . sufficient to support operations through the end of 2022." (*Id.* ¶ 30.) He also claimed that Kinderhook had invested in upgrading a Texas facility, that PDPP planned to sell the facility and that sales would "generate significant liquidity and strengthen [PDPP's] balance sheet, providing runway toward a sale of [PDPP] within the following 12–18 months." (*Id.*)

Next, on July 9, 2021, Weisleder spoke with Ted Mischaikov (then the CEO of Primal Pet) and Tim Simonds (then a member of PDPP's board of directors). (*Id.* ¶ 31.) During those calls, Mischaikov and Simonds "reiterated the state of [PDPP's] capital structure and liquidity previously described by Tuttle." (*Id.*) They also stated that PDPP's lending relationship with Comerica would provide sufficient operating liquidity through 2022, and that the planned sale of the Texas facility would "generate additional liquidity and balance sheet strength necessary to position [PDPP] for a sale within the following 12–18 months." (*Id.*) Either Tuttle or Simonds reiterated these claims again on November 10, 2021 (*id.* ¶ 32), January 27, 2022 (*id.* ¶ 33), March 15, 2022 (*id.* ¶ 35) and March 18, 2022 (*id.* ¶ 36). Either Tuttle or Simonds described

PDPP's capital and liquidity position as "stable" on January 27, 2022[2] (*id.* ¶ 33), March 15, 2022 (*id.* ¶ 35) and March 18, 2022 (*id.* ¶ 36).

At an unspecified time before closing, Defendants imposed a $300,000 reduction to EcoKind's EBITDA (a profitability metric standing for Earnings Before Interest, Taxes, Depreciation and Amortization) that "materially reduced the transaction valuation." (*Id.* ¶ 34) Tuttle offered Plaintiff $500,000 each year for two years under a consulting agreement to offset this harm. (*Id.*) Plaintiff relied on that representation in closing the EcoKind sale. (*Id.*)

Defendants also made the following representations before closing: PDPP's "operations and supply chains were sound" (*id.* ¶ 41); PDPP had a "strong and scalable" supply chain (*id.*); PDPP maintained "strong" inventory quality (*id.*); PDPP possessed "sufficient inventory levels to support ongoing operations and lender financing" (*id.*); PDPP had "sufficient liquidity and financial flexibility to support growth initiatives" (*id.* ¶ 42); PDPP's financial statements "fairly reflected the [c]ompany's performance and overall financial condition" (*id.*); and Weisleder could "reasonably expect" an exit within 18–24 months at "a 5–6x return" on investment (*id.*)

Plaintiff alleges that Defendants made material omissions during the closing process. Defendants failed to disclose any liquidity constraints, capital shortfall or other financial issues inconsistent with the liquidity and capital strategy previously described to Plaintiff. (*Id.* ¶ 36.) Nor did Defendants disclose that prior platform acquisitions, including Holistic Hound and Prairie Dog, already experienced "significant operational failures and value destructions," even after representing them as "best-in-class businesses." (*Id.* ¶ 43.)

---

2 The Court notes Plaintiff's allegation that, on January 27, 2022 "Tuttle *again* described [PDPP's] capital and liquidity position as stable." (*Id.* ¶ 33) (emphasis added). However, Plaintiff makes no allegation that Tuttle (or anyone else) described PDPP's capital and liquidity position as "stable" before that date.

On March 31, 2022, the parties closed the EcoKind transaction. (*Id.* ¶ 37.) The parties executed an Asset Purchase Agreement (in which Weisleder agreed to sell EcoKind) (*id.* ¶ 43), and a Contribution Agreement (under which EcoKind transferred its goodwill and going concern value to PDPP in exchange for PDPP equity) (*id.* ¶ 44). Plaintiff signed each document in his personal capacity and on behalf of EcoKind. (ECF Nos. 17-4 ("Asset Purchase Agreement"); 17-5 ("Contribution Agreement")). The Asset Purchase Agreement describes Weisleder as "Owner" and EcoKind as "Seller." (ECF No. 17-4 at 1.) The Contribution Agreement describes Weisleder as "Principal" and EcoKind as "Seller." (ECF No. 17-5 at 1.) The Contribution Agreement further notes that, at the time, Plaintiff held "all of the issued and outstanding equity interests of [EcoKind]." (*Id.*) Plaintiff agreed to join Primal Pet as a consultant to assist with e-commerce strategy. (Compl. ¶ 46.) He served on PDPP's board of directors and participated in leadership calls, at least for a time. (*Id.* ¶ 48.)

Plaintiff alleges that Defendants had exclusive control over financial information that showed PDPP's financial weakness at the time of closing and belied their representations to Plaintiff. (*Id.* ¶¶ 72–74.) He alleges that "contemporaneous internal reporting reflected a cash burn and working capital profile that did not support the represented runway through 2022." (*Id.* ¶ 76.) Specifically, "contemporaneous liquidity forecasts, working capital requirements, and lender constraints available to Defendants at that time" show that "the need for additional capital in the near term was known or recklessly disregarded." (*Id.* ¶ 77.) According to Plaintiff, Defendants possessed other information that should have or did alert them to these problems, including: "internal cash flow statements, balance sheets reporting, borrowing-base calculations, and lender communications that reflected PDPP's actual liquidity position and capital constraints." (*Id.* ¶ 82.)

### C. Post-Closing Events

PDPP struggled after the EcoKind transaction. (*Id.* ¶ 49.) In May 2022, two months after closing, Plaintiff participated in a PDPP leadership call in which Simonds stated that PDPP projected "cash exhaustion" by late summer 2022. (*Id.*) Simonds characterized the liquidity shortfall as "a temporary operational and working capital issue being actively managed by Kinderhook and PDPP leadership." (*Id.* ¶ 50.)

In August 2022, Kinderhook provided bridge financing to PDPP to support its continued operations. (*Id.* ¶ 51.) Defendants removed Weisleder from the Board in late 2022 without explanation. (*Id.*) Plaintiff noticed that PDPP "underperform[ed] operationally relative to expectations." (*Id.* ¶ 57.)

In early 2023, Plaintiff learned that Comerica — the bank that Defendants had told Plaintiff would provide financing through the end of 2022 — had "classified PDPP's debt as non-accrual" and had demanded repayment from anticipated proceeds of the Texas facility sale. (*Id.* ¶ 53.) In December 2023, PDPP completed a preferred equity financing that raised approximately $56 million. (*Id.* ¶¶ 61, 67.) PDPP issued 56,000,000 new units senior to the equity units that Plaintiff received at closing. (*Id.* ¶ 64.) Defendants did not disclose or offer the financing to Plaintiff. (*Id.* ¶ 61.) Plaintiff learned about this refinancing in April 2024. (*Id.*) Plaintiff claims that this financing revealed for the first time that PDPP had misrepresented its financial strength at the time of the EcoKind closing. (*Id.* ¶ 62.) The financing demonstrated, according to Plaintiff, that PDPP's "capital structure had been materially impaired and that substantial additional capital had been required to sustain operations" at the time of closing. (*Id.*) Plaintiff alleges that the financing "directly contradicted Defendants' pre-closing representations

that PDPP possessed sufficient liquidity and runway to operate without sponsor rescue capital and to pursue a near-term exit." (*Id.*)

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve factual contests, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court accepts the plaintiff's well–pleaded allegations as true and views the facts in the light most favorable to the plaintiff. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

Federal Rule of Civil Procedure 9 normally governs the pleading standards in fraud cases. Under that standard, a party must "state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). But plaintiffs bringing a securities fraud claim must clear additional hurdles imposed by the PSLRA. The PSLRA's heightened pleading standard requires that "any private securities complaint alleging that the defendants made a false or misleading statement must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Klein v. Altria Grp., Inc.*, 525 F. Supp. 3d 638, 656 (E.D. Va. 2021) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)). While courts reviewing a 12(b)(6) motion usually take into account the set of facts that could be proven consistent with the allegations of a complaint, even if such facts have not been alleged in the complaint, the PSLRA modifies this scheme "(1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court

to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission." *Klein*, 525 F. Supp. 3d at 656.

## III. DISCUSSION

Defendants moved to dismiss Plaintiff's action on April 30, 2026. (ECF No. 13.)[3] They argue that Plaintiff fails to state a claim that meets the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") for three reasons. First, he fails to plead a single fact showing the falsity of any statement that Defendants made at the time that they made it. Rather, each alleged representation constitutes non-actionable puffery, a statement of opinion or falls under the PSLRA's safe harbor protecting forward-looking statements. Second, he fails to plead scienter. Third, Weisleder lacks standing to sue, because EcoKind held PDPP's equity interest, not Weisleder personally. (ECF No. 14 at 1–2.)

Plaintiff brings suit under Section 10(b) of the Exchange Act and SEC Rule 10b–5. Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security[,] . . . any manipulative or deceptive device or contrivance of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated under § 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud;
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

---

[3] Per the parties' requests, the Court applies Defendants' Motion to Dismiss and the parties' subsequent briefing to the Amended Complaint (ECF No. 17-1).

17 C.F.R. § 240.10b-5. The Supreme Court has "implied a private cause of action from the text and purpose of [Section] 10(b)" to parties that buy or sell securities and thereby suffer injury from a violation of Section 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).

To state a Section 10(b) and Rule 10b–5 claim, plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* at 37–38.

Here, Defendants contend that Plaintiff has failed to plead two of these elements: an actionable misrepresentation or omission and scienter. Additionally, Defendants claim that Weisleder lacks standing under the PSLRA. The Court will examine these arguments in turn.

**A. Material Misrepresentations or Omissions**

The Court finds that Plaintiff has alleged actionable misrepresentations or omissions. "To prevail on a [Section] 10(b) claim, a plaintiff must show that the defendant made a statement that was 'misleading as to a material fact.'" *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Complaints basing claims on alleged misrepresentations or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b).

The Fourth Circuit assesses materiality using the following standard:

> [A] fact stated or omitted is material if there is a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in determining whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact.

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 682–83 (4th Cir. 1999). Of course, Section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information." *Singer v. Reali*, 883 F.3d 425, 440 (2018). However, "disclosure of material information is required when necessary to make statements made, in light of the circumstances in which they were made, not misleading." *Id.* Indeed, "failure to disclose negative information about the products at issue can create a misleading impression to investors about the success of the company." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 604 (E.D. Va. 2015).

Plaintiff must identify a "*factual* statement or omission—that is, one that is demonstrable as being true or false." *Longman*, 197 F.3d at 682 (emphasis in original). So, statements of opinion or "puffery" generally do not suffice to state a claim. *Boykin v. K12, Inc.*, 54 F.4th 175, 183–84 (4th Cir. 2022). Statements relating to strong finances and future developments, such as "healthy growth," "achieving our objectives" and "competitive advantages" constitute paradigmatic examples of non-material business puffery, which cannot be actionable under securities laws. *In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 767 (E.D. Va. 2004). However, in some contexts "when [opinion or puffery] is both factual and material, it may be actionable." *Longman*, 197 F.3d at 683. The Fourth Circuit has also distinguished between "allegedly false predictions [which] are not material," and "expressions of belief or opinion concerning *current* facts" which may be material. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (emphasis in original). Additionally, the PSLRA protects certain forward-looking statements, such as certain projections of "future economic performance," made with "meaningful cautionary language and without actual knowledge of falsity." *Boykin*, 54 F.4th at 184.

Here, Defendants argue that Plaintiff has failed to sufficiently identify any actionable false representations or omissions. (ECF No. 14 at 18.) Defendants claim that Plaintiff's allegations fail, because they either: (1) lack sufficient facts demonstrating the falsity of the purportedly actionable statements; (2) identify non-actionable statements of opinion or puffery or (3) identify forward-looking statements protected by the PSLRA's safe harbor. (*Id.* at 18–23). The Court analyzes these claims by first separating non-actionable statements of opinion, puffery and forward-looking projections from sufficiently specific representations or omissions. Then, looking to only the remaining, specific representations, the Court analyzes whether Plaintiff has sufficiently plead facts regarding the falsity of those representations.

**1. Actionable Statements**

Many of Plaintiff's allegations identify non-actionable puffery, opinion or protected forward-looking statements. These include classic puffery statements such as describing PDPP's subsidiaries as "best-in-class businesses within their respective markets" (Compl. ¶ 43), and descriptions of PDPP's supply chain as "strong and scalable" and "sound" (*id.* ¶ 41). Such statements represent "immaterial boasting and exaggerations" that do not give rise to fraud claims. *Boykin*, 54 F.4th at 183.

Further, the Court agrees with Defendants that some of Plaintiff's allegations represent future-looking projections that the PSLRA's safe harbor renders unactionable. For example, the safe harbor protects Defendants' representations that selling a Texas facility would "generate additional liquidity and balance sheet strength" (Compl. ¶ 31) and that Plaintiff could "reasonably expect an exit within 18 to 24 months at 5–6x return" (*id.* ¶ 42). *See Emps' Ret. Sys. Of City of Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 389 (4th Cir. 2023) ("Future

performance projections that are not phrased as guarantees are generally not actionable.") (quotations and citations omitted).[4]

Still, several representations that Defendants made survive this inquiry. Plaintiff alleges that Defendants' representatives told him on at least six occasions that PDPP had lending capacity through Comerica Bank sufficient to support operations through the end of 2022. (Compl. ¶¶ 30, 31, 32, 33, 35, 36.) Additionally, on at least three occasions, PDPP representatives described the company's capital and liquidity position as "stable." (*Id.* ¶¶ 33, 35, 36.) Plaintiff alleges a related material omission: Defendants did not disclose "liquidity constraints, capital shortfall, or other financial issues inconsistent with the liquidity and capital position" that Defendants described to him. (*Id.* ¶ 37.) Unlike the above non-actionable statements, these representations describe a factual scenario, specifically, how much money PDPP could then borrow from Comerica. Defendants did not merely offer estimates about PDPP's future financial performance, unlike, say, prognostications about the result of a future sale of the Texas facility. Rather, claims that PDPP then possessed sufficient credit through Comerica to support the projected 2022 operational needs describe concrete, present-tense conditions made to induce investment.

This determination accords with this Court's previous decisions. *See SS Richmond LLC v. Harrison*, 640 F. Supp. 3d 453, 475–76 (E.D. Va. 2022) (finding statements actionable where defendant assured plaintiffs that "the Project was 'shovel-ready," that he had "secured debt financing for the purchase and construction of the project," and where defendant "laid out a timeline for purchase, construction, and return-realization that Plaintiffs allege that he knew to be

---

4 Although not actionable, these statements may add to the evidentiary context to evaluate the falsity of other statements and Defendants' scienter.

impossible to meet"); *In re James River Group Holdings, Ltd. Sec. Litig.*, 3:21cv444, 2023 WL 5538218, at *8 (E.D. Va. Aug. 28, 2023) (where "particularized and current representations" about a business' operations "constitute more than a 'rosy affirmation' or optimistic future projection," such statements qualify as actionable).

Having concluded that Plaintiff's Amended Complaint alleges actionable statements, the Court turns to assess whether Plaintiff sufficiently alleges the falsity of these statements.

**2. Allegations Regarding Falsity**

At the motion to dismiss stage, a Plaintiff need not "prove absolute, incontrovertible falsity . . . The construction of § 78u–4(b)(1) requires a plaintiff to allege *sufficient facts* to support a *reasonable belief* in the allegation that a defendant's statement was misleading." *In re Genworth Financial Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 771 (E.D. Va. 2015) (emphasis in original). Here, Plaintiff sufficiently alleges the falsity of Defendants' representations regarding PDPP's liquidity and borrowing capacity at the time made. For example, Plaintiff alleges that, on March 15, 2022, Simonds described PDPP's capital and liquidity position as "stable" and repeated Defendants' claim that PDPP's "financing relationship with Comerica would support operations through 2022." (Compl.¶ 36.) Just two months later, Simonds informed Weisleder that the company did not have sufficient cash to operate even through *summer* of 2022. (*Id.* ¶ 49.) Kinderhook provided PDPP "bridge financing" in August 2022 to keep the company operating. (*Id.* ¶ 51.) Such a quick turnaround after the EcoKind transaction supports a reasonable belief that PDPP did not, in fact, possess sufficient borrowing capacity from Comerica two months earlier to fund operations through the year. Plaintiff further alleges that Defendants' contemporaneous internal financing documents and knowledge, including "liquidity forecasts, working capital requirements and lender constraints," demonstrated that Defendants

did not have sufficient cash and credit access to operate through 2022. (*Id.* ¶ 79.) The Court therefore finds that Plaintiff sufficiently alleged the falsity of Defendants' statements.

**B. Scienter**

The PSLRA requires plaintiffs pleading securities fraud to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Establishing that state of mind requires a plaintiff to "show either 'intentional misconduct' or such 'severe recklessness' that the danger of misleading investors was 'either known to the defendant or so obvious that the defendant must have been aware of it.'" *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (citations omitted). "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking–gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324 (citations omitted).

The Court recognizes that, generally, a plaintiff must "frame the facts respecting the defendant's mental state . . . without the benefit of discovery, and therefore, most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002). And, the Court must review "all of the allegations holistically." *Id.* at 326. Indeed, "[t]he inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009) (quoting *Tellabs*, 551 U.S. at 310). Here, the Court asks "whether plaintiff['s] inference of scienter is 'cogent and at least as compelling' as

defendants' inference of a legitimate business judgment." *Cozzarelli*, 549 F.3d at 623. The Court finds that it is.

Defendants argue that the following marks the most compelling inference available from the complaint: "Plaintiff made an investment that has not performed as well as he had hoped." (ECF No. 14 at 17.) They claim that PDPP's representatives simply "made 'optimistic projections' that didn't pan out." (ECF No. 14 at 17 (quoting *San Antonio Fire & Police Pension Fund v. Syneos Health*, 75 F.4th 232, 244 (4th Cir. 2023)). The Court disagrees. Representations that Defendants contemporaneously possessed cash and credit access sufficient to operate through 2022 constitute concrete claims about then-existing financial conditions that do not fall into the category of "projections."

Plaintiff plausibly alleges that Defendants intentionally made false statements and omissions regarding PDPP's borrowing capacity and liquidity to induce Plaintiff to sell EcoKind. Defendants' corporate representatives, including Tuttle and Simonds, met with Plaintiff for the specific purpose to "ensure that [Plaintiff] was comfortable with the financial health and business prospects of PDPP and to induce him to sell EcoKind." (Compl. ¶ 29). Each held themselves out as having knowledge about PDPP's liquidity and capital position, and they claimed that PDPP had lending capacity through Comerica Bank to support operations through 2022. (*Id.* ¶¶ 30–31.)

Plaintiff alleges that Defendants knew or recklessly disregarded the falsity of this information at the time that they made the statements. (*Id.* ¶ 90.) Specifically, he alleges that Defendants possessed, controlled and knew of information that contradicted their assurances regarding PDPP's liquidity and borrowing capacity (*id.* ¶¶ 77, 79), including "core aspects of

PDPP's business that were central to the representations Defendants made to induce Plaintiff's participation in the transaction." (ECF Nos. 15, 18 (citing ECF No. 1 ¶¶ 29–35, 75–76, 81).)

Defendants' post-closing conduct factors into this Court's holistic review of the Complaint. Plaintiff alleges that Defendants — only two months after the EcoKind sale and two months after again describing PDPP's financial position as "stable" — made an about-face and informed Plaintiff that PDPP projected cash exhaustion within months. (*Id.* ¶ 49.) Then, Defendants removed Plaintiff from their board, denied him access to pertinent financial information and ran a fundraising round that diluted Plaintiff's stock without telling him in advance. (*Id.* ¶¶ 52, 61, 64.) These post-transaction facts bolster Plaintiff's inference that Defendants sought to conceal the true state of PDPP's finances from him long enough to convince him to sell EcoKind and then withheld information to prevent Plaintiff from discovering the falsity of their earlier representations.

Accordingly, Plaintiff's allegations raise a strong, cogent inference that Defendants either knew or recklessly disregarded the falsity of their representations and made them nevertheless to convince Plaintiff to sell EcoKind. The Fourth Circuit has made clear the Court "cannot impute factual knowledge to individuals merely based on their professional position or because such knowledge relates to the business's core operations. *Syneos Health Inc.*, 75 F.4th at 242. Still, such allegations remain "relevant to the court's holistic analysis of scienter." *Yates v. Mun. Mortg. & Eq., LLC*, 744 F.3d 874, 890 (4th Cir. 2014). And here, Plaintiff has supplied sufficiently "detailed allegations" establishing a strong inference of "defendants' actual exposure" to the falsity of their claims regarding operational capacity through 2022. *Id.* Taken together, Plaintiff's allegations raise a strong inference of scienter at this motion to dismiss stage.

### C. Standing

As to Plaintiff's standing to bring this action, the Supreme Court has recognized an implied private right of action for purchasers or sellers of securities under Section 10(b) pursuant to the statute's text and purpose. *Tellabs*, 551 U.S. at 318; *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975) (describing the right of action as a "judicial oak which has grown from little more than a legislative acorn."); *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (private securities fraud actions provide "a most effective weapon in the enforcement" of securities laws).

Defendant argues that Weisleder does not constitute an "actual purchaser," because he "did not buy or sell any securities in his personal capacity in connection with the EcoKind transaction." (ECF No. 14 at 24.) As proof, they point to the Contribution Agreement (attached as an exhibit to Weisleder's complaint (ECF No. 17-5)), which provides that EcoKind — not Weisleder — received the equity interest in PDPP. (ECF No. 14 at 24.) That Agreement names EcoKind as "Seller" and Weisleder as "Principal." (ECF No. 17-5 at 1.) Weisleder signed the agreement both in his personal capacity and on behalf of EcoKind. (ECF No. 17-5.) In it, PDPP "issues to Seller the Equity Consideration." (ECF No. 17-5 at 2.)

Plaintiff does not dispute that EcoKind purchased the PDPP securities in its name. (ECF No. 15 at 23–26.) Instead, Weisleder argues that he "is, and was recognized by Defendants as[,] the real party in interest to the transaction," because he negotiated the agreements directly, Defendants induced him to enter the transaction and he signed the agreements in his personal capacity. (*Id.* at 23.) Weisleder allegedly wholly owned and operated the entity that purchased the securities (ECF No. 17-5 at 1; Compl. ¶¶ 2, 15), negotiated the transaction (Compl. ¶¶ 27, 34) and signed deal documents in his personal capacity (ECF Nos. 17-4, 17-5). Defendants

targeted him with allegedly fraudulent representations to induce him to purchase securities. (Compl. ¶ 1.) As part of the deal, Plaintiff agreed to join Primal Pet as a consultant for two years (*id.* ¶ 26) and sat on PDPP's board of directors (*id.* ¶ 47). Moreover, Defendants themselves viewed Plaintiff as the real party in interest. (*See id.* ¶ 37) ("Tuttle expressed enthusiasm about completing the transaction and noted that *Weisleder's decision to take equity* reflected that he would be a 'real partner' in the business") (emphasis added).

These facts differ from the cases that Defendants cite, because those deal with parties far more removed than Weisleder. *Blue Chip* dealt only with a plaintiff who claimed that he would have bought stock from a public company if not for that company's misrepresentations. In *Advanced Resources Intern., Inc. v. Tri-Star Petroleum Co.*, the Fourth Circuit addressed whether the *Birnbaum* rule — which states that only "actual purchasers and sellers of securities" may sue under 10(b) and Rule 10-b5 — applies to suits for injunctive relief as well as damages. 4 F.3d 327, 331–33 (4th Cir. 1993). The *Advanced* Court set out exceptions for when a plaintiff otherwise barred by the *Birnbaum* rule may sue for injunctive relief. *Id.* at 333. That case does not guide the outcome here for two reasons: first, Plaintiff does not seek injunctive relief. Second, Plaintiff need not fit into an exception to the *Birnbaum* rule. The *Birnbaum* rule squarely governs in this case. This dispute instead asks whether Weisleder constitutes an "actual purchaser" eligible to sue under the rule.

Absent binding Fourth Circuit or Supreme Court precedent, the Court looks elsewhere to inform its analysis. *Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d 1151 (10th Cir. 1989) deals with similar facts. There, the Tenth Circuit held that the plaintiff, Grubb, qualified as an "actual purchaser" of stock under *Birnbaum* when he created a corporate entity and purchased stock in the entity's name rather than his own. *Id.* at 1162. Plaintiff Grubb "was not a mere bystander to

the sale of [company] stock. [Defendant] made the alleged representations directly to Grubb . . . thus inducing him to involve himself in the transaction. . . Grubb was the actual party at risk in the transaction. In effect, Grubb himself bought half of the [company's] stock." *Id.* at 1161.

The Tenth Circuit rejected an argument identical to that of Defendants' here: because Grubb's corporate entity technically purchased the stock in its name, Grubb himself could not bring suit in his personal capacity. *Id.* at 1160. The Court reasoned that "Courts should read Rule 10b-5 flexibly, not technically," and that the "remedial purpose of the rule should not be defeated by taking a technical, unrealistic view of what happened in a case." *Id.* at 1162. Other courts have arrived at similar conclusions. *See, e.g., Ashland Inc. v. Oppenheimer & Co., Inc.*, 689 F. Supp. 2d 874, 881 (E.D. Ky. 2010) (determining that a parent corporation had standing to bring suit even when it purchased securities through a subsidiary, because it "exercised complete control over [the subsidiary], and any losses [the subsidiary] sustained would be reflected in their consolidated financial statement."); *Less v. Lurie*, 789 F.2d 624, 626 (8th Cir. 1986) (stating in dicta that "we are inclined to agree that having the critical transaction in one's own name is not dispositive for standing under *Blue Chip Stamps*").

The Court finds that Weisleder constitutes an "actual purchaser" of the PDPP stock for purposes of the *Birnbaum* rule.[5] Weisleder transacted in the sale in his personal capacity, signed both the Contribution Agreement (ECF No. 17-5) and the Asset Purchase Agreement (ECF No. 17-4) in his personal capacity, controlled and solely owned EcoKind (the entity that technically holds the PDPP equity) and negotiated the transaction. He agreed to serve as a consultant for Primal Pet and to sit on PDPP's board of directors. (Compl. ¶¶ 26, 47.) Most importantly,

---

[5] Defendant does not argue that EcoKind lacks standing under the PSLRA. (ECF No. 19, 3).

Defendants made the allegedly false representations to induce *Weisleder* into the transaction. Moreover, Weisleder's claims do not raise the concerns motivating the *Birnbaum* rule. *See Blue Chip Stamps*, 421 U.S. at 743, 747 (the *Birnbaum* rule prevents "vexatious litigation" from "bystanders to the securities marketing process [who] could await developments on the sidelines without risk" and sue after they "allow[ed] retrospectively golden opportunities to pass"). Like the similarly situated plaintiffs in *Grubb* and *Ashland*, Weisleder was the true party in interest. Accordingly, he has standing to bring this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's Motion to Amend (ECF No. 17) and DENIES Defendants' Motion to Dismiss (ECF No. 13).

Let the Clerk file a copy of this Memorandum Order and notify all counsel of record.

It is so ORDERED.

______/s/__________________
David J. Novak
United States District Judge

Richmond, Virginia
Date: October 14, 2026